# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Food Lion, LLC, and Maryland and
Virginia Milk Producers Cooperative
Association, Inc.,

     *Plaintiffs,*

v.

Dairy Farmers of America, Inc.,

     *Defendant.*

Case No. 1:20-cv-442
Oral Argument Requested

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## <u>MOTION FOR PRELIMINARY INJUNCTION [ECF No. 13]</u>

**HUNTON ANDREWS KURTH LLP**

A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*pro hac vice forthcoming*)
John S. Martin (admitted *pro hac vice*)
Kevin Hahm (admitted *pro hac vice*)
Carter C. Simpson (admitted *pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN SANDERS LLP**

Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (*pro hac vice pending*)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362
james.lamberth@troutman.com

*Attorneys for Maryland and Virginia Milk*
*Producers Cooperative Association, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

QUESTION PRESENTED ................................................................................................. 7

ARGUMENT ...................................................................................................................... 7

I.    THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR PRELIMINARY RELIEF. ................................................................................................................... 8

    A.   Because Section 7 of the Clayton Act Is Designed to Arrest Anticompetitive Mergers in their Incipiency, Preliminary Relief Is Often Necessary to Fulfill that Purpose. ............... 8

    B.   Plaintiffs' Antitrust Claims Are Likely to Succeed on the Merits. ................................... 10

    C.   Since Plaintiffs Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Issued, the Balance of Harms Tips Strongly in Favor of Issuing an Asset Preservation Order. ... 16

    D.   A Preliminary Injunction in the Form of an Asset Preservation Order Is in the Public Interest. ........................................................................................................................... 20

II.   THE COURT SHOULD SET ORAL ARGUMENT AND AN EVIDENTIARY HEARING. ................................................................................................................ 22

CONCLUSION .................................................................................................................. 22

-ii-

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Allis-Chalmers Mfg. Co. v. White Consol. Indus. Inc.*,
    414 F.2d 506 (3d Cir. 1969) ........................................................................... 9

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*,
    550 F.2d 189 (4th Cir. 1977) ..................................................................... 20

*Brown Shoe Co. v. United States*,
    370 U.S.294 (1962) ..................................................................................... 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..................................................................................... 8

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990) .......................................................................... 7, 10, 11

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ..................................................................... 15

*F.T.C. v. Dean Foods Co.*,
    384 U.S. 597 (1966) .............................................................................. 17, 18

*F.T.C. v. Exxon Corp.*,
    636 F.2d 1336 (D.C. Cir. 1980) ................................................................ 16

*Issa v. Sch. Dist. of Lancaster*,
    847 F.3d 121 (3d Cir. 2017) ....................................................................... 20

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992) ..................................................................... 15

*In re Microsoft Corp. Antitrust Litig.*,
    333 F.3d 517 (4th Cir. 2003) .................................................................. 8, 10

*Pargas, Inc. v. Empire Gas Corp.*,
    423 F. Supp. 199 (D. Md.), *aff'd*, 546 F.2d 25 (4th Cir. 1976) .............. 9, 16

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ....................................................................... 8

Case 1:20-cv-00442-CCE-JLW   Document 17   Filed 05/22/20   Page 3 of 30

*In re: Southern Foods Group, et al.*,
  No. 19-36313 (Bankr. S.D. Tex.) ................................................................................. 6

*Tasty Baking Co. v. Ralston Purina, Inc.*,
  653 F. Supp. 1250 (E.D. Pa. 1987) ...................................................................... 17, 22

## Statutes

Clayton Act Section 7, 15 U.S.C. § 18 ............................................................. 7, 8, 10, 16

Clayton Act Section 16, 15 U.S.C. § 26 ...................................................................... 9

Sherman Act Section 2, 15 U.S.C. § 2 ...................................................................... 7, 15

## Other Authorities

Local Rule 65.1 ......................................................................................................... 22

Rule 65 .................................................................................................................... 19

# INTRODUCTION

This motion seeks a narrowly tailored preliminary injunction to protect the Court's ability to order an adequate remedy upon resolution of this litigation. On May 1, 2020, Defendant Dairy Farmers of America, Inc. ("DFA"), the nation's largest raw milk producer, strengthened its chokehold on the dairy industry by strategically maneuvering to purchase most of the assets of the nation's largest fluid milk processor, Dean Foods Company ("Dean"), including three milk processing plants in North and South Carolina (the "Carolinas plants"), out of bankruptcy (the "Asset Sale"). While there are myriad antitrust concerns with the Asset Sale, this case focuses solely on the anticompetitive effects of DFA's acquisition of the Carolinas plants and the higher prices consumers in this area will bear as a result.

