IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Food Lion, LLC, and Maryland and Virginia Milk Producers Cooperative Association, Inc., <br><br> *Plaintiffs*, <br><br> v. <br><br> Dairy Farmers of America, Inc., <br><br> *Defendant*. | Case No. 1:20-cv-00442 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY AND MANDATORY MEET AND CONFER

Plaintiffs Food Lion, LLC ("Food Lion") and the Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA") seek limited expedited discovery relating to their pending Motion for Preliminary Injunction [ECF No. 13]. Plaintiffs' Complaint alleges that Dairy Farmers of America, Inc.'s ("DFA") recent acquisition of three milk processing plants in North and South Carolina from Dean Foods Company ("Dean") substantially lessens competition in violation of Section 7 of the Clayton Act and is part of an attempt to monopolize in violation of Section 2 of the Sherman Act. To address the irreparable harm that this transaction would otherwise cause, Plaintiffs' Motion for Preliminary Injunction asks this Court to enter an asset preservation order to maintain the status quo at these local processing plants in order to preserve the Court's ability to fashion a divestiture remedy after an adjudication of the merits. Expedited discovery, however, is appropriate to provide the Court with the benefit of a fuller record,

including discovery that is solely within DFA's possession, custody, and control, upon which to rule on the merits of that Motion. Accordingly, for the reasons set forth below, Plaintiffs respectfully request that the Court allow for expedited discovery that is narrowly tailored to enable the parties to present fulsome arguments in their briefing and, if granted, at the requested hearing regarding the propriety of preliminary relief.

## STATEMENT OF FACTS

The dairy supply chain is complex and involves multiple levels. At the risk of oversimplification, dairy cooperatives, such as DFA and MDVA, supply raw milk from farmers to processing plants, which then process, package, and sell fluid milk to retailers like Food Lion. Declaration of Mike John ¶¶ 6-7, ECF. No. 14 ("John Decl."). In what is known as the "upstream" market in the supply chain, DFA and MDVA compete to market the raw milk of their member-farmers to milk processing plants. *Id.* ¶¶ 8-9; Declaration of Mikhael Shor ¶ 19, ECF No. 15 ("Shor Decl."). In the "downstream" market, milk processing plants compete to supply processed fluid milk to retailers such as Food Lion and other customers. Declaration of Mark Latva ¶ 8, ECF N. 16 ("Latva Decl."); Shor Decl. ¶ 19. Robust competition in milk production and milk processing is critical to maintaining competitive pricing in both the upstream and downstream markets. Shor Decl. ¶ 19.

On May 1, 2020, DFA, the largest dairy cooperative in the country, purchased a nationwide portfolio of milk processing plants from Dean, formerly the country's largest processor of fluid milk, out of bankruptcy (the "Asset Sale"). Compl. ¶ 95; Shor Decl. ¶¶ 29, 34. The Asset Sale transformed DFA into the largest producer *and* processor of

milk in the country overnight.  Shor Decl. ¶ 30.  The purchase included three milk processing plants in High Point, North Carolina, Winston-Salem, North Carolina, and Spartanburg, South Carolina (the "Carolinas plants").  Compl. ¶ 24.

Food Lion and MDVA filed this lawsuit on May 19, 2020.  The complaint alleges that DFA's purchase of the Carolinas plants, which account for over 50% of the raw milk purchased by processing plants in the Carolinas, Shor Decl. ¶ 34, is part of an attempt by DFA to monopolize both the upstream and downstream markets for milk in violation of federal antitrust law.  Plaintiffs allege that the Asset Sale substantially lessens competition in two markets:  the upstream market for the supply of raw milk by cooperatives and farmers who can reasonably turn to milk processing plants in the Carolinas with their supply, and the downstream market for the processing and sale of fluid milk to customers who can reasonably turn to milk processing plants in the Carolinas for their purchases.  *See* Compl. ¶¶ 10-11, 21-26.  By gaining control of the majority of both markets, DFA now has the ability and the incentive to cut off its raw milk competitors' supply to processing facilities, squeezing those competitors from the raw milk market, John Decl. ¶¶ 25-29; charge supracompetitive prices for raw milk to competing milk processors; and ultimately raise the prices of processed milk to retailers like Food Lion, Shor Decl. ¶ 6.  Plaintiffs intend to seek divestiture of at least one of the Carolinas plants at trial as a remedy to preserve competition in the relevant markets going forward.

