# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### 1:20-CV-442

FOOD LION, LLC, and MARYLAND
AND VIRGINIA MILK PRODUCERS
COOPERATIVE ASSOCIATION, INC.,

     Plaintiffs,

v.

DAIRY FARMERS OF AMERICA, INC.,

     Defendants.

**DEFENDANT DAIRY FARMERS OF AMERICA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY AND MANDATORY MEET AND CONFER**

On May 20, 2020 Food Lion, LLC and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA," together with Food Lion, the "Plaintiffs") filed a Complaint alleging antitrust violations arising from Dairy Farmers of America, Inc.'s ("DFA's") acquisition of certain assets from bankrupt milk producer Dean Foods Company ("Dean"). In addition to alleging antitrust violations arising out of that transaction, the Complaint accuses DFA of obstruction of justice and fraud. Three days after filing the Complaint—and before DFA had any opportunity to respond to this invective—Plaintiffs filed a Motion for a Preliminary Injunction, seeking the extraordinary remedy of an asset preservation order, and they now seek expedited voluminous discovery in support of that Motion.

The pending Motion for Expedited Discovery—filed to bolster the pending Motion

for Preliminary Injunction—both arise from a flawed Complaint that on its face is insufficient as a matter of law and fact. Additionally, the Complaint is barred by the "Failing Firm Doctrine." *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974) (holding failing firm doctrine applied where company acquired faced the grave possibility of failure and there was no viable alternative purchaser for the company that would be less anticompetitive). Moreover, Plaintiffs' request for extraordinary relief is not justified by any showing of imminent harm; in fact, DFA has no plans to close any of the former Dean plants in North Carolina and South Carolina or significantly change their operations. *See* Declaration of John J. Wilson ("Wilson Dec."), filed herewith, as Ex. A, at ¶ 20.

DFA respectfully submits that before the parties spend hundreds of hours and tens (or hundreds) of thousands of dollars on overbroad and potentially unnecessary discovery, the Court should have an opportunity to consider, in an expeditious manner, the underlying legal flaws in the Complaint. Accordingly, DFA proposes to file a Motion to Dismiss and supporting materials when due, on June 16, 2020, with briefing to be completed by July 14, 2020. That would allow the Court the benefit of briefing on threshold legal issues in this matter before deciding whether the extraordinary step of expedited discovery is warranted.

### Factual Background

The Defendant, DFA, is a milk marketing cooperative made up of nearly 7,500 family-owned dairy farm member-owners who produce milk throughout the country.

2

Wilson Dec. at ¶ 5. The majority of these farmers—roughly 6,600 (or almost 90% of DFA's total member farms)—operate small family farms with an average herd size of 87 cows. *Id.* at ¶ 6. Roughly 45% of DFA's member farms milk less than 50 cows. *Id.* In the Carolinas, DFA has 53 members and over 80% are small farms. *Id.* at 7. The product from these cows, raw milk, is a highly perishable crude commodity which, unlike other commodities, is the product of 2-3 milkings per day. *Id.* at ¶ 9. The milk must be received, processed, and made into products within 48 to 72 hours, or it becomes worthless. *Id.* This central fact drives the economics of the dairy industry, and requires that processing and distribution networks exist and are capable of consistent and reliable processing of milk, for subsequent sale to customers, which provides the cash flow necessary for farms to remain viable. DFA purchases and markets the milk produced by its member farmers. *Id.* at ¶ 8. Because time is limited for this product, DFA also owns milk processing and manufacturing plants, including fluid milk plants in certain parts of the United States. *Id.* at ¶ 12. For more than a decade, however, DFA has not owned—in whole or part—any fluid milk or other processing plants in the Carolinas until its recently completed acquisition of certain assets from Dean in connection with its Chapter 11 Bankruptcy filing. *Id.* at ¶ 13.

In the Carolinas, DFA has for several years, and currently supplies the majority of the raw milk processed by the Dean plants in High Point (North Carolina), Winston-Salem (North Carolina), and Spartanburg (South Carolina). *Id.* at ¶ 19. This enabled DFA

3

members' milk to be processed into fluid milk and then sold by Dean to stores, schools, and various other outlets.

