# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Food Lion, LLC, and Maryland and Virginia Milk Producers Cooperative Association, Inc.,

*Plaintiffs*,

v.

Dairy Farmers of America, Inc.,

*Defendant*.

Case No. 1:20-cv-00442

## DEFENDANT DAIRY FARMERS OF AMERICA, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

James P. Cooney III
N.C. State Bar No. 12140
Sarah Motley Stone
N.C. State Bar No. 34117
WOMBLE BOND DICKINSON (US) LLP
Charlotte, North Carolina 28202
Phone: 704-331-4900
Fax: 704-331-4955
Jim.Cooney@wbd-us.com
Sarah.Stone@wbd-us.com

Brent F. Powell
N.C. State Bar No. 41938
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: 336-721-3600
Fax: 336-721-3660
Brent.Powell@wbd-us.com

W. Todd Miller*
Amber McDonald*
BAKER & MILLER PLLC
2401 Pennsylvania Avenue N.W.
Suite 300
Washington, D.C. 20037
Phone: 202-663-7820
Fax: 202-663-7849
TMiller@bakerandmiller.com
AMcDonald@bakerandmiller.com

Attorneys for
Dairy Farmers of America, Inc.

*Special Appearance Forthcoming

**TABLE OF CONTENTS**

NATURE OF THE MATTER BEFORE THE COURT ...................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

QUESTIONS PRESENTED ................................................................................... 5

ARGUMENT .................................................................................................... 6

I.    STANDARD OF REVIEW ............................................................................ 6

II.   THE COMPLAINT'S SPECULATIVE ALLEGATIONS FAIL TO ESTABLISH ARTICLE III STANDING, ANTITRUST INJURY, OR HARM TO COMPETITION. .................................................................................... 7

      A. The Complaint Fails to Meet the Injury-in-Fact Requirement for Article III Standing. .......................................................................... 7

      B. Plaintiffs' Speculative Injuries Are Not Antitrust Injuries. ................... 9

          1. MDVA Lacks Antitrust Standing Because It Complains Not of Decreased Competition, But Rather of Increased Competition Following Its Failed Bid. .............................................................. 10

          2. Food Lion Lacks Antitrust Standing Because It Has Not Alleged Any Injury of the Type the Antitrust Laws Were Intended to Prevent. .................. 11

      C. The Complaint Fails to State a Claim Because It Does Not Identify any Tangible, Non-Speculative Harm to Competition Caused by DFA's Acquisition of the Carolinas Plants. ......................................... 12

III.  THE FAILING COMPANY DOCTRINE SUPPLIES A COMPLETE DEFENSE TO PLAINTIFFS' SECTION 7 CLAIM. ............................................... 17

      A. Dean Faced a Grave Possibility of Business Failure Absent an Acquisition. ...... 18

      B. Dean Made a Good Faith Effort to Seek Other Buyers. ....................... 19

IV.   THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE ITS ALLEGED GEOGRAPHIC MARKET IS IMPLAUSIBLE AND CANNOT SUPPORT PLAINTIFFS' SECTION 7 OR SECTION 2 CLAIM. ........................................... 20

      A. Plaintiffs' Relevant Geographic Market Is Implausible in Light of the Facts Pleaded by Plaintiffs and Plaintiffs' Own Dairy Operations. ................ 21

      B. Plaintiffs' Assertions Directly Contradict Food Lion's Previous Positions. ........ 22

CONCLUSION ................................................................................................. 23

Case 1:20-cv-00442-CCE-JLW   Document 31   Filed 06/16/20   Page 2 of 30

# TABLE OF AUTHORITIES

*Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*,
  826 F.2d 1235 (3d Cir. 1987) ...................................................................... 13

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ...................................................................................... 11

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ......................................................................... 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 6

*Bishop v. Bartlett*,
  575 F.3d 419 (4th Cir. 2009) ......................................................................... 6

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ...................................................................................... 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................. 10, 11

*B-S Steel of Kan. v. Tex. Indus.*,
  439 F.3d 653 (10th Cir. 2006) ....................................................................... 9

*California v. Sutter Health Sys.*,
  130 F. Supp. 2d 1109 (N.D. Cal. 2001)....................................................... 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................... 7, 9

*Davies v. Genesis Med. Ctr.*,
  994 F. Supp. 1078 (S.D. Iowa 1998)............................................................ 21

*Downeast Builders & Realty, Inc. v. Essex Homes Se., Inc.*,
  No. 3:11-cv-02653-CMC, 2012 U.S. Dist. LEXIS 91764 (D.S.C. July 3, 2012).. 20

*Dreher v. Experian Info. Sols., Inc.*,
  856 F.3d 337 (4th Cir. 2017). ........................................................................ 7

*Edwards v. City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999) ......................................................................... 7

*Food Lion, LLC v. Dean Foods (In re Se. Milk Antitrust Litig.)*,
  No. 2:07-CV 188, 2012 U.S. Dist. LEXIS 37650 (E.D. Tenn. Mar. 20, 2012)..... 23

*Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*,
  730 F. Supp. 2d 804 (E.D. Tenn. 2010) ...................................................... 23

iii

*Fruehauf Corp. v. FTC.*,
    603 F.2d 345 (2d Cir. 1979) .................................................................. 13, 14, 15

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) ........................................................................ 6