Plaintiffs Food Lion, LLC ("Food Lion") and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA") assert that the Asset Sale substantially lessens competition in violation of Section 7 of the Clayton Act and furthers DFA's ongoing attempts to monopolize in violation of Section 2 of the Sherman Act. The relief requested by Plaintiffs at trial will include divestiture of at least one of the Carolinas plants. In the interim, however, there is a considerable danger that DFA will take action that would frustrate the Court's ability to fashion an adequate divestiture remedy, including closing, selling, or degrading the plants; transferring or laying off workers; entering into long-term contracts that would saddle any potential divestiture buyer; and moving aggressively to "scramble the eggs" by consolidating and comingling operations. This motion therefore seeks a preliminary injunction in the form of an asset

preservation order to maintain the status quo and preserve the Court's ability to fashion an appropriate remedy later.

This type of order is particularly well-suited for Section 7 cases. As the Supreme Court has recognized, Congress enacted Section 7 to arrest anticompetitive acquisitions in their incipiency and to serve as a "brake" on such transactions before their anticompetitive effects can gather momentum. For this reason, courts routinely issue preliminary relief in Section 7 cases to slow such momentum, preserve the status quo, and protect their ability to enter a divestiture remedy later.

Plaintiffs' request satisfies all the traditional criteria for preliminary relief. As an initial matter, Plaintiffs are likely to succeed on the merits. The seminal Supreme Court case addressing a vertical merger challenge—*Brown Shoe Co. v. United States*—is directly on point and, if anything, the Asset Sale presents even more egregious circumstances. As in *Brown Shoe*, the Asset Sale must be viewed against the backdrop of the history of dealings between the parties and DFA's concomitant efforts to consolidate the now highly concentrated dairy industry. This history includes an exclusive dealing arrangement between DFA and Dean that has lasted for nearly two decades—the extension of which is the primary motivation for the Asset Sale—and DFA's use of the market power created thereby to exclude rivals at the earliest opportunity. The amount of permanent market foreclosure created by the Asset Sale, moreover, far exceeds that deemed problematic in *Brown Shoe* and its progeny. Plaintiff MDVA is the only remaining competitor to DFA in the relevant raw milk market and, after DFA uses the

-2-

Asset Sale to substantially foreclose MDVA from the market, DFA will secure for itself unchecked power at two levels of the dairy supply chain going forward.

Even more important in the preliminary relief calculus is the balance of harms, which tips strongly in Plaintiffs' favor. Plaintiffs face irreparable harm if the preliminary injunction is not entered while DFA faces minimal harm, if any, if it is. Indeed, if any of the dangers articulated above come to pass, Plaintiffs (and the Court) could be deprived of the divestiture remedy that the Supreme Court has characterized as "the most important of antitrust remedies" in Section 7 cases. And even if DFA would suffer some minimal harm, such harm would be caused by DFA's own choices in this matter. Instead of working cooperatively to address antitrust concerns ex ante, DFA strategically chose to close expeditiously on the Asset Sale, knowing that this lawsuit and request would be forthcoming, and thus assumed the risk associated with its own maneuvering. As the acquirer, DFA is the proper party to bear such risk and, if it believes that temporary relief would cause it harm, it remains free to try to present evidence that a bond would be appropriate.

Finally, the public interest in enforcing federal antitrust policies, protecting dairy farmers, and ensuring that milk prices do not rise during a pandemic weigh heavily in favor of an asset preservation order. Such an order would strike the appropriate balance between allowing DFA to operate the Carolinas plants and proceed with its plans for the remaining 41 plants while also protecting the public's strong interest—as reflected in

-3-

Congress's stated purpose in enacting Section 7—in arresting the potential anticompetitive aspects of the Asset Sale in their incipiency.

The requested relief is the only way that the Court can protect its ability to provide an ultimate remedy. As such, it represents the dairy industry's last best hope for ensuring competition in the region's dairy supply chain going forward.

## STATEMENT OF FACTS

There are multiple levels of the dairy supply chain. Dairy farmers harvest raw milk. These farmers generally belong to cooperatives, such as DFA and MDVA, that market their raw milk and sell it to processing plants. Processing plants process, bottle, and sell fluid milk products to retailers like grocery stores. Retailers, such as Food Lion, then resell these products to consumers to complete the farm-to-table process.

DFA has dominated the highly concentrated dairy industry for decades and is currently the nation's largest dairy cooperative by a wide margin. Declaration of Mike John ¶ 8, ECF No. 14 ("John Decl."). With 14,000 members, DFA produces three times as much milk as its closest competitor, producing 52.7 billion pounds of raw milk in 2018. *Id*. Over the years, DFA expanded vertically, partnering with and acquiring processing facilities, hauling companies, and distribution centers to compound its control over the dairy supply chain. *Id*. DFA earns more than $13 billion annually and now controls two critical steps of the dairy supply chain—"upstream" production and "downstream" processing—in many areas of the country. Compl. ¶¶ 33-34.