In the interim, there is a considerable danger that DFA will take action that would frustrate the Court's ability to fashion an adequate divestiture remedy, including closing,

selling, or degrading the plants; transferring or laying off workers; entering into long-term contracts that would saddle any potential divestiture buyer; and moving aggressively to "scramble the eggs" by consolidating and comingling operations. Plaintiffs have therefore requested a preliminary injunction in the form of an asset preservation order to maintain the status quo and preserve the Court's ability to fashion an appropriate remedy later at trial. *See* ECF No. 13. Absent such relief, Plaintiffs will be irreparably harmed.

## QUESTION PRESENTED

> Whether Plaintiffs should be permitted to serve expedited, narrowly tailored discovery in support of their pending motion for a preliminary injunction in order to provide the Court with a more fulsome record upon which to rule on the merits.

## ARGUMENT

This Court has broad discretion to allow the parties to engage in expedited discovery before the parties hold an initial conference under Federal Rule of Civil Procedure 26(f). Fed. R. Civ. P. 26, advisory committee notes, 1993 amend., subdiv. (d) ("Discovery can begin earlier if authorized . . . by [court] order . . . . This will be appropriate in some cases, such as those involving requests for a preliminary injunction . . . ."); *Ciena Corp. v. Jarrad*, 203 F.3d 312, 320 (4th Cir. 2000) (remanding "with instructions to allow [the defendant] such expedited discovery on the injunction application as she may justify to the [district] court"). Such expedited discovery is "*particularly appropriate* when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Teamworks Innovations, Inc. v. Starbucks Corp.*, No. 1:19-CV-1240, 2020 WL 406360, at *2 (M.D.N.C. Jan. 24, 2020) (Auld, Magistrate J.)

4

(internal quotation marks and citations omitted). Indeed, this Court routinely grants expedited discovery when it is limited to issues raised in a preliminary injunction motion. *See, e.g.*, *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 668 (M.D.N.C. 2009) (noting the Court previously allowed discovery on issues raised by Plaintiff's preliminary injunction motion); *S.E.C. v. Elfindepan, S.A.*, 169 F. Supp. 2d 420, 423 (M.D.N.C. 2001) (same).

## I. Good Cause Exists to Grant Expedited Discovery.

In evaluating a request for expedited discovery relating to a preliminary injunction motion, this Court applies a good cause or reasonableness test, taking into account the totality of the circumstances. *Teamworks Innovations*, 2020 WL 406360, at *3; *see also Me2 Prods., Inc. v. Does 1-16*, No. 4:16-CV-279, 2016 WL 7017268, at *1 (E.D.N.C. Dec. 1, 2016) (applying reasonableness standard to grant request for expedited discovery).[1] Factors considered include (1) the timing of the motion, (2) whether the party seeking discovery narrowly tailors its requests to gather information relevant to a preliminary injunction determination, and (3) whether the requesting party has shown a

---

[1] The Fourth Circuit has not established a specific standard for evaluating expedited discovery requests, and recent decisions in this District have employed the majority standard that is "based on reasonableness or good cause." *Vient v. Herald*, No. 1:19-cv-2, 2020 WL 616578, at *4 (M.D.N.C. Feb. 10, 2020) (Auld, Magistrate J.), *report and recommendation adopted*, 2020 WL 1077491 (M.D.N.C. Mar. 6, 2020) (Schroeder, J.) (citation omitted). The minority standard examines requests for expedited discovery under the standard for evaluating preliminary injunctions. *Teamworks Innovations*, 2020 WL 406360, at *3. Plaintiffs meet both the majority and minority standards.

5

likelihood of irreparable harm without access to expedited discovery. *Teamworks Innovations*, 2020 WL 406360, at *3.