On November 12, 2019, Dean and a number of its affiliates filed bankruptcy in the Southern District of Texas (Case No. 19-36313) ("Bankruptcy Court"). Dean was the largest fluid milk processor in the country at that time, with 57 plants in 29 states. Wilson Dec. at ¶ 14. DFA was thus faced with the potential collapse of its largest customer, and a critical outlet for its members' and other dairy famers' milk. *Id.* at ¶ 15. This case arises out of the events that happened in the next six months. After a fair, open, and transparent sale process, on March 31, 2020, Dean announced that DFA was the successful bidder for the vast majority of Dean's plants (44 plants, in 23 states), including the three plants in the Carolinas ("Carolina Plants"), which are at issue in this matter. *In re: Southern Foods Group, LLC et al.*, 19-36313 (S.D. Tx. Bankr.) at ECF 1270 (Mar. 31, 2020). Plaintiff MDVA was announced as the Alternate Bidder for the High Point, North Carolina facility. *Id.* Plaintiff Food Lion made no attempt to bid on any of the plants. Indeed, there were no other bidders for the Carolina Plants, other than the High Point, North Carolina facility.

The Bankruptcy Court approved DFA's winning bid, and thus its acquisition of 44 plants, at a sale hearing on April 3, 2020. *In re: Southern Foods Group, LLC et al.*, 19-36313 (S.D. Tx. Bankr.) at ECF 1572 (Apr. 5, 2020). On April 20, 2020, MDVA and Food Lion filed a motion in the Bankruptcy Court to permit it to file an antitrust case immediately in federal district court to enjoin DFA's acquisition. *Id.* at ECF 1693 (Apr. 20, 2020). That motion was denied. *Id.* at ECF 1872 (Apr. 30, 2020). Plaintiffs were not the only parties

4

examining the acquisition. The United States Department of Justice and many states attorneys' general also conducted merger inquiries and investigations.

On May 1, 2020, the United States Department of Justice and the States of Wisconsin and Massachusetts jointly filed a complaint and a proposed final judgment resolving that complaint in the Northern District of Illinois. *United States et al v. Dairy Farmers of America, Inc. et* al, 1:20-cv-02658 (N.D. Ill.). The consent decree required DFA to divest certain plants that it had acquired from Dean in Illinois, Wisconsin, and Massachusetts. Upon the execution of the stipulation in that case, the transaction closed later that day without objection by either the Department of Justice or the attorney general of any other state.

Nineteen days later, Plaintiffs filed their complaint in this matter. *See* Compl. [ECF 1], filed May 19, 2020, served May 26, 2020. Plaintiff Food Lion is a subsidiary of Koninklijke Ahold Delhaize N.V. ("Ahold"), one of the world's largest companies and grocery retailers, and headquartered in the Netherlands. In the United States, Ahold companies collectively own and operate over 1,400 supermarkets in New England, the Mid-Atlantic, and the Southeastern United States. *In re: Southern Foods Group, LLC et al.*, 19-36313 (S.D. Tx. Bankr.) at ECF 1065 (Mar. 9, 2020). MDVA is a dairy cooperative competitor of DFA, headquartered in Reston, Virginia, that also has interests in fluid milk processing plants. It currently has a plant in, among other places, Newport News, Virginia, less than 40 miles from the North Carolina border. Compl. ¶ 80 [ECF 1]. It also had a plant in New Bern, North Carolina, that it acquired in 2003 and closed in 2014. Wilson

5

Dec. at ¶ 21.

Two days after service, Plaintiffs filed their Motion for a Preliminary Injunction and now seek expedited discovery. In their Motion, Plaintiffs seek to have DFA provide tens of thousands of documents and gigabytes of structured data in less time than the Plaintiffs took to file their Complaint.

## Summary of Argument

The Supreme Court has cautioned against permitting discovery to proceed in antitrust cases before examining the merits of the complaint because of the tremendous burden and expense of such discovery. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (noting that the courts should be mindful "that proceeding to antitrust discovery can be expensive."). This case is no different. Plaintiffs propose broad-ranging and burdensome discovery on an expedited basis. Plaintiffs' rush warrants close scrutiny by this Court.