*Granader v. Public Bank*,
    281 F. Supp. 120 (E.D. Mich. 1967) ........................................................... 18

*HCI Techs., Inc. v. Avaya, Inc.*,
    241 F. App'x 115 (4th Cir. 2007) .................................................................. 9

*In re Se. Milk Antitrust Litigation*,
    739 F.3d 262 (6th Cir. 2014) ...................................................................... 23

*Iselin v. Bama Cos.*,
    690 F. App'x 593 (10th Cir. 2017) ............................................................... 7

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981) ...................................................................... 14

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
    573 F. Supp. 2d 1125 (E.D. Ark. 2008) ................................................. 20, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................... 10

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ....................................................................... 12

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765 (4th Cir.
    1991) ............................................................................................................ 6

*Shaughnessy v. Duke Univ., Private Diagnostic Clinic, PLLC*, No. 1:18-CV-461, 2018
    U.S. Dist. LEXIS 196355) (M.D.N.C. Nov. 19, 2018) ................................... 6

*Shred-It Am., Inc. v. Macnaughton*, No. 10-00547 DAE-KSC, 2011 U.S. Dist. LEXIS
    51933 (D. Haw. May 13, 2011) .................................................................. 20

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................. 7

*Sureshot Golf Ventures v. Topgolf Int'l, Inc.*, 7
    54 F. App'x 235 (5th Cir. 2018) ................................................................... 8

*United States v. AT&T, Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) ............................................................ 13

*United States v. Culbro Corp.*,
    504 F. Supp. 661 (S.D.N.Y. 1981) ............................................................. 17

iv

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974) ...................................................................................... 17, 18

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) ...................................................................................... 12, 14

*United States v. Md. & Va. Milk Producers Assoc.*,
  167 F. Supp. 799 (D.D.C. 1958) .......................................................................... 17

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) .............................................................................................. 12

*Veney v. Wyche*,
  293 F.3d 726 (4th Cir. 2002) .................................................................................. 7

*Witthohn v. Fed. Ins. Co.*,
  164 Fed. App'x 395 (4th Cir. 2006) ..................................................................... 18

v

## NATURE OF THE MATTER BEFORE THE COURT

On May 19, 2020, after failing to convince the Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court") to block the sale of certain Dean Foods Company ("Dean") processing plants to Dairy Farmers of America, Inc. ("DFA"), Plaintiffs—Food Lion, LLC ("Food Lion") and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA")—filed a Complaint seeking to undo this acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act. The thrust of Plaintiffs' Complaint is that DFA's acquisition of bankrupt Dean's three processing plants in North and South Carolina (the "Carolina Plants") *might*, in 2021, prevent MDVA from competing to supply those plants with raw milk, and that as a result of MDVA hypothetically not gaining that business, Food Lion *might* not receive as low prices as it would like for future purchases of processed fluid milk ("Processed Milk") from the Carolina Plants.

The Complaint concedes that these future harms have not yet occurred. In fact, competition remains unaffected in the market: the Carolina Plants still process raw milk from DFA (as they did prior to DFA's acquisition of these plants); MDVA still sells its raw milk to processors other than Dean or DFA; and Food Lion still purchases its Processed Milk from processors other than Dean or DFA. Accordingly, Plaintiffs have not suffered the requisite "injury-in-fact" for Article III standing.

Just as the Complaint fails to establish Article III standing for purposes of subject-matter jurisdiction, it also fails to state a viable antitrust claim. It does not establish the critical element of "antitrust injury"—injury to competition—but instead reveals that

1

MDVA, a failed bidder, is complaining only of *increased* competition, while Food Lion alleges no cognizable injury under the antitrust laws.

The Complaint is further foreclosed by the Failing Company Doctrine. That doctrine permits the acquisition of a failing firm when there are no other reasonable alternatives, on the theory that the continued operation of the failing firm (even by a competitor) causes less harm than any alleged anticompetitive effects. The Failing Company Doctrine applies here because DFA's acquisition was authorized and overseen by the Bankruptcy Court, during which that court made factual findings that establish this defense.

Finally, the Complaint alleges an implausible geographic market that imagines Georgia and Virginia do not exist. The Complaint suggests that North and South Carolina, bounded by "the Atlantic Ocean to the East and the Appalachian Mountains to the West," Complaint [ECF 1] ¶23, exist as a combined island. This not only defies common sense but is contradicted by the Government's own regulation of the market, and Food Lion's claims in other cases.

## STATEMENT OF FACTS

DFA is a nation-wide cooperative of more than 14,000 dairy farmers. ECF 1 ¶3. According to the Complaint, for nearly twenty years DFA maintained a contractual relationship with Dean to supply raw milk for processing into Processed Milk. MDVA, which is also a cooperative of farmers producing raw milk, alleges that since 2019 it has not sold any raw milk to the Carolina Plants. ECF 1 ¶62. Although Plaintiffs spend pages

2

alleging prior wrongdoing by both DFA and Dean, they do not challenge or seek relief for the actual agreements that presently (or previously) operate in the market. Rather, the Complaint alleges without explanation that, because of the sale of the Carolina Plants to DFA, "MDVA is at serious risk of soon losing access" to one processing facility (Hunter Farms) that is not owned by Dean or DFA. ECF 1 ¶74. It also complains that other options may not be ideal because of distance or inferior facilities. ECF 1 ¶¶74, 76. The Complaint alleges that "MDVA was relying heavily on the prospect of competing for access to Dean plants in the Carolinas" in 2021, when it says the contractual agreements between Dean and DFA will expire. ECF 1 ¶78.