-4-

Until May 1, 2020, Dean was the nation's largest milk processor. The company was created out of a controversial 2001 merger between the two largest processors in the country. *See* Compl. ¶¶ 39-49; Declaration of Mikhael Shor ¶ 16, ECF No. 15 ("Shor Decl."). In connection with the 2001 merger, DFA and Dean entered into a long-term exclusive supply arrangement pursuant to which Dean promised to buy DFA's raw milk in exchange for DFA's agreement not to compete with Dean at the processing level. Compl. ¶ 44-48. To enforce this illicit agreement, DFA secured a twenty-year, contingent, subordinated promissory note from Dean (the "Side Note"), which was valued at $96 million and made payable to DFA if Dean materially breached or terminated its milk supply agreements before 2021. *Id*. ¶ 47. The Side Note spawned years of litigation (and large settlements) in which dairy farmers and retailers challenged the anticompetitive conditions it created at the production and processing levels of the milk market. *Id*. ¶¶ 54-58.

Over time, DFA increasingly leveraged its relationship with Dean to push rival producers out of Dean's plants. *Id.* ¶¶ 59-62; John Decl. ¶ 14. Plaintiff MDVA felt the effects. In 2013, when DFA was not enforcing its exclusivity arrangement due to the pendency of litigation, MDVA supplied 1.142 billion pounds of raw milk to the Carolinas plants. John Decl. ¶ 14. Shortly thereafter, however, Dean told MDVA that DFA wanted MDVA out of Dean's facilities and that, despite MDVA's excellent quality and service, it was obliged to comply. *Id*. DFA gradually accomplished its mission: by 2019, no Dean facility in the Carolinas bought any MDVA milk. *Id*. Needless to say, MDVA eagerly

-5-

anticipated the Side Note's expiration in 2021 and the opportunity to compete once again to supply milk to Dean facilities. *Id.* ¶ 18.

In November 2019, Dean filed for Chapter 11 bankruptcy. *See In re: Southern Foods Groups, LLC, et al.*, No. 19-36313 (Bankr. S.D. Tex.). If Dean's plants had been sold to a milk processor unaffiliated with DFA, the buyer would have purchased the plants *without* the Side Note and would have been free to buy raw milk from the most competitive source, including MDVA. John Decl. ¶¶ 15-17. DFA, however, could not let that happen, so it strategically maneuvered to gain control of 44 of Dean's 57 Dean processing facilities, including all three Carolinas plants. Throughout the bankruptcy proceedings, Food Lion and MDVA objected to the Asset Sale on antitrust grounds. Ultimately, the bankruptcy court approved DFA's bid, but declined to address the antitrust issue and instead included in its order a provision expressly recognizing Plaintiffs' right to bring this lawsuit. Bankr. Dkt. 1572, ¶ 37.

The Asset Sale closed on May 1, 2020, and DFA has now taken control of all three of the legacy Dean Carolinas plants. As a result, DFA now controls Dean's 59% share of downstream milk processing in the Carolinas, in addition to its 65% and 59% shares of the upstream raw milk supply in North and South Carolina, respectively. Shor Decl. ¶¶ 31, 34. In essence, by acquiring Dean out of bankruptcy, DFA not only ensured that the exclusive, full supply rights embodied in the Side Note became permanent, but also that it now controls a significant majority of both the milk supply and processing markets going forward.

-6-

## QUESTION PRESENTED

Whether the Court should issue a preliminary injunction in the form of an asset protection order requiring that DFA preserve the status quo at the Carolinas plants pending a trial on the merits in order to protect the Court's ability to fashion an appropriate divestiture remedy at trial.

## ARGUMENT

This motion seeks a narrowly tailored preliminary injunction to preserve the status quo pending resolution of this litigation. Plaintiffs assert that DFA's acquisition of all three Carolinas plants substantially lessens competition in violation of Section 7 of the Clayton Act and furthers DFA's ongoing attempt to monopolize in violation of Section 2 of the Sherman Act. The ultimate relief Plaintiffs request involves divestiture of one of the plants in order to preserve competition. *See California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990) (divestiture is the "most important of antitrust remedies" in Section 7 cases because it is "simple, relatively easy to administer, and sure"). In the interim, the Court should issue a preliminary injunction in the form of an asset preservation order to protect its ability to order the relief requested and prevent DFA from taking affirmative steps that would frustrate that ability, including (1) closing, selling, consolidating, or degrading the plants; (2) transferring or laying off workers; (3) entering into long-term contracts that would saddle a divestiture buyer; and (4) moving aggressively to consolidate and comingle operations that would "scramble the eggs" and undercut the feasibility of a later divestiture remedy.