### A. Plaintiffs Filed this Motion Early and Expeditiously.

Because Plaintiffs are filing this motion at the outset of the case and within a few business days of filing their Motion for Preliminary Injunction, there is no question that this motion is properly timed. The timing of this motion is focused at getting information from DFA in sufficient time to incorporate it into the parties' briefing and present it to the Court at the requested preliminary injunction hearing.

### B. Plaintiffs' Discovery Requests Are Narrowly Tailored to Aid the Court in Determining Whether to Issue a Preliminary Injunction.

Plaintiffs' proposed expedited discovery requests, which are attached as Exhibit A, are narrowly tailored to gather information relevant to a preliminary injunction determination. The discovery Plaintiffs seek is straightforward: (1) documents relevant to the Asset Sale and the U.S. Department of Justice's antitrust review of the Asset Sale, most of which was previously produced by DFA and can easily be identified and re-produced, (2) documents relating to DFA's future plans following the Asset Sale, which is highly pertinent to the very immediate dangers necessitating the motion; (3) documents relating to the conduct described in the Complaint, which directly bears on Plaintiff's likelihood of success; and (4) economic information and data necessary for Plaintiffs' experts to assess the anticompetitive effects of the Asset Sale. The limited scope of this expedited discovery is reasonable and bears directly on questions that this Court will need to resolve the pending motion for preliminary injunction.

### 1. *Asset Sale-Related Productions and Concerns*

Request Nos. 1-5 seek information directly related to the Asset Sale. The requested discovery includes documents produced by DFA to the U.S. Department of Justice and state Attorneys General in connection with their review of the sale and related communications (Nos. 1-2), non-privileged communications with third parties related to potential antitrust issues associated with the Asset Sale (No. 3), nonpublic documents produced by Dean and DFA during the bankruptcy proceedings that led to the Asset Sale (No. 4), and DFA's bids and valuations of the Carolinas Plants as part of the Asset Sale (No. 5). These requests strike at the heart of the anticompetitive nature of the Asset Sale and the need for preliminary relief. As such, the information gathered in these requests will complement those described in Section 3, below, related to Plaintiffs' likelihood of success on the merits of their antitrust claims.

Request Nos. 1-5 also largely piggyback off of previous productions made by DFA to minimize the burden on DFA in complying with Plaintiffs' requests. Request Nos. 1 and 4, for example, simply ask for documents that DFA produced to the DOJ and the bankruptcy court in connection with the Asset Sale process. Consequently, DFA should be able to simply copy of these productions and produce it to Plaintiffs expeditiously. Request Nos. 2, 3, and 5, moreover, simply request communications with the DOJ and third parties regarding the antitrust issues presented by the Asset Sale and DFA's bid thereon. As such, Request Nos. 2, 3, and 5 merely seek specific documents that should be readily identifiable, limited in number, and easy to collect and produce.

### 2. *DFA's Plans for the Carolinas Plants*

Request Nos. 6 and 7 seek documents and communications related to DFA's actual or contemplated plans for the Carolinas Plants, which are solely within DFA's possession, custody and control. The purpose of these requests is straightforward. Plaintiffs moved for preliminary relief to prevent DFA from taking affirmative steps that would frustrate the Court's ability to order ultimate relief at trial, including closing, selling, consolidating or degrading the plants; transferring or laying off workers; entering into long-term contracts that would saddle any potential divestiture buyer; and moving aggressively to consolidate and comingle operations that would "scramble the eggs" and undercut the feasibility of a later divestiture remedy. Request No. 6 is designed to discover information that will shed additional light on this subject, which will in turn provide the Court with a more concrete and fulsome record in evaluating Plaintiffs' request for preliminary relief.