Plaintiffs' Complaint is legally flawed. Its theories on vertical merger violation or market foreclosure will not stand and its claims are barred by the Failing Firm Doctrine. Moreover, the Plaintiffs' stated reason for the rush to discovery—that changes will be made that cannot be undone—is not correct for two reasons. First, that is not the standard for expedited discovery. Second, no significant operational changes are contemplated by DFA, leaving more than enough time for the Court to consider the threshold legal issues in the Complaint. In addition, the request for expedited discovery imposes time limits that are unreasonably short and demands the production of data and documents that go well

6

beyond the three plants and market claimed to be at issue.

DFA submits that, in light of the absence of any real emergency, it will be more efficient for the Court to first receive briefing on DFA's Motion to Dismiss. That way, the Court can consider the critical threshold issues in this matter and whether the extraordinary step of expedited discovery is warranted, with the benefit of full briefing on the threshold legal issues.

## Argument

While "Federal Rule of Civil Procedure 26 gives a trial court wide discretion to manage the discovery process[,]....expedited discovery is not the norm." *Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill. 2000). Rather, courts "grant[] expedited discovery [only] when unusual circumstances exist." *ForceX, Inc. v. Tech. Fusion, LLC*, No. 4:11-cv-88, 2011 WL 2560110, at *4, 2011 U.S. Dist. LEXIS 69454, at *10 (E.D. Va. June 27, 2011) (internal quotations omitted). The burden is on the movant to "make some *prima facie* showing of the need for...expedited discovery." *Merrill Lynch*, 194 F.R.D. at 623.

"'[W]here [a litigant] requests expedited discovery in preparation for a preliminary injunction determination...., a standard based upon reasonableness or good cause, taking into account the totality of the circumstances, is...in keeping with discretion bestowed upon the [C]ourt in the Federal Rules of Civil Procedure.'" *Teamworks Innovations, Inc. v. Starbucks Corp.*, No. 1:19-CV-1240, 2020 WL 406360, at *3, 2020 U.S. Dist. LEXIS 11892, at *7-8 (M.D.N.C. Jan. 24, 2020) (alterations in original) (quoting *Dimension Data*

*N. Am., Inc. v. Netstar-1, Inc.*, 226 F.R.D. 528, 531 (E.D.N.C. 2005)).  When determining "the foregoing good cause/reasonableness standard," courts may consider:

> (1) the timing of the [instant M]otion…;
>
> (2) whether [Plaintiff] has narrowly tailored its [discovery] requests to gather information relevant to a preliminary injunction determination…; and
>
> (3) whether [Plaintiff] has shown a likelihood of irreparable harm without access to expedited discovery….

*Teamworks Innovations*, 2020 WL 406360, at *3, 2020 U.S. Dist. LEXIS 11892, at *8 (internal quotations omitted).  Although Plaintiffs' Motion arguably meets the timing requirement, it fails to show a likelihood of irreparable harm without access to the expedited discovery, and Plaintiffs have not narrowly tailored their requests.  As such, the majority of factors—and general standards of reasonableness—weigh in favor of denying Plaintiffs' motion.

## I.     The Court Should Consider Threshold Legal Issues Before Ordering Expedited Discovery

Plaintiffs' Complaint is flawed for a number of reasons.  These flaws mandate not expedited discovery, but a threshold consideration of whether the Complaint should be permitted to proceed at all.  While not setting forth the full arguments that will be presented in its Motion to Dismiss, as part of the consideration of the Motion for Expedited Discovery, DFA believes it is important to highlight for the Court several of the substantive legal weaknesses presented in Plaintiffs' Complaint and Motion for Preliminary Injunction.

8

*The Failing Firm Doctrine*

The Plaintiffs' Complaint, Motion for Preliminary Injunction, and related papers, do not mention or address the well-known "Failing Firm Doctrine." The Failing Firm Doctrine operates as a complete defense to any antitrust challenge to DFA's acquisition of the majority of Dean because the doctrine "presupposes that the effect on competition and the 'loss to stockholders and injury to the communities where its plants were operated' will be less if a company continues to exist even as a party to a merger than if it disappears entirely from the market." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974) (holding failing firm doctrine applied where company acquired faced the grave possibility of failure and there was no viable alternative purchaser for the company that would be less anticompetitive) (quoting *International Shoe Co. v. FTC*, 280 U.S. 291, 302 (1930)). *See also Calif. v. Sutter Health Sys.,* 84 F. Supp. 2d 1057, *aff'd,* 217 F.3d 846 (9th Cir. 2000).