As for Food Lion, the Complaint alleges that Food Lion's present sources of Processed Milk, MDVA and Kroger's Hunter Farms, are not "economical long-term source[s]" or "solution[s]." ECF 1 ¶83. Food Lion further alleges that sourcing Processed Milk from other plants, including MDVA plants, imposes higher transportation costs or is too "difficult to predict" for "long-term viability." ECF 1 ¶85. Thus, Food Lion complains that "once the effects of the Asset Sale set in," it will have "no viable, long-term alternative" but to purchase product from the Carolina Plants at what it claims will be "supra-competitive" prices. *Id.*

The sale of Dean's assets occurred in the context of a fair, open, and transparent sale process overseen by the Bankruptcy Court in Deans' bankruptcy. Food Lion was not a bidder in that process, and MDVA bid only on the plant in High Point, North Carolina. ECF 1 ¶87. DFA was "[t]he only party that submitted a bid for the vast majority of the

Debtors' plants and related assets…" *See* Defendant's Motion to Dismiss ("Mot."), at Exhibit A (Case 19-36313 (Bankr. S.D. Tex.) ("Bankr. Ct. Dkt."), ECF 1514-1) ("Ex. A") at ¶15.

Food Lion and MDVA both participated in the bankruptcy process, including making their positions known at hearings. Food Lion's counsel explained to the Bankruptcy Court that Food Lion was working with the Department of Justice regarding their antitrust concerns (*see* Mot. at Exhibit B (Transcript of March 12, 2020 Hearing before Bankruptcy Court, Bankr. Ct. Dkt. ECF 1145), at 86:12-17), and MDVA also explained some of its objections to the court (*see* id. at 39:23-43:7). In support of an emergency motion to be permitted to file an antitrust suit to enjoin DFA's acquisition of the Carolina Plants, Plaintiffs argued that they would not be able to successfully challenge the acquisition in this Court after the acquisition closed because, under the antitrust laws, "no private party has ever succeeded in obtaining and enforcing equitable relief unwinding a consummated merger." Mot. at Exhibit C (Bankr. Ct. Dkt. ECF 1816) ("Ex. C") at ¶17. The Bankruptcy Court denied Plaintiffs' objections and motion, decisions Plaintiffs did not appeal. *See* Mot. at Exhibit D (Bankruptcy Court Sale Order, Bankr. Ct. Dkt. ECF 1572) ("Ex. D") at 14, ¶1; Mot. at Exhibit E (Transcript of April 28, 2020 Hearing before Bankruptcy Court, Bankr. Ct. Dkt. ECF 1883) at 79:25-80:19. The Department of Justice

4

resolved the relevant antitrust issues to its satisfaction[1] and closed its investigation into the acquisition. Plaintiffs then instituted this lawsuit.

## QUESTIONS PRESENTED

1. Does this Court have subject matter jurisdiction where Plaintiffs lack Article III standing due to the Complaint's speculative allegations and failure to allege certainly impending injury?

2. Do Plaintiffs have antitrust standing where the Complaint alleges only speculative injuries that are not of the type the antitrust laws were intended to prevent?

3. Are Plaintiffs' speculative allegations about future potential anticompetitive harm posed by this presumptively procompetitive and lawful vertical merger sufficient to state a claim under Section 7 of the Clayton Act?

4. Did Dean face the grave probability of a business failure and try and fail to secure an alternative purchaser, such that the Failing Company Doctrine supplies a complete defense to Plaintiffs' Section 7 claim, even assuming Plaintiffs' speculative allegations do not otherwise defeat their claims?

5. Does the Complaint fail to plead a plausible relevant geographic market where Plaintiffs' allegations, as pleaded here and as argued by Food Lion in previous litigation, as well as their own dairy operations, support a market much broader than North and South Carolina?

---

[1] The Department of Justice filed its Proposed Final Judgment, which involved the voluntary divestiture of three plants in Illinois, Wisconsin, and Massachusetts. *See* Mot. at Exhibit F (May 1, 2020 Department of Justice Press Release); Exhibit G (Proposed Final Judgement filed in *United States of America, et al. v. Dairy Farmers of America, Inc., et al.*, Case 1:20-cv-02658 (N.D. Ill.), ECF 4-2).

5

# ARGUMENT

## I. STANDARD OF REVIEW

### *Subject-Matter Jurisdiction*

"Subject matter jurisdiction is a 'threshold matter' courts must address before making any decision on the merits of a case." *Shaughnessy v. Duke Univ., Private Diagnostic Clinic, PLLC*, No. 1:18-CV-461, 2018 U.S. Dist. LEXIS 196355, at *3 (M.D.N.C. Nov. 19, 2018). Plaintiffs bear the burden of establishing standing. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). They "must include the necessary factual allegations in the pleading, or else the case must be dismissed for lack of standing" under Rule 12(b)(1). *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009). When deciding whether subject matter jurisdiction exists, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond*, 945 F.2d at 768.