-7-

I.    **THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR PRELIMINARY RELIEF.**

This is a classic case in which a preliminary injunction should issue.  Indeed, the "traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  Parties seeking preliminary injunctions must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  In applying this well-known standard, the Fourth Circuit has emphasized that the second and third factors, which courts often consider together, "are the two most important factors." *Microsoft*, 333 F.3d at 526; *Agro v. Makhteshim Agan of N. Am.*,  No. 1:10-cv-276, 2015 WL 12991089 (M.D.N.C. Feb. 10, 2015) (Osteen Jr., C.J.).

A.    **Because Section 7 of the Clayton Act Is Designed to Arrest Anticompetitive Mergers in their Incipiency, Preliminary Relief Is Typically Necessary to Fulfill that Purpose.**

Section 7 of the Clayton Act prohibits mergers and acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18. The words "may be" reflect Congress's conscious decision to enact a prophylactic antitrust statute.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat.,* 429 U.S. 477, 485 (1977). In *Brown Shoe Co. v. United States*, the Supreme Court explained that Congress enacted Section 7 to "arrest mergers at a time when the trend to a lessening of competition in a

-8-

line of commerce was still in its incipiency" in order "to brake this force at its outset and before it gathered momentum." 370 U.S. 294, 317-18 (1962). The Court later explained that Section 7 was enacted against the backdrop of "a rising tide of economic concentration in the American economy." *United States v. Von's Grocery Co.*, 384 U.S. 270, 276 (1966). As such, Section 7 was designed to "clamp down with vigor" on anticompetitive mergers in order to arrest "this rising tide towards concentration into too few hands and to halt the gradual demise of . . . small business[]." *Id*.

The "incipiency" doctrine has since been followed in a long, unbroken line of binding Supreme Court decisions that recognize the importance of addressing anticompetitive acquisitions either before they happen or at an early stage post-closing. Congress "expressly extended the availability of the injunctive remedy to private parties" by enacting Section 16 of the Clayton Act for this very reason. *Allis-Chalmers Mfg. Co. v. White Consol. Indus.,* 414 F.2d 506, 510 (3d Cir. 1969). Courts in the Fourth Circuit have thus recognized that "injunctive relief is particularly suited to the preventive function of [Section] 7 [of the Clayton Act]." *Pargas, Inc. v. Empire Gas Corp*., 423 F. Supp. 199, 207 (D. Md.), *aff'd*, 546 F.2d 25 (4th Cir. 1976).

In Section 7 challenges, preliminary injunctive relief typically includes an asset protection and/or hold separate order, which is widely viewed as the antitrust tool best suited to preserve the status quo while the court determines whether the acquisition violates Section 7. *See, e.g.*, *F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7, 1084 (D.C. Cir. 1981). An "established device in antitrust law enforcement," this type of order

-9-

"permits the challenged transaction to go forward, but requires the acquiring company to preserve . . . and to safeguard 'unscrambled' the assets acquired so that they may be divested effectively" later if plaintiffs prevail. *Id.* By issuing such an order, therefore, the Court preserves its ability to order an effective divestiture remedy after adjudication of the merits, while simultaneously adhering to Congress's stated intent of arresting anticompetitive mergers in their incipiency. *Id.; see also Microsoft*, 333 F.3d at 525-26.

## B. Plaintiffs' Antitrust Claims Are Likely to Succeed on the Merits.

Plaintiffs' antitrust claims are strong and likely to succeed on the merits. To show a merger or acquisition is unlawful under Section 7, a plaintiff need only show that "its effect *may be* substantially to lessen competition or to tend to create a monopoly" in a product and geographic market. *Am. Stores*, 495 U.S. at 284. This standard is by nature predictive, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963); that is, concerned "with probabilities, not certainties." *Brown Shoe*, 370 U.S. at 328-29 (noting standard is "less stringent" than Sherman Act). "Any doubts," moreover, "are to be resolved against the transaction." *F.T.C. v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016).

In vertical merger cases, the "primary vice. . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe*, 370 U.S. at 323-24. Relevant factors in making this assessment include the nature and purpose of the vertical agreement, concentration levels

-10-

and trends in the affected markets, the degree of foreclosure created by the transaction, and the ease with which potential entrants may overcome barriers to entry and compete effectively with existing companies. *Id.* at 322, 328-29.

*Brown Shoe* is the Supreme Court's seminal case examining—and finding unlawful—a vertical merger under Section 7. There, the fourth-largest shoe manufacturer in the nation sought to merge with the nation's largest independent chain of family shoe stores. *Id.* at 331. In declaring the merger unlawful, the Court relied on both the sizeable market share foreclosed to competing manufacturers by the sale and the trend toward concentration in the industry. *Id.* As here, the industry had been for years consolidating as a "result of deliberate policies of Brown and other leading shoe manufacturers," which caused "acquiring manufacturers to become increasingly important sources of supply for their acquired outlets." *Id.* at 332. Against this backdrop, the Court was troubled by the manufacturer's historic policy of "forcing its own shoes upon its retail subsidiaries" and determined that the merger was designed to allow the manufacturer to do the same with the nation's largest shoe retailer. *Id.* at 332-35.