### 3. *Documents Relating to DFA's Underlying Conduct and the Likelihood of Success on the Merits*

Request Nos. 8-12 are aimed at certain discovery necessary to Plaintiffs' likelihood of success on its antitrust claims. Plaintiffs make two claims: first, that DFA's acquisition of the three Carolinas plants may substantially lessen competition in the raw milk and processed milk markets, defined in Compl. ¶¶ 9-10, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. *See California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (Section 7 prohibits mergers and acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly"). And second, that DFA is attempting to monopolize the raw milk market in violation of Section 2 of the

8

Sherman Act, 15 U.S.C. § 2. *See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (Attempted monopolization involves (1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success).

At trial, both claims will require in-depth analysis of competition in the markets at issue before and after the Asset Sale. In the Supreme Court's seminal case on vertical acquisitions like this one, *Brown Shoe Co. v. United States*, 370 U.S.294 (1962), the Court analyzed several factors in determining that an acquisition violated Section 7. Among those were the nature and purpose of the vertical agreement, concentration levels and trends in the affected markets, the degree of foreclosure created by the transaction, and the ease with which potential entrants may overcome barriers to entry and compete effectively with existing companies. *Id.* at 322, 328-29. Such analysis necessitates extensive market information and data. At this stage, however, Plaintiffs need only show a likelihood of success on the merits of their claims. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (explaining preliminary injunction standard). Nonetheless, reliable market information and date will provide further, helpful evidence that will allow the Court to determine whether Plaintiffs are indeed likely to succeed.

Likewise for Section 2 claims under the Sherman Act. The Fourth Circuit affirmed the denial of a motion to dismiss an attempted monopolization claim in *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992), examining the defendant's exclusionary contracts, communications requiring compliance with said contracts, documents showing the defendant's intent to exclude

competitors from the market, pricing information showing self-injurious anticompetitive behavior, and various market shares in the relevant market. And in the Fourth Circuit's recent *E.I. DuPont* case, it relied on supply agreements, market share, market foreclosure statistics, and the defendant's ability to control prices to determine that the complaint plausibly alleged an attempted monopolization claim. 637 F.3d at 450-54.

Request Nos. 8-12 seek documents that are highly relevant to the factors outlined above. Request No. 8, for example, seeks documents concerning the Side Note, which effectively gave DFA a twenty-year exclusive contract to supply raw milk to legacy Dean plants until Dean's bankruptcy. Plaintiffs allege that the possible expiration of the Side Note due to the bankruptcy, and the competition that it would usher in thereafter, is DFA's primary motivation in pursuing the Asset Sale and the primary means by which DFA intends to exclude competition in the relevant markets permanently. Relatedly, Request Nos. 9-10 seek information regarding DFA's contractual or legal obligations affecting either the raw milk or processed milk markets, which affects market dynamics and potential foreclosure, and Request No. 11 likewise speaks to those same issues. Finally, Request No. 12 requests information regarding customer, supplier, or DFA-member complaints about the Asset Sale that are all directly relevant to the anti-competitive effects of the Asset Sale. Each Request is therefore crafted to obtain only information that will aid the Court in determining, at this preliminary stage, whether Plaintiffs are likely to succeed in proving the above elements under prevailing case law.

4. *Economic Data for Expert Analysis*

The final Request Nos. 13-16 hone in on specific economic information Plaintiffs' experts could use to perform a more fulsome antitrust analysis of the markets at issue. These narrow requests seek only documents sufficient to show the manner of supply to the Carolinas plants and the outflow of processed milk from those plants since January 2017 in order to facilitate this economic analysis. Obtaining this information will be significant both to supporting Plaintiffs' request for a preliminary injunction and to enabling the Court's evaluation of such request.

### C. Plaintiffs Have Shown a Likelihood of Irreparable Harm Without Access to Expedited Discovery.

Without access to the requested documents on an expedited basis, Plaintiffs will be forced to litigate their preliminary injunction motion without helpful market and economic data that is uniquely within DFA's custody, possession and control. These were precisely the grounds upon which Magistrate Judge Auld granted a motion for expedited discovery earlier this year. In *Teamworks Innovations*, the plaintiff claimed that it would suffer irreparable harm absent expedited discovery, explaining that if it were "required to wait until after the initial discovery conference to conduct discovery, [the plaintiff] will be prejudiced because it will be unable to gather further evidence in support of its [Preliminary Injunction] Motion for inclusion in its [Preliminary Injunction] Motion reply." 2020 WL 406360, at *4 (internal alterations omitted). The Court compared the information sought to the elements the plaintiff would have to show to support its motion for a preliminary injunction, determining that the requested information was both relevant and would "better enable the Court to judge the parties' interests and respective chances