When briefed in full, DFA will show that it satisfies the three-pronged test for application of the Failing Firm Doctrine; specifically, that Dean was in imminent danger of failure, there was no realistic prospect for Dean's reorganization, and there was no less anticompetitive purchaser to DFA. In fact, the Bankruptcy Court determined within the bankruptcy proceedings that Dean faced the grave possibility of failure, that there was no prospect of a reorganization of Dean, and that there was no viable alternative purchaser to DFA to keep the majority of Dean Foods operating. *See Granader v. Pub. Bank*, 417 F.2d 75, 83 (6th Cir. 1969) (affirming district court's determination that Failing Firm defense to Section 7 claim was established where state court had already found in a receivership action

that acquired entity was insolvent and acquirer was only prospective purchaser available).

Putting aside MDVA's attempt to cherry-pick a single plant, DFA's offer was the only one that could have, and did, keep the vast majority of Dean, including its employees, operational. Plaintiffs' failure to mention the Failing Firm Doctrine cannot be mere oversight.

*The Challenges in Proving a Merger Violation*

Plaintiffs allege that DFA's purchase of the Dean assets substantially lessens competition in two markets:

- the upstream market for the supply of raw milk by cooperatives and farmers who can reasonably turn to milk processing plants in the Carolinas with their supply, and

- the downstream market for the processing and sale of fluid milk to customers who can reasonably turn to milk processing plants in the Carolinas for their purchases.

*See* Compl. [ECF 1] ¶¶ 10-11, 21-26. Plaintiffs further allege that "[b]y gaining control of the majority of both markets, DFA now has the ability and the incentive to [1] cut off its raw milk competitors' supply to processing facilities, squeezing those competitors from the raw milk market; [2] charge supracompetitive prices for raw milk to competing milk processors; and [3] ultimately raise the prices of processed milk to retailers like Food Lion." Mem. [ECF 21] at 3 (internal citations omitted).

As an initial matter, DFA's acquisition does not and cannot raise "horizontal" merger concerns—concerns involving the merger of competitors—as there was no overlap between DFA and Dean in either of the Complaint's alleged relevant markets. DFA was

10

not a competitor in the fluid milk market in the Carolinas, in which Dean operated. Dean was not a competitor in the raw milk market in which DFA and MDVA compete. Without any overlap, there would be no elimination of competition in the alleged relevant markets. Indeed, there is no change in the markets, DFA remains the existing raw milk supplier and the Dean plants continue to operate.

With respect to "vertical" merger concerns—those relating to the merger of companies at different levels in a distribution chain—the Complaint's vertical "foreclosure" theories are unsupported by both law and fact. As a matter of law, vertical integration is typically viewed as procompetitive because "vertical mergers create vertical integration efficiencies between purchasers and sellers." *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). *See also* Makan Delrahim, Asst. Attn'y Gen., Dep't of Justice, Antitrust Div., Remarks at The Deal's Third Annual Corporate Governance Conference: Merger Enforcement Decisions Under Uncertainty and Imperfect Information (June 7, 2018) ("[The Antitrust Division] ha[s] long recognized that vertical integration can and does generate valuable efficiencies that benefit consumers. Indeed, most vertical mergers are pro-competitive or competitively neutral.").[1]

Because of this beneficial outcome, the antitrust agencies very infrequently litigate vertical merger cases, and when they do, the agencies typically lose. The only vertical merger case to be litigated to an outcome by the United States antitrust agencies in the past

---

[1] *See* https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-deal-s-third-annual-corporate (last visited June 3, 2020).