### *Failure to State a Claim*

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is *plausible* on its face." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis in original). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court assumes the complaint's well-pleaded facts are true and draws all reasonable factual inferences from the pleadings in the plaintiff's

6

favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Court need not, however, accept as true factual allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). In determining whether a claim is plausible, courts take into account whether the claim is internally inconsistent. *See Iselin v. Bama Cos.*, 690 F. App'x 593, 598 (10th Cir. 2017) (affirming dismissal of claim as failing to raise the right to relief above the speculative level because allegations were, inter alia, internally inconsistent).

## II. THE COMPLAINT'S SPECULATIVE ALLEGATIONS FAIL TO ESTABLISH ARTICLE III STANDING, ANTITRUST INJURY, OR HARM TO COMPETITION.

### A. The Complaint Fails to Meet the Injury-in-Fact Requirement for Article III Standing.

To establish Article III standing, a plaintiff must show, *inter alia*, that it suffered an "injury in fact." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). Injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). "Allegations of possible future injury" are insufficient; the "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs' Complaint fails to allege any "certainly impending" injury. The Fifth Circuit's decision in *Sureshot Golf Ventures v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 241

(5th Cir. 2018), is instructive. In that case, Sureshot had entered into a long-term supply agreement for golf shot-tracking technology. Sureshot's competitor, Top Golf, acquired the supplier of the shot-tracking technology. Top Golf allegedly refused to provide Sureshot assurances that it would renew the supply agreement when it expired and told Sureshot it should consider other options. Sureshot brought claims under Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act, based on a market foreclosure theory. The Fifth Circuit affirmed the district court's conclusion that Sureshot's allegations did not amount to "certainly impending" injury sufficient to establish subject matter jurisdiction, and concluded that the market foreclosure harms alleged by Sureshot were "speculative." *Id.* at 241.

Plaintiffs' allegations of harm and foreclosure here are more speculative than those in *Sureshot.* Whereas Sureshot had an existing contract with the acquired company, MDVA admits that it does not currently supply the Carolina Plants acquired by DFA. ECF 1 ¶¶62, 78. Rather, MDVA supplies raw milk to three other processors in the Carolinas, and alleges only that this is "not sustainable in the long term." ECF 1 ¶73. Accordingly, MDVA admits that it will not be harmed until 2021 at the earliest, when it assumes it will not have an anticipated "opportunity to compete" to supply the Carolina Plants. ECF 1 ¶¶47, 101, 104. In short, MDVA's alleged injury is contingent on at least four speculative assumptions: (1) MDVA will lose its current supply contracts with other processors; (2) in 2021, MDVA would have had an opportunity to compete to supply the Carolina Plants; (3) in 2021, MDVA would have been successful in its bid to supply the Carolina Plants;

8

and (4) because of DFA's acquisition of the Carolina Plants, MDVA's opportunity to supply these plants is foreclosed. This is not "certainly impending" injury that is sufficient to show injury in fact.

In addition to the same speculative causal chain identified above, Food Lion's claimed injury relies on two more assumptions: (1) DFA's acquisition of the Carolina Plants will have a price effect and (2) Food Lion will be forced in the future to buy Processed Milk subject to that price effect from the Carolina Plants. Not only are these assumptions speculative, but they ignore that DFA's acquisition of the Carolina Plants does not change the concentration of the Processed Milk market or the raw milk market in the Carolinas. *See* ECF 1 ¶85.

Because Plaintiffs' theory of injury depends upon a "speculative chain of possibilities" that "does not establish that injury…is certainly impending," *Clapper*, 568 U.S. at 414, Plaintiffs' Complaint should be dismissed.

### B. Plaintiffs' Speculative Injuries Are Not Antitrust Injuries.

In addition to Article III standing, Plaintiffs must establish antitrust standing.[2] *See B-S Steel of Kan. v. Tex. Indus.*, 439 F.3d 653, 667 (10th Cir. 2006). Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful"—in other words, injury to competition. *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 123 (4th Cir. 2007). Here, Plaintiffs' claimed

---

[2] Antitrust standing is evaluated under Rule 12(b)(6).

injuries are speculative, implausible, and not caused by the alleged anticompetitive behavior.

### 1. MDVA Lacks Antitrust Standing Because It Complains Not of Decreased Competition, But Rather of Increased Competition Following Its Failed Bid.

Plaintiffs' Complaint confirms that MDVA is not worried about *reduced* competition in the raw milk market; instead it is worried about having to compete with a more efficient, vertically integrated cooperative in the market where its farmer-members are located. MDVA has not alleged any plausible facts to suggest it will not be able to access the non-DFA plants in the Carolinas, or plants farther north or south, including its own plant in Newport News, Virginia. And the claimed mechanism for potential injury to Food Lion—higher prices charged by cooperatives such as MDVA for the supply of raw milk—would inure to the benefit of MDVA, meaning that MDVA has no standing to bring this suit. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (competitor cannot claim antitrust injury where allegedly anticompetitive conduct would have allowed that same competitor to charge supracompetitive prices).

MDVA also cannot show antitrust injury because its supposed future injury is the same "injury" it is allegedly experiencing now. It alleges it does not supply the Carolina Plants, and it is concerned it will not supply them in the future. *See* ECF 1 ¶¶ 62, 78; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) (regardless of whether acquisition violated Section 7, plaintiff did not experience antitrust injury where same injury could have been caused by lawful conduct). Moreover, for MDVA to

experience that alleged future injury, speculative independent events would need to occur, namely, if DFA had not acquired the Carolina Plants, MDVA speculates it would have obtained a contract to supply these plants in 2021. Such hypothetical injury cannot support antitrust standing. *See Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983) (considering antitrust standing and relying on finding that "nothing but speculation informs the [plaintiff's] claim of injury by reason of the alleged unlawful" conduct).