The Asset Sale here tracks *Brown Shoe* exactly. Just as in *Brown Shoe*, two decades of consolidation have saddled the region's dairy industry with high concentration and significant barriers to entry, largely owing to DFA's deliberate attempts to commandeer the supply chain. This anticompetitive trend was facilitated by DFA's long-term, exclusive dealing arrangement with Dean, which was set to expire in 2021 and usher in a wave of competition. The intent and purpose of the Asset Sale was thus to

-11-

make this anticompetitive arrangement permanent and forestall the coming wave of competition that would have crested if someone else had acquired the Carolinas plants. Just as the Court was concerned in *Brown Shoe* that the manufacturer would "force" its own supply upon its downstream retail acquisition, the Asset Sale guarantees that very result for DFA. Indeed, as in *Brown Shoe*, there is a demonstrated history of DFA gaining control of processing plants, either by contract or acquisition, and immediately forcing its raw milk upon such processors at the earliest opportunity.

The amount of permanent market foreclosure created by the Asset Sale far exceeds that deemed problematic by the Court in *Brown Shoe*. DFA is a dairy industry behemoth, far larger in size and market share than the manufacturer in *Brown Shoe*. Indeed, both DFA and Dean controlled ***majority*** shares in the raw and processed milk markets, respectively, prior to the Asset Sale. In the wake of the Asset Sale, therefore, DFA will control majority shares of ***both*** markets, and the Carolinas plants will be forced to buy their raw milk from DFA by corporate fiat. As a result, MDVA will be permanently foreclosed from these facilities, which amounts to foreclosure far greater than in *Brown Shoe* where neither the manufacturer nor the downstream retailer possessed a majority share in either market. Because this "clog on competition"—as the Court described it in *Brown Shoe*—deprives MDVA of a fair opportunity to compete for over half the market, the Asset Sale substantially lessens competition in violation of Section 7. *Id.* at 323-24.

***Raw Milk Market.*** The Asset Sale first threatens the raw milk market. Specifically, the relevant product and geographic market is the market for the supply of

raw Grade A milk by dairy producers, like DFA and MDVA, to which milk processing plants in the Carolinas can reasonably turn for supply. *See* Compl. ¶¶ 9, 11-16, 19-27; Shor Decl. ¶¶ 21, 25-29. This market has only two significant competitors—DFA and MDVA—and both compete for sales to processing plants. The Carolinas plants, however, account for 59% of milk processing in the Carolinas and, as a result of the Asset Sale, MDVA will be permanently foreclosed from accessing their share of the market and likely more.[1] Shor Decl. ¶ 34, 45. This is a "substantial share" under any possible definition. *Brown Shoe*, 370 U.S. at 334.[2] By foreclosing MDVA's access, MDVA will have to pay more to ship its milk, reducing its operations and efficiencies. Shor Decl. ¶ 52. DFA will leverage its own access to nearby facilities and MDVA's weakened position to recruit farmers away from MDVA. *Id*. ¶ 44-45. As a result,

---

[1] The non-legacy-Dean processing facilities in the region are not viable long-term options as outlets for MDVA to sell its raw milk. John Decl. ¶ 20. Both Milkco and Hunter Farms are owned by supermarket chains and operate at high capacity (75% and 92%, respectively). Shor Decl. ¶ 34. In addition, there is a high degree of likelihood that MDVA loses access to Kroger's Hunter Farms facility in the near future in favor of DFA, John Decl. ¶ 22, and Milkco purchases from a DFA affiliate and uses packaging that limits the retailers to which it sells. *Id*. ¶ 23. Borden, which filed for bankruptcy in January 2020, is located on the southern coast of South Carolina and is too far away for economical use by farmers in the northern regions of the areas that supply milk to the Carolinas. *Id*. ¶ 24. And MDVA cannot practicably build its own facility because of high construction costs and the challenge of financing the project in an industry marked by an aspiring monopolist and where two large independent milk processors—Dean and Borden—have recently filed for bankruptcy protection. *Id.* ¶ 32.

[2] *See also United States v. Microsoft Corp*., 253 F.3d 34, 69 (D.C. Cir. 2001) (foreclosure of less than 40-50% of the market may give rise to a Sherman Act violation); *United States v. Dentsply Int'l, Inc*., 399 F.3d 181, 196 (3d Cir. 2005) (finding anticompetitive effect where defendant excluded competitors from key dealers necessary to sell to consumers).