11

for success on the merits" *Id*. at *5 (internal quotation marks and alterations omitted). This same analysis applies here: the discovery that Food Lion and MDVA seek "will bear on the merits of the P[reliminary] I[njunction] Motion and will facilitate the Court's resolution of" that motion. *Id*.

Further, the balance of equities weighs heavily in favor of granting Plaintiffs' request. A significant amount of the requested discovery is simply piggybacking on prior document productions made by DFA that can be reproduced to Plaintiffs expeditiously at little cost and the remaining request seek documents that are easily identifiable, readily capable of being produced, and highly relevant to the Court's assessment of preliminary relief. Without discovery into DFA's contemplated plans with the Carolinas plants and other related data, for example, Plaintiffs (and the Court) will be disadvantaged in presenting evidence in support of its motion for preliminary relief, particularly since much of the evidence is solely within DFA's possession, custody and control. A more fulsome record, by contrast, will provide the Court with stronger and more concrete evidence upon which to base its ruling. This opportunity will be lost if expedited discovery is not ordered.

**II.     A Mandatory Meet and Confer Will Advance Expedited Discovery and Briefing.**

Federal Rule 26(f) empowers the Court to order the parties to confer before a scheduling order is issued. *See* Fed. R. Civ. P. 26(f)(1) ("Except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B) or *when the court orders otherwise,* the parties must confer as soon as practicable . . .") (emphasis added). This

Court routinely orders early discovery conferences between the parties to predetermine the scope of discovery. *See, e.g.*, *Teamworks Innovations*, 2020 WL 406360, at *1 (directing "the parties to confer in an attempt to reach a mutual resolution regarding the specific scope of the expedited discovery that would occur" and setting "a deadline for them to report the results of their conference" after determining that some expedited discovery was necessary). The Court should do the same here.

An expedited meet and confer on discovery issues makes practical sense. In addition to discussing document retention obligations as contemplated by Local Rule 16.1(f), the parties will need to coordinate to complete expedited discovery in sufficient time for that evidence to be incorporated into the parties' preliminary injunction briefing and to be presented to the Court. A mandatory conference among counsel will allow the parties at the outset to negotiate concerns related to the discovery requests, discuss any potential depositions that may be needed,[2] and negotiate any proposed revisions to the briefing schedule set forth in the Local Rules. A meet and confer between the parties to discuss these and related issues would reduce delays and minimize additional motions practice before the Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court issue an order granting Plaintiffs' Motion and providing the specific relief proposed in the motion.

---

[2] After the parties complete document discovery, Plaintiffs anticipate that a small number of depositions will be necessary, which the parties can discuss at the expedited meet and confer conference.

DATED: May 28, 2020         Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

s/ Ryan G. Rich
A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*pro hac vice forthcoming*)
John S. Martin (*admitted pro hac vice*)
Kevin Hahm (*admitted pro hac vice*)
Carter C. Simpson (*admitted pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN SANDERS LLP**

s/ Jason D. Evans
Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (admitted *pro hac vice*)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
(404) 885-3362
james.lamberth@troutman.com

14

*Attorneys for Maryland and Virginia Milk
Producers Cooperative Association, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing memorandum does not exceed 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

This the 28th day of May 2020.

/s/ Ryan G. Rich
Ryan G. Rich

## CERTIFICATE OF SERVICE

      I hereby certify that on May 28, 2020, I electronically filed this document with the Clerk of the Court using the CM/ECF system, and that said document was served on the defendant via UPS Overnight Mail, addressed as follows:

DAIRY FARMERS OF AMERICA, INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

                                       /s/ Ryan G. Rich
                                           Ryan G. Rich