40 years was *AT&T/Time Warner* in 2018—which the government lost—and before that it was the 1979 *Fruehauf/Kelsey-Hayes* merger—which the government also lost. *See Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 348 (2d Cir. 1979). The "vertical integration efficiencies between purchasers and sellers" that existed in *AT&T/Time Warner* and led the court to find in favor of the merging parties also exist here, as the proposed DFA transaction would combine entities that operate at wholly distinct levels of the supply chain.[2]

*The Flaws in the Vertical Foreclosure Theory*

The alleged facts also do not support Plaintiffs' vertical "foreclosure" theory. First, the proposed acquisition of the Carolina Plants cannot result in any significant "foreclosure" of MDVA, let alone anticompetitive foreclosure, since the Dean plants in North Carolina already source almost all of their milk from DFA, and the South Carolina plant buys the majority of its raw milk from DFA. *See* Wilson Decl. ¶ 19. Second, the Complaint suggests that post-acquisition DFA would not sell raw milk to non-Dean milk processing facilities in the region. This would be against DFA's self-interest. Even if DFA were to do this, the Complaint does not explain why MDVA and other non-DFA milk suppliers cannot fill any alleged deficiency. And third, though the Department of Justice ("DOJ") specifically analyzed potential horizontal and vertical antitrust issues in the Carolinas, the resolution of DOJ's investigation did not require any relief in the Carolinas

---

[2] Private parties have been no more successful, in the very few private cases that have been brought. *See, e.g.*, *HTI Health Services, Inc. v. Quorum Health Group, Inc.*, 960 F. Supp. 1104 (S.D. Miss. 1997); *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217 (N.D. Ill. 1987); *cf. Steven C. Salop, Invigorating Vertical Merger Enforcement*, 127 Yale L.J. 1962, 1964 (2018) ("There has been very little private litigation.").

(in contrast to Illinois, Wisconsin, and Massachusetts).

## II. There is No Risk of Imminent Harm Without Access to Expedited Discovery.

Plaintiffs state that they "intend to seek [as a remedy] divestiture of *at least one* of the Carolinas plants at trial…."  Mem. [ECF 21] at 3 (emphasis added).  In the interim, however, they seek "a preliminary injunction in the form of an asset preservation order to maintain" a no longer existent, so-called "status quo" for *all three plants*.  *Id.* at 4.  It appears Plaintiffs' main thrust is that a preliminary injunction should be entered merely because it will be difficult to "unscramble the eggs."  Mem. [ECF 17] at 14.  While this is factually irrelevant since the transaction has been completed, if this were all that were required for a preliminary injunction, one would expect such injunctions to be common and handed out in any case in which a merger is challenged.  However, this position ignores the standard for a preliminary injunction and the case law that holds that preliminary injunctions are extraordinary measures.  Plaintiffs have not cited and DFA has not found any case in the Fourth Circuit, or in any other court, that abides by this standard.

"In order to succeed in gathering expedited discovery, the Plaintiff must also demonstrate that they would likely suffer irreparable harm in its absence."  *ForceX, Inc.*, 2011 WL 2560110 at *7, 2011 U.S. Dist. LEXIS 69454, at *20 (E.D. Va. June 27, 2011). For example, expedited discovery may be justified where "the discovery sought will be unavailable in the future or is subject to pending destruction if it is not taken now." *Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005) (denying expedited discovery where, *inter alia*, plaintiff neglected to allege that discovery

13

would be unavailable if not performed in an expedited manner). Plaintiffs here make no such allegations.

Indeed, Plaintiffs have not made any showing that they will be irreparably harmed by delaying the broad-based discovery requested. Rather, Plaintiffs repeat the irreparable harm standard without identifying what information is necessary and why it is needed now. Plaintiffs mention only one category of information as necessary to their preliminary injunction motion—"market and economic data"—and yet seek expedited discovery on 16 discovery requests (several of which include multiple subparts). Mem. [ECF 21] at 11. Plaintiffs do not explain how they will be prevented from, for example, litigating their preliminary injunction in the absence of DFA's farmer member's email addresses, all documents and communications concerning or relating to the 19-year-old Promissory Note between DFA and Dean, or communications with the Wisconsin Attorney General. Plaintiffs have left it to the Court and DFA to sort out what evidence is actually necessary to its preliminary injunction motion. *Hughes v. B/E Aerospace, Inc.*, 2014 WL 906220, at *1, 2014 U.S. Dist. LEXIS 29535, at *1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."). As Plaintiffs themselves cannot articulate irreparable harm, they have not met their burden, and this factor weighs against them.