MDVA's allegations hint at its true concern—that DFA's vertical integration will make DFA a more effective competitor for farmer members. *See* ECF 1 ¶¶116 ("As it loses members to DFA, MDVA eventually will be significantly weakened…"); 138, 140. Notably, Plaintiffs do not suggest that any dairy farms will be put out of business. Instead, they express concern that DFA will become a more attractive option for MDVA's members. But that is not the type of harm the antitrust laws were intended to avoid—that is competition. *See Pueblo Bowl-O-Mat*, 429 U.S. at 488 (the antitrust laws "were enacted for the protection of *competition*, not c*ompetitors*" (internal quotation marks omitted) (emphasis in original)).

### 2. Food Lion Lacks Antitrust Standing Because It Has Not Alleged Any Injury of the Type the Antitrust Laws Were Intended to Prevent.

Food Lion has also failed to allege antitrust injury. Its claimed injury—increased Processed Milk prices—is just the next step in MDVA's speculative chain. *See* ECF 1 ¶¶117, 125, 128.

Food Lion also fails to allege antitrust injury for a separate reason: its claimed future injury would not be caused by DFA having any newly acquired power to raise prices because of the acquisition. *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) (plaintiffs do not have antitrust standing where their "particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices"). Because DFA did not have any processing facilities in the Carolinas region prior to the acquisition, DFA is simply replacing Dean in the processing market, and will have the exact same regional market share that Dean had.

## C. The Complaint Fails to State a Claim Because It Does Not Identify any Tangible, Non-Speculative Harm to Competition Caused by DFA's Acquisition of the Carolinas Plants.

Even apart from standing, Plaintiffs' speculative injury allegations are fatal to Plaintiffs' Section 7 claim because that claim cannot stand on "ephemeral possibilities." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 (1974).

When analyzing a merger under the antitrust laws, the courts first determine the nature of the transaction: horizontal (between competitors); vertical (between companies at different levels of the supply chain); or conglomerate (between companies that are neither competitors nor supplier/customer). The vast majority of antitrust merger challenges are to horizontal mergers, as some such mergers may create an inference of anticompetitive effect. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).

12

DFA's acquisition of three Dean processing facilities in the Carolinas, with which DFA only had a supplier-customer relationship in the Carolinas, was a vertical transaction.[3] "A vertical merger, unlike a horizontal one, does not eliminate a competing buyer or seller from the market. It does not, therefore, automatically have an anticompetitive effect or reduce competition." *Fruehauf Corp. v. FTC.*, 603 F.2d 345, 351 (2d Cir. 1979) (internal citations omitted). Vertical mergers are typically viewed as procompetitive because "vertical mergers create vertical integration efficiencies between purchasers and sellers." *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019)[4]; *see also Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1245 (3d Cir. 1987) (injuries to a competitor caused by a vertical merger that enabled the buyer to acquire better prices from self-dealing "should not be compensable under the antitrust law because they do not flow from the anticompetitive effects of a merger").

Therefore, to assert a Section 7 claim, Plaintiffs' Complaint must allege facts to support a theory of competitive harm that is probable, not speculative. *See Marine*

---

[3] Plaintiffs' Complaint makes clear that an acquisition of one of the Carolina Plants by MDVA would in fact be a horizontal merger of competitors if one considers MDVA's Newport News, Virginia plant (*see* ECF 1 ¶84); as such, it would be subject to close scrutiny.

[4] Antitrust agencies seldom litigate vertical merger cases, and when they do, the agencies typically lose. The only vertical merger case litigated to an outcome by the U.S. antitrust agencies in the past 40 years was *AT&T/Time Warner* in 2018—which the government lost—and before that it was the 1979 *Fruehauf/Kelsey-Hayes* merger—which the government also lost. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 348 (2d Cir. 1979).

13

*Bancorp.*, 418 U.S. at 622-23; *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 274 (7th Cir. 1981) (asserting the standard is a reasonable probability, not mere possibility), cert. denied, 455 U.S. 921 (1982); *Fruehauf,* 603 F.2d at 351 (holding that "there must be the reasonable probability of a substantial impairment of competition…. A mere possibility will not suffice.").

Plaintiffs assert that DFA's acquisition of the Carolina Plants will harm competition because it may foreclose possible competition for raw milk sales in 2021. ECF 1 ¶¶78, 101, 104. Without that competition, Plaintiffs contend, DFA will maintain a higher price for raw milk, resulting in higher prices for Processed Milk. ECF 1 ¶¶106-108; 117. But Plaintiffs' theory of harm is nothing more than supposition, as the market has not changed. DFA was already the supplier to the Carolina Plants (ECF 1 ¶¶62, 78), DFA did not operate any Processed Milk plants that are located or compete in the Carolinas (ECF 1 ¶72), and Dean did not compete in the market for raw milk with MDVA and DFA (ECF 1 ¶104). Whether MDVA would have succeeded in getting an agreement to supply the Carolina Plants in 2021 is nothing but surmise and speculation. This is insufficient to create the required "reasonable probability" of anticompetitive harm caused by DFA's acquisition of the Carolina Plants.