-13-

MDVA will be significantly weakened or pushed out of the market, further increasing DFA's market power.

History tips DFA's hand: DFA has done this before and will do it again. Shor Decl. ¶¶ 43-45. For example, before DFA purchased New Jersey processor Cumberland Dairy in 2017, MDVA and Cumberland had enjoyed a profitable and mutually beneficial relationship that included the sale of bulk raw milk and co-packing. John Decl. ¶ 27. Almost immediately following DFA's takeover of the facility, Cumberland stopped buying milk from MDVA farmers and began buying solely from DFA members. *Id*. The deal's "nature and purpose" was as clear there as it is here: the foreclosure of MDVA. *Brown Shoe*, 370 U.S. at 329-32. As DFA substantially forecloses MDVA and takes its members, moreover, DFA's shares of both production and processing in the region will soar, and it will emerge as the sole milk producer, free to raise prices to rival processors, to retailers like Food Lion, and ultimately to consumers.

***Processed Milk Market.*** The Asset Sale also threatens to substantially lessen competition in the processing market. Specifically, the relevant market is the market for the processing, co-packing, and delivery of fluid milk products to retailers like Food Lion and other customers (the "processed milk market") who can reasonably turn to milk processing plants in North and South Carolina for their purchases. *See* Compl. ¶¶ 10, 17-27, Shor Decl. ¶ 22-23, 25-29. As noted above, the three Dean processing facilities already control 59% of milk processed in the Carolinas and its only competitors are either in bankruptcy (Borden) or vertically integrated plants serving supermarket chains with

-14-

little excess capacity (Kroger and Ingles Markets).  To consolidate its market power, DFA will be able to use its near-monopoly control of the raw milk production market following the Asset Sale—which Plaintiffs allege to be over 60%—to raise prices to rival processors who depend on DFA for raw milk.[3]  This, in turn, will force inefficient "cross-shipping," preventing retail customers from buying processed milk from the closest processors.  Shor Decl. ¶¶ 48, 53. This way, by reducing supply to competitor processors or offering to sell only at very high prices, DFA forces rival processors to pay supra-competitive prices for its raw milk.  *Id*. ¶¶ 51-53.  Ultimately, this results in higher prices to retailers. *Id.* ¶ 57.

Accordingly, under *Brown Shoe*, Plaintiffs have a substantial likelihood of success on their Section 7 claim.[4]  The divestiture of even one centrally located plant to a

---

[3] In addition, MDVA's dairy farms that require access to the legacy Dean processing facilities would be forced to join DFA.  Shor Decl. ¶¶ 44, 50.  As DFA suffocates MDVA, processors will then be forced to buy exclusively from DFA out of necessity.

[4] For similar reasons, Plaintiffs' claim that DFA attempted to monopolize the raw milk market under 15 U.S.C. § 2 is also likely to succeed.  Such an offense consists of: (1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success.  *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 441 (4th Cir. 2011).  DFA used its exclusive agreement with Dean to foreclose MDVA from Dean's facilities then purchased those facilities (the anticompetitive conduct) with the aim of further foreclosing its only competitor in the market from access to necessary processing facilities (intent to monopolize) and possesses a 65% and 59% market share in North and South Carolina, respectively, and an estimated market share of over 60% throughout the relevant geographic region (a dangerous probability of success).  *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (noting that "claims involving greater than 50% share" are sufficient to show dangerous probability of success).

-15-

qualified, independent buyer who would allow non-DFA suppliers to compete for sales would transform the market. Shor Decl. ¶ 60. Two competitors would vie to supply the plant. *Id*. ¶ 43 (explaining that restricting MDVA's access to its plants did not appear to align with legacy Dean's economic interests); John Decl. ¶ 18. With a ready supply of low cost milk, the new entrant could bid for sales at a lower price given its lower costs. As it gains more sales, the new entrant could ramp up utilization at the under-utilized facility. In a virtuous circle, the new entrant could then sell even more milk. This competition would force DFA to lower its milk prices from the two plants it retains. Everyone wins—except DFA, which would be forced to compete for the first time in nearly two decades. The purpose and promise of the antitrust laws would be realized as the anticompetitive effects of the Asset Sale would be arrested in their incipiency. *See Pargas*, 423 F. Supp. at 222.

## C. Since Plaintiffs Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Issued, the Balance of Harms Tips Strongly in Favor of Issuing an Asset Preservation Order.