Nor are Plaintiffs correct that "the balance of equities weighs heavily in favor of granting Plaintiffs' request" because "[a] significant amount of the requested discovery is simply piggybacking on prior document productions made by DFA that can be reproduced

14

to Plaintiffs expeditiously at little cost and the remaining requests seek documents that are easily identifiable, readily capable of being produced, and highly relevant to the Court's assessment of preliminary relief." Plaintiffs' broad-based requests cannot simply be "reproduced" as the requests extend, in many instances, well beyond what the Department of Justice sought. Moreover, Plaintiffs are not entitled to what they seek. Discovery related to matters and plants located elsewhere is well outside the limits of what is permissible and underscore that the balance of equities does not favor Plaintiffs.

Most importantly, Plaintiffs ignore the fundamental equities that favor DFA: as discussed above, Plaintiffs' Complaint and Preliminary Injunction motions are deficient on their face, and DFA should not be put to the burden and expense of responding to Plaintiffs' broad discovery until this Court has had the opportunity to examine the merits of Plaintiffs' case.

## III. Plaintiffs Have Failed to Narrowly Tailor Their Discovery Requests.

"When a party is seeking expedited discovery in connection with a request for a preliminary injunction, the discovery requests should be 'narrowly tailored to focus on information believed to be probative to the preliminary injunction analysis.'" *Dimension Data N. Am., Inc.*, 226 F.R.D. at 531. Although Plaintiffs claim that their requests are "straightforward," Mem. [ECF 21] at 6, "the discovery requested is not narrowly tailored to obtain information relevant to a preliminary injunction determination." *Dimension Data N. Am., Inc.*, 226 F.R.D. at 532. The reality is that Plaintiffs' requests are overbroad and sweep well "beyond the narrow issues the Court may need to resolve at th[e preliminary

15

injection] juncture." *Teamworks Innovations*, 2020 WL 406360, at *4, 2020 U.S. Dist. LEXIS 11892 at *11 (internal quotations removed). At a high level, the requests seek information about states and markets arguably irrelevant to the case in its entirety, and certainly would have no bearing on the more limited matter of the preliminary injunction.[3]

## A. Request Nos. 1-5

According to Plaintiffs, Request Nos. 1-5 "merely" seek "information directly related to the Asset Sale." Mem. [ECF 21] at 7. The reality of the requests is much different. In the interest of clarity, DFA provides the following examples of Plaintiffs' failure to narrowly tailor[4]:

| No. | Food Lion / MDVA Request | DFA's Response |
|---|---|---|
| 1. | All documents produced by DFA or Dean to the U.S. Department of Justice and/or state Attorneys General in connection with their investigation(s) and review(s) of the Asset Sale. | Plaintiffs allege a market limited to North and South Carolina, however the Asset Sale was for a total of 44 plants, in 23 states. Information was produced to the DOJ and five states attorneys general, and communications with other states attorneys' general. |
| 2. | All communications between DFA and/or Dean on the one hand and the U.S. Department of Justice and/or state Attorneys General on the other in connection with the Asset Sale. | (same response as 1) |

---

[3] Furthermore, if Plaintiffs' concern was being adequately prepared for the preliminary injunction, accepting a massive document dump of wholly irrelevant material would be a waste of time and effort.

[4] This is not intended to be a full substitute for objections and responses, rather a high-level identification of over broad and burdensome requests that are not narrowly tailored to the purposes at hand.

16

| 3. | All communications between DFA on the one hand and Dean or any third party on the other, including without limitation bankers, lenders, advisors, shareholders, investors, unions, employees, partners, suppliers, or customers, regarding potential antitrust or competition issues associated with the Asset Sale. | Plaintiffs allege a market limited to North and South Carolina, however the Asset Sale was for a total of 44 plants, in 23 states. |
|---|---|---|
| 4. | All documents produced by DFA or Dean, as well as any deposition transcripts, and any sealed and/or redacted filings, in connection with the bankruptcy proceedings in *In re: Southern Foods Groups, LLC*, et al., No. 19-36313 (Bankr. S.D. Tex.). | Some of this material will require approval of third parties, to the extent it involves sealed/redacted materials. Most of the issues before the Bankruptcy Court, such as the nature of secured debt and union contracts, are unrelated to any issue likely to be germane to this litigation. |
| 5. | All documents and communications concerning or relating to DFA's bid for, or its valuation of, any or all of the Carolinas plants. | DFA made a single bid for all of the 44 Dean plants it acquired. |