Plaintiffs conjure a world where DFA's acquisition will result in foreclosure of competing suppliers to the Carolina Plants and allow DFA to strengthen its position in the raw milk market. ECF 1 ¶116. But as a leading antitrust treatise notes, "many instances of vertical integration cause injury to upstream or downstream firms who lose a trading

14

partner…. Further, this loss can be significant, particularly if the integrating firm accounts for a large percentage of the independent firm's sales … Such injuries are certainly injuries-in-fact 'caused' by vertical integration. But they have absolutely nothing to do with any injury to competition." Areeda & Hovenkamp, Antitrust Law ¶756a2 (4th ed. 2016). And as the Second Circuit explained in *Fruehauf*, the Supreme Court's Section 7 precedent "contravenes the notion that a significant level of foreclosure is itself the proscribed effect…" 603 F.3d at 352.

Plaintiffs' own allegations show that DFA's acquisition of the Carolina Plants will not result in any foreclosure, much less anticompetitive foreclosure. Accepting as true that the relevant geographic market is limited to the Carolinas (which, as discussed in further detail below, is implausible), Plaintiffs allege that DFA's producers and DFA's partners' producers account for 64% of raw milk produced, while MDVA and its partners account for 36% of raw milk produced.[5] *See* ECF 1 ¶65, Fig. 2.[6] Plaintiffs allege that the Carolina Plants account for 59% of processing volume in the Carolinas, and 60.8% of processing capacity. ECF 1 ¶¶69 (Fig. 3), 70. In other words, whether accounting for volume or

---

[5] Plaintiffs seem to arrive at this high market share based on the inclusion of undisclosed "partner cooperatives." ECF 1 ¶65. Plaintiffs do not name these "partner cooperatives," explain what makes them "partners," or explain how DFA would exercise control over the raw milk of other cooperatives.

[6] Percentages derived from combining milk volume numbers from North Carolina and South Carolina for each category and comparing DFA and its alleged partners' share, then MDVA's and its partners' shares, to total volume.

Case 1:20-cv-00442-CCE-JLW   Document 31   Filed 06/16/20   Page 20 of 30

capacity, MDVA will be able to access roughly 40% of the processing capacity in the Carolinas at other plants, while only producing 36% of the raw milk in the market.

Plaintiffs thus undermine and contradict their claim that DFA's "only purpose" in purchasing the Dean plant in High Point was the suppression of competition. ECF 1 ¶88. Even with DFA's purchase of the three Carolina Plants, DFA still has a smaller percentage of downstream processing capacity than its alleged percentage of raw milk production in the Carolinas. DFA's purchase thus allows *continued* access to processing facilities for DFA's farmer members' and other farmers' milk by the continued operation of the plants and the pro-competitive efficiencies that come with vertical integration.

Plaintiffs complain of, at most, the normal readjustments following a vertical merger—not harm to competition as a whole. Plaintiffs vaguely allege that MDVA's supply to other processors may not continue because they claim MDVA is at "serious risk" of losing access to Hunter Farms (ECF 1 ¶74), that MilkCo buys milk elsewhere (as well as from MDVA) (ECF 1 ¶¶73, 75), and that the Borden plant is not a great fit for MDVA (despite being in MDVA's own proposed relevant market) (ECF 1 ¶76).[7] These allegations

---

[7] Plaintiffs spin out some other contradictory theories. For example, they allege that DFA will engage in foreclosure by favoring its own plants and reducing other plants' access to DFA's milk. ECF 1 ¶121. But if DFA stopped supplying Hunter Farms, MilkCo, and Borden with milk, MDVA's allegations make clear that those processors would need to turn to MDVA for their supply of raw milk—potentially putting MDVA in a better position than it was prior to the acquisition. Similarly, Food Lion claims it would be harmed by reduced competition from MDVA in the raw milk supply market (ECF 1 ¶143), but if DFA favored its own plants as alleged, any higher prices charged to Food Lion would

reveal what motivates this lawsuit—MDVA and Food Lion had a business plan that centered on the acquisition of a plant in the Carolinas from Dean, which was frustrated by DFA's acquisition. But a failed bid does not make an antitrust case.

## III. THE FAILING COMPANY DOCTRINE SUPPLIES A COMPLETE DEFENSE TO PLAINTIFFS' SECTION 7 CLAIM.

The Failing Company Doctrine ("Doctrine") is "an absolute defense to an action under Section 7 of the Clayton Act." *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1133 (N.D. Cal. 2001). For the Doctrine to apply, a defendant must show that the acquired corporation "faced the grave probability of a business failure, and further that it tried and failed to [locate a buyer] other than the acquiring [company]." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974) (internal citations, notations, and quotation marks omitted). The latter requirement is met where the company has "conduct[ed] a good faith effort to seek offers from other potential purchasers." *Sutter Health Sys.*, 130 F. Supp. 2d at 1136; *see also United States v. Culbro Corp.*, 504 F. Supp. 661, 668 (S.D.N.Y. 1981).