Private antitrust cases under Section 7 typically present paradigmatic cases of irreparable injury because post-acquisition integration makes it "particularly difficult" to return to the status quo after trial. *See F.T.C. v. Tronox Ltd.*, 332 F. Supp. 3d 187, 217 (D.D.C. 2018). This makes sense because acquisitions, particularly in the bankruptcy context, often lead to significant changes like selling or disposing of certain assets and integrating or firing employees. *Id.* Acquisitions are also "often followed by a commingling of assets and other substantial changes in the structures of the enterprises

-16-

involved," which can quickly make it difficult for courts to later split apart later if divestiture is required. *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1342 (D.C. Cir. 1980). For this reason, courts have held that doubts as to the necessity of issuing a preliminary injunction in Section 7 cases should be resolved in favor of granting the injunction. *Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261 (2d Cir. 1989). Indeed, with these concerns in mind, the Supreme Court entered preliminary relief in an earlier case involving Dean Foods to safeguard its ability to enter the effective ultimate relief of divestiture. *F.T.C. v. Dean Foods Co.,* 384 U.S. 597, 606 n.5 (1966).

This was likewise the case in *Tasty Baking Co. v. Ralston Purina, Inc*., 653 F. Supp. 1250 (E.D. Pa. 1987), a similar private post-acquisition challenge. There, the court ordered preliminary relief to preserve the status quo upon evidence—after expedited discovery—that the defendant would, within the next few months, restructure and bleed the acquired company of substantial assets, displace management and operations personnel, and assume administrative functions. *Id*. at 1277. Because "the viability of [the divested asset] would be difficult to assure" absent such relief, the court ordered the parties to meet and confer and submit proposed orders designed to preserve the status quo with supporting memorandum within 15 days to help the court fashion an appropriate order. *Id*. at 1277-78.

The same preservation considerations reflected in *Tasty Baking* commend a like order here. Without one, Plaintiffs will suffer immediate and irreparable harm. First, it is likely that DFA's post-acquisition plans for a bankrupt entity involve substantially

-17-

altering the facilities to the tune of closure, sale, terminating employees, or altering distribution routes and associated operational plans, *Tasty Baking*, 653 F. Supp. at 1277, which would have the effect of undercutting the Court's ability to order divestiture later. DFA may also scramble the eggs in an attempt to neuter the possibility of a later divestiture remedy—that is, they may aggressively move to "displac[e] . . . [Dean's] management and operations personnel," "assum[e Dean's] administrative functions," and combine the newly acquired Dean plants with their existing operations, at once stripping the facilities of their ability to function and allowing DFA to strategically set up a later claim that divestiture is no longer feasible. *Id.*

Indeed, current realities suggest that DFA already plans to make immediate changes to the Carolinas facilities. For example, because the High Point plant is operating at low utilization, DFA could sensibly sell or close the plant, or merge it with the nearby Winston-Salem plant. *See Dean Foods,* 384 U.S. at 606 n.5 (injunction necessary to preserve ability to fashion an ultimate remedy where Dean planned to sell milk plants and distribute the acquired assets to its shareholders). Even with an expedited schedule, a final decision in this litigation will likely take months, by which time DFA could have closed one of the Carolina plants, terminated hundreds of jobs, and recruited many farmers from non-DFA cooperatives, all to the detriment of consumers in the region.

By comparison, it is difficult to imagine what harm will befall DFA if this Court issues an order that simply preserves the Court's ability to rule on the merits. Because

-18-

DFA acquired specific assets, and did not merge with or acquire Dean entirely, an order requiring DFA to hold those assets separately for a limited period of time should be relatively straightforward. If it is acting in good faith, DFA should have no objection to, for example, keeping the plants operating and the employees employed during this time, particularly given its representations to the bankruptcy court regarding its need for expediency to save the Dean plants and employees from this very fate.[5]  DFA successfully opposed Plaintiffs attempts to address its antitrust concerns prior to the closing of the merger and voluntarily chose to move forward with closing despite fair warning that this lawsuit and specific request for relief would be forthcoming. This strategic decision came with concomitant costs that DFA had foreknowledge of and chose to accept. *See Exxon,* 636 F.2d at 1343 n.26 (acquiring company is the "more appropriate party to bear any loss resulting from an antitrust violation" if divestiture is ordered after the transaction is consummated).  Finally, to the extent that DFA alleges that it will suffer any harm while the order is in place, it remains free to present evidence that a bond would be appropriate under Rule 65.

---

[5] To avoid private antitrust scrutiny prior to closing, Dean and DFA decried the disastrous consequences that would ensue if it was not able to close on the Asset Sale promptly, including the possible closure of plants and the loss of thousands of jobs. *See* Bankr. Dkt. 1804, 1807.  Having successfully argued this before the bankruptcy court, it would be incongruent for DFA to now claim that it would be harmed were it not able to engage in those very acts after closing. *See Lowery v. Stovall,* 92 F.3d 219, 223 (4th Cir. 1996) ("Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation . . . prevent[ing] a party from playing fast and loose with the courts.").