## B. Request Nos. 6 and 7

As with Requests No. 1 through 5, Plaintiffs failed to tailor their discovery requests

6 and 7 in scope and effort.

| No. | Food Lion / MDVA Request | DFA's Response |
|---|---|---|
| 6. | All documents and communications concerning or relating to DFA's actual or contemplated plans for the Carolinas plants following the Asset Sale, including without limitation all strategic, competitive, business, operational, integration, sourcing, pricing, staffing, or financial plans. | Massive amounts of highly sensitive business information would have to be collected, processed through a third-party vendor, then reviewed for responsiveness, as well as confidentiality and privilege concerns. This is a time-consuming process, not the mere copying of a single, centralized file, and is inconsistent with Plaintiffs' demand for expediency. |

17

| | | Moreover, it remains to be seen how merely "contemplated"—as opposed to "actual"—plans would be helpful for Plaintiffs' motion for a preliminary injunction. Plaintiffs provide no explanation. |
|---|---|---|
| 7. | All analyses, studies, surveys, and reports conducted by or for DFA or Dean after January 1, 2019, concerning or relating to the Carolinas plants. | (same as 6) |

## C. Request Nos. 8-12

Request Nos. 8-12 are also inconsistent with Plaintiffs' motion for expedited discovery. Plaintiffs provide no justification for these requests beyond the vague assertion that "Request Nos. 8-12 are aimed at certain discovery necessary to Plaintiffs' likelihood of success on its antitrust claims." Mem. [ECF 21] at 8. However, as set forth above, Plaintiffs' claims under Section 7 of the Clayton Act are unlikely to succeed for a multitude of reasons unrelated to the discovery sought.

DFA does not disagree with Plaintiffs that, should this matter proceed to trial, Plaintiffs' "claims will require in-depth analysis of competition in the markets at issue before and after the Asset Sale." Mem. [ECF 21] at 9.

18

| No. | Food Lion / MDVA Request | DFA's Response |
|---|---|---|
| 8. | All documents and communications concerning or relating to the Side [Promissory] Note. | Discovery regarding this agreement is irrelevant to DFA's acquisition of Dean assets and is not narrowly tailored to the preliminary injunction motion. Rather Plaintiffs seek to challenge alleged conduct from well outside the statute of limitations period. |
| 9. | All documents and communications concerning or relating to comparisons of pricing, costs, transportation, or other aspects of raw milk sourcing from DFA and Plaintiff Maryland and Virginia Milk Cooperative Association, Inc. | There is no geographic limitation for this request. DFA is in the business of marketing its farmer-members' raw milk, so most of its communications relate to its pricing, costs, transportation, or the vaguely worded "other aspects" of raw milk.[5] |
| 10. | All contractual or other agreements concerning or relating to (1) the sourcing or supply of raw milk to a milk processing plant in North or South Carolina, or (2) the sale of processed fluid milk from the Carolina plants, that were effective in the year prior to the Asset Sale or that will be effective following the Asset Sale. | This seeks voluminous data from both DFA and the newly acquired Dean Carolinas Plants for *all sales*. |
| 11. | All contractual or other agreements between DFA and Kroger concerning or relating to the supply of raw milk to Kroger-owned processing plants nationwide or in North or South Carolina. | It is unclear how this is relevant to the preliminary injunction. Kroger is a competitor of Plaintiff Food Lion; MDVA is a supplier to Kroger in North Carolina. MDVA is a competitor of DFA. |
| 12. | All documents and communications concerning or relating to customer, supplier, or member complaints or inquiries regarding the Asset Sale. | As with earlier requests, this seeks materials for the entire Asset Sale, across all geographic regions. |

---

[5]      As a competing dairy cooperative, Plaintiff MDVA is well aware of the volume and burden of this Request.