Courts have held that under the Doctrine "the acquisition of capital stock or assets of a failing corporation is not within the ban of Section 7 of the Clayton Act." *United States v. Md. & Va. Milk Producers Assoc.*, 167 F. Supp. 799, 808 (D.D.C. 1958), *aff'd on other grounds*, 362 U.S. 458 (1960). The Doctrine is "a 'lesser of two evils' approach, in

---

likely be because higher prices were being charged by MDVA—and not DFA—to the processor from which Food Lion purchases its milk.

which the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business." *Gen. Dynamics Corp.*, 415 U.S. at  507.  In other words, the Doctrine is intended to avoid the liquidation and piecemeal sale of a corporation's assets by permitting the sale of the corporation to a willing buyer, even if the only willing buyer for the entire corporation happens to be the failing company's competitor.

Here, the Bankruptcy Court made factual findings that establish the required elements of the Doctrine, and this Court may take judicial notice of those findings.  *See Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x 395, 397 (4th Cir. 2006) (in deciding a motion to dismiss, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed"); *see also Granader v. Public Bank*, 281 F. Supp. 120, 123 (E.D. Mich. 1967) (estopping the plaintiff from contesting a defendant's failing company defense where the two requirements for the application of the defense were already determined in a state court receivership action to which the plaintiff was a party), *aff'd*, 417 F.2d 75, *cert. denied*, 397 U.S. 1065 (1967).

### A.    Dean Faced a Grave Possibility of Business Failure Absent an Acquisition.

The Bankruptcy Court previously determined that Dean faced a grave possibility of business failure absent an acquisition—the first condition for the applicability of the Failing Company Doctrine.  The Bankruptcy Court concluded in its Bidding Procedure order that Dean had "demonstrated a compelling and sound business justification for the

18

Court to enter" the bidding procedures that would lead to the sale of Dean's business operations or its assets. Mot. at Exhibit H (Bankruptcy Court's Bidding Procedure Order, Bankr. Ct. Dkt. ECF 1178), at 3-4, ¶D.

### B. <u>Dean Made a Good Faith Effort to Seek Other Buyers.</u>

The Bankruptcy Court also concluded that Dean made a good faith effort to seek other buyers, finding that other potential buyers had notice of and every opportunity to bid on the insolvent company. Ex. D (Bankr. Sale Order) at 7-8, ¶¶N, T-X. The court stated that

> substantial prepetition and post-petition marketing efforts and a competitive sale process were conducted and the Debtors (a) afforded all creditors, other parties in interest, and all potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer(s) to purchase the Acquired Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets, and (c) appropriately considered all bids submitted.

*Id*. at 9, ¶U. Yet, as was explained in declarations relied upon by the Bankruptcy Court (*see id.* at 3), "[t]he only party that submitted a bid for the vast majority of the Debtors' plants and related assets was DFA." Ex. A (Magro Decl.) ¶15.

The Bankruptcy Court arrived at these conclusions after receiving, considering, and overruling objections from both Plaintiffs. *See* Bankr. Ct. Dkt. ECF 1058, 1065, 1406, 1415; Ex. D (Bankr. Sale Order) at 14, ¶1. Plaintiffs were free to appeal the Bankruptcy Court's order; they did not, and pursuant to Bankruptcy Rule 8002(a), the order became non-appealable on April 19, 2020. Fed. R. Bankr. P. 8002(a). Plaintiffs, having been heard in full in the bankruptcy case, cannot now challenge rulings on the same critical issues

19

resolved in the underlying bankruptcy proceeding that they did not appeal. In light of this, the Court should hold that the Failing Firm Doctrine applies, and Plaintiffs' Section 7 claim should be dismissed.

IV. **THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE ITS ALLEGED GEOGRAPHIC MARKET IS IMPLAUSIBLE AND CANNOT SUPPORT PLAINTIFFS' SECTION 7 OR SECTION 2 CLAIM.**

To state a claim under Section 7 of the Clayton Act or Section 2 of the Sherman Act, a plaintiff must plead a plausible relevant market, which includes a relevant product market and a relevant geographic market. *See Downeast Builders & Realty, Inc. v. Essex Homes Se., Inc.*, No. 3:11-cv-02653-CMC, 2012 U.S. Dist. LEXIS 91764, at *8 (D.S.C. July 3, 2012) (Section 2 claim); *Shred-It Am., Inc. v. Macnaughton*, No. 10-00547 DAE-KSC, 2011 U.S. Dist. LEXIS 51933, at *15 (D. Haw. May 13, 2011) (Section 7 claim). The relevant geographic market is "the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1148 (E.D. Ark. 2008) (quoting *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)). "A geographic market is determined not by where consumers *actually* go for a particular product or service, but rather by where they *could* go should the defendants' prices become anticompetitive." *Id.* (internal quotation marks omitted) (emphasis in original).

Courts dismiss complaints for failure to state a claim where the alleged relevant geographic market's narrowness ignores geographic and commercial realities. *See, e.g.,*

*Little Rock Cardiology Clinic,* 573 F. Supp. 2d at 1148 ("[C]ourts have not hesitated to dismiss antitrust claims where it is clear that the alleged geographic market is too narrow or implausible."); *Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1101 (S.D. Iowa 1998) (dismissing antitrust claims because narrow geographic market contradicted reasonable inference). Here, Plaintiffs' claims fail because their alleged geographic market of North and South Carolina is implausible and directly conflicts with Plaintiffs' own allegations. *See* ECF 1 ¶21.