In sum, the balance of harms strongly favors Plaintiffs. A preliminary injunction modeled as an asset preservation order is a simple, equitable, and common-sense measure to preserve the status quo pending trial on the merits. The key principles of such an order would be merely prohibitory and simply prevent DFA from affirmatively changing the status quo to its advantage during the pendency of the litigation. Absent such relief, the Court may not be able to fashion an adequate remedy later.

### D. A Preliminary Injunction in the Form of an Asset Preservation Order Is in the Public Interest.

The final element of the preliminary injunction standard is the public interest. As a practical matter, however, "if a plaintiff proves both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest favors preliminary relief." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). Nonetheless, the public interest clearly supports issuing an asset preservation order here. Private merger challenges "serve . . . the high purpose of enforcing the antitrust laws," which are designed to arrest anticompetitive acquisitions in their incipiency. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969).

Processed milk, moreover, is a staple in virtually every home in the nation and a vital source of calories and nutrition for hundreds of millions of consumers. In the midst of a global pandemic and a looming economic crisis, and with record numbers of Americans out of jobs and confined to their homes, it is critical that milk remain accessible and affordable for consumers and retailers who sell to them. Declaration of

-20-

Mark Latva ¶ 7, ECF No. 16. The public thus has a strong interest in preserving competition in order to guard against skyrocketing milk prices during a pandemic. Likewise, the public also has a compelling interest in protecting independent dairy farms, whose significance to rural families and communities and to the larger U.S. economy cannot be overstated.

Finally, Plaintiffs would be remiss not to acknowledge that the public also has an interest in allowing DFA to continue operating the Carolinas plants during the pendency of this litigation. Rather than seek more aggressive interim relief, as is typical in Section 7 cases,[6] Plaintiffs opted to seek far more limited relief designed solely to preserve the status quo and the Court's ability to issue a divestiture remedy later. This request thus strikes the appropriate balance between the public's interest in continued operation of the Carolinas plants and its equally important interest in ensuring that anticompetitive mergers are arrested in their incipiency. *See Weyerhaeuser*, 665 F.2d at 1087 (preliminary relief "permits the public immediately to reap the unchallenged benefits of a proposed transaction" while parties litigate the challenged aspects of the transaction).

---

[6] In a typical Section 7 case, the most common preliminary remedies are preliminary injunctions preventing the transaction from closing or a "hold separate" order that requires the Defendant to continue to operate the acquired company or asset completely separately in order to, in the horizontal context, preserve competition pending trial. Here, however, DFA and Dean do not currently compete with each other in the relevant processed milk markets so the more onerous provisions of the traditional hold separate order are less imperative. Instead, a hold separate order is only needed for the more limited purpose of ensuring that a divestiture remedy remains feasible at trial.

-21-

## II. THE COURT SHOULD SET ORAL ARGUMENT AND AN EVIDENTIARY HEARING.

Pursuant to Local Rule 65.1, Plaintiffs request the opportunity to present oral argument and testimony in support of this motion. Plaintiffs will move separately to seek limited discovery from DFA in preparation for such a hearing. In this fact-intensive case, expedited discovery and an evidentiary hearing will aid the Court in determining whether preliminary relief is appropriate.

Once counsel for DFA appears, Plaintiffs intend to meet-and-confer on a proposed schedule for the Court's consideration that balances the expediency required by Plaintiffs' motion with the litigation challenges presented by the pandemic.

## CONCLUSION

The Asset Sale sets DFA squarely atop a dairy empire, giving it the ability and incentive to substantially foreclose competition in multiple segments of the industry. Until this Court can examine the effects of the sale on competition, a narrowly crafted asset preservation order will maintain the status quo and ensure that post-trial divestiture—the appropriate remedy for an unlawful merger—remains available. Accordingly, as in *Tasty Baking*, Plaintiffs respectfully request that the Court grant preliminary relief and order the parties to (1) meet and confer regarding an appropriate order and, if they cannot agree, (2) submit proposed orders with a supporting memorandum outlining their respective views on the terms of the order within fifteen (15) days.

-22-

DATED:  May 22, 2020

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

s/ Ryan G. Rich
A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*pro hac vice forthcoming*)
John S. Martin (*admitted pro hac vice*)
Kevin Hahm (*admitted pro hac vice*)
Carter C. Simpson (*admitted pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN SANDERS LLP**

s/ Jason D. Evans
Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (*pro hac vice pending*)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362
james.lamberth@troutman.com

-23-

*Attorneys for Maryland and Virginia Milk*
*Producers Cooperative Association, Inc.*

-24-

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing memorandum does not exceed 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

This the 22nd day of May 2020.

/s/ Ryan G. Rich
Ryan G. Rich

-25-

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that said document will be served on the defendant via UPS overnight mail, addressed as follows:

DAIRY FARMERS OF AMERICA, INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

s/ Ryan G. Rich
Ryan G. Rich