19

### D. Request Nos. 13-16

Requests Nos. 13 and 14 seek, broadly, all bids for the supply of raw and processed milk since January 1, 2017. Request Nos. 15 and 16 contain fifteen and thirteen sub-parts, respectively, for "structured data," including:

a. The terms of each sale;

b. The invoice number;

c. The purchase order number;

d. All locations from which the raw milk originated (i.e., not a pooling facility);

e. The supplier's name, phone number(s), address(es), email address(es);

f. The identity of the entity that was billed;

g. The location to which the raw milk was shipped;

h. The date and time the raw milk was shipped and the date and time the customer took delivery;

i. The class and/or grade of the raw milk;

j. The quantity (and units of measure) for each sale;

k. All pricing information concerning the sale, including shipping, tax, or similar charges, and the gross and net unit price for each item in the sale;

l. Any discounts, rebates, credits, freight allowances, returns, free goods and/or services, and any other pricing adjustments for each sale, with sufficient information to attribute these adjustments to individual sales;

m. Any fixed or variable cost or costs of goods sold concerning the sale (including freight charge and transportation cost, sales and distribution cost, raw materials, intermediaries, marketing or sales cost, and any other cost attributed or allocated to the sale;

n. Any Structured Data fields in which the user can freely enter text, such as

20

"comments" or similar fields; and

o. Any Structured Data fields summarizing terms of the sale or agreements or contracts relating to the sale.

Standing alone, these requests are not permitted under the Federal Rules. Collectively, these 30-plus requests demand all of DFA's and legacy Dean's raw and fluid milk data for North and South Carolina "in the most disaggregated form (meaning at the transactional level, not aggregated by month or quarter) in which it is kept." *See also Dimension Data N. Am., Inc.*, 226 F.R.D. at 532 (finding unreasonable a request for all of defendant's "accounts receivables…involving entities in North Carolina"). To say nothing of the business and antitrust concerns associated with giving DFA's competitor its most sensitive sales information in its most disaggregated form, Plaintiffs offer no explanation as to why they need or what they intend to do with detailed contact information, including email addresses, for each of DFA's members and customers.

Because Plaintiffs' proposed discovery is overbroad, and not narrowly tailored to its purpose, this factor weighs against granting the instant motion. *See Dimension Data N. Am., Inc.*, 226 F.R.D. at 531.

## Conclusion

Plaintiffs seek to leapfrog the normal and rational litigation process in order to commence discovery in a highly complex antitrust case where the complaint appears invalid on its face. Plaintiffs fail to establish that there would be irreparable harm if their motion to expedite discovery is denied. And as detailed above, they fail to propound discovery that is reasonably and narrowly tailored to its purported goal of furthering

21

briefing on the motion for a preliminary injunction. A more sensible approach in this situation is to permit the Court to consider the forthcoming motion to dismiss, which should be fully briefed by the middle of next month, before having DFA commence the expensive and time-consuming process of responding to discovery to allow Plaintiffs to refile their motion for a preliminary injunction. DFA therefore respectfully requests that Plaintiffs' instant motion be denied.

Respectfully submitted this the 3rd day of June, 2020.

/s/ James P. Cooney III
James P. Cooney III
N.C. State Bar No. 12140
Sarah Motley Stone
N.C. State Bar No. 34117
WOMBLE BOND DICKINSON (US) LLP
Charlotte, North Carolina 28202
Phone: 704-331-4900
Fax: 704-331-4955
Jim.Cooney@wbd-us.com
Sarah.Stone@wbd-us.com

Brent F. Powell
N.C. State Bar No. 41938
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: 336-721-3600
Fax: 336-721-3660
Brent.Powell@wbd-us.com

Rebecca C. Fleishman
N.C. State Bar No. 41233
WOMBLE BOND DICKINSON (US) LLP

555 Fayetteville Street
Suite 1100
Raleigh, North Carolina 27601
Phone: 919-755-2100
Fax: 919-755-2100
Rebecca.Fleishman@wbd-us.com

W. Todd Miller*
Amber McDonald*
BAKER & MILLER
2401 Pennsylvania Avenue N.W.
Suite 300
Washington, D.C. 20037
Phone: 202-663-7820
Fax: 202-663-7849
AMcDonald@bakerandmiller.com
TMiller@bakerandmiller.com

Attorneys for Dairy Farmers of America, LLC


*Special Appearance Pending

## WORD COUNT CERTIFICATION

This is to certify that the foregoing document complies with the word count limit set forth in L.R. 7.3(d)(1).

_/s/ James P. Cooney III_
James P. Cooney III
N.C. State Bar No.