**A.     Plaintiffs' Relevant Geographic Market Is Implausible in Light of the Facts Pleaded by Plaintiffs and Plaintiffs' Own Dairy Operations.**

Plaintiffs' alleged market of North and South Carolina flies in the face of geography, commercial realities, and Plaintiffs' own allegations.  Plaintiffs argue that North and South Carolina are isolated by "the Atlantic Ocean to the East and the Appalachian Mountains to the West."  ECF 1 ¶23.  Plaintiffs provide no reason that milk cannot move north and south—indeed, it is common for raw and Processed Milk to be moved from Virginia to South Carolina, or from North Carolina or South Carolina to Georgia.

The movement of milk beyond the Carolinas is consistent with the Federal Milk Marketing Order system.[8]  According to the U.S. Department of Agriculture ("USDA"), "[a] marketing area"—or Order—"is generally defined as a geographic area where handlers

_____

[8] The Federal Milk Marketing Order system exists pursuant to the Agricultural Marketing Agreement Act of 1937.  *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 341 (1984).  The system was designed to bring milk producers' "destabilizing competition under control."  *Id.*

compete for packaged [processed] fluid milk sales, although other factors may be taken into account when determining the boundaries of a marketing area." Mot. at Exhibit I ("Federal Milk Marketing Order" print-out from USDA website). As Plaintiffs acknowledge, North and South Carolina are in Order 5 under that system (ECF 1 ¶14), along with portions of Virginia, West Virginia, Kentucky, Tennessee, Indiana, and Georgia. *See* 7 C.F.R. § 1005.2 (listing counties and cities included in Order 5)

Buyers consider areas outside the Carolinas to be an alternative source for Processed Milk. Indeed, Plaintiffs allege that when unhappy with prices within the Carolinas, Food Lion turned to MDVA's plant in Virginia for its Processed Milk, suggesting that some or all of Virginia must be in the relevant geographic market. ECF 1 ¶5.

On the raw milk side, Plaintiffs offer no support for the proposition that dairy processors cannot buy raw milk from outside the Carolinas. The entire area is federally regulated, and raw milk is commonly shipped from Virginia, Maryland, Pennsylvania, and other states into the Carolinas for processing. The borders of North and South Carolina have no bearing when it comes to shipping raw milk, and Plaintiffs allege no facts to the contrary.

B. **Plaintiffs' Assertions Directly Contradict Food Lion's Previous Positions.**

Contrary to the Complaint, Food Lion previously argued that the "relevant geographic market for the sale of processed milk is the 'Southeast,' which they define as the geographic area within Federal Milk Marketing Orders 5 and 7. These Orders cover

22

all or part of 14 states[9]…." *See Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*, 730 F. Supp. 2d 804, 822 (E.D. Tenn. 2010).

In the *Southeastern Milk Antitrust Litigation*, Food Lion's expert claimed that the relevant geographic market for a Section 2 claim extended beyond North and South Carolina to include Georgia, Virginia, and the eastern part of Tennessee. *Food Lion, LLC v. Dean Foods (In re Se. Milk Antitrust Litig.)*, No. 2:07-CV 188, 2012 U.S. Dist. LEXIS 37650, at *31 (E.D. Tenn. Mar. 20, 2012). He claimed to have looked "at regions where Dean Foods sells, and Food Lion buys, processed milk." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 278 (6th Cir. 2014); *see also Food Lion, LLC*, 2012 U.S. Dist. LEXIS 37650, at *50. Further, he claimed to have "relied on estimates of transportation costs and elasticity of demand." *In re Se. Milk Antitrust Litig.*, 739 F.3d at 278; *see also Food Lion, LLC*, 2012 U.S. Dist. LEXIS 37650, at *33. Given Food Lion's prior position, it seems insincere for Food Lion to now join MDVA to argue in the present action that the relevant market for raw milk and Processed Milk is limited to North and South Carolina.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted,

___ */s/ Brent F. Powell* ___
James P. Cooney III
N.C. State Bar No. 12140
Sarah Motley Stone

---

[9] North Carolina, South Carolina, Georgia, Indiana, Kentucky, Tennessee, Virginia, West Virginia, Alabama, Arkansas, Mississippi, Louisiana, Florida and Missouri.

Case 1:20-cv-00442-CCE-JLW   Document 31   Filed 06/16/20   Page 28 of 30

N.C. State Bar No. 34117
WOMBLE BOND DICKINSON (US) LLP
Charlotte, North Carolina 28202
Phone: 704-331-4900
Fax: 704-331-4955
Jim.Cooney@wbd-us.com
Sarah.Stone@wbd-us.com

Brent F. Powell
N.C. State Bar No. 41938
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: 336-721-3600
Fax: 336-721-3660
Brent.Powell@wbd-us.com

W. Todd Miller*
Amber McDonald*
BAKER & MILLER PLLC
2401 Pennsylvania Avenue N.W.
Suite 300
Washington, D.C. 20037
Phone: 202-663-7820
Fax: 202-663-7849
AMcDonald@bakerandmiller.com
TMiller@bakerandmiller.com

Attorneys for
Dairy Farmers of America, Inc.

*Special Appearance Forthcoming

24

## WORD COUNT CERTIFICATION

This is to certify that the foregoing document complies with the word count limit set forth in L.R. 7.3(d)(1).

_/s/ Brent F. Powell_
Brent F. Powell
N.C. State Bar No. 41938