# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Food Lion, LLC, and Maryland and Virginia Milk Producers Cooperative Association, Inc., <br><br> *Plaintiffs*, <br><br> v. <br><br> Dairy Farmers of America, Inc., <br><br> *Defendant*. | Case No. 1:20-cv-00442 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

**HUNTON ANDREWS KURTH LLP**

A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*admitted pro hac vice*)
John S. Martin (*admitted pro hac vice*)
Kevin Hahm (*admitted pro hac vice*)
Carter C. Simpson (*admitted pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@ huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (*admitted pro hac vice*)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362
james.lamberth@troutman.com

*Attorneys for Maryland and Virginia Milk Producers Cooperative Association, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT........................................................................................................ 2

I.   PLAINTIFFS' ALLEGATIONS OF THREATENED INJURY ARE MORE
     THAN SUFFICIENT UNDER SECTION 16 OF THE CLAYTON ACT. ........... 2

     A.   The Clayton Act Is Designed to Stop Anti-Competitive Acquisitions in
          Their Incipiency. ........................................................................................ 3

     B.   DFA Improperly Conflates the Antitrust Injury Standards for Damages
          and Injunctive Actions................................................................................ 4

     C.   Plaintiffs Adequately Allege Antitrust Injury Under Section 16. ................ 6

          1.   Plaintiffs sufficiently pled that MDVA has been foreclosed and
               that such foreclosure is made permanent by the Asset Sale. ............ 7

          2.   Plaintiffs sufficiently pled a significant threat of Food Lion
               being forced to incur higher prices because of the Asset Sale. .......... 9

     D.   DFA's Antitrust Injury Arguments Would Render the Clayton Act
          Useless........................................................................................................ 11

II.  DFA'S GENERALIZED ATTACKS ON VERTICAL MERGER
     CHALLENGES HAVE NO PLACE IN A RULE 12(b) MOTION. ..................... 12

III. "FAILING COMPANY" IS AN AFFIRMATIVE DEFENSE THAT IS NOT
     SUITABLE FOR DETERMINATION ON THE PLEADINGS........................... 14

IV.  PLAINTIFFS ALLEGE A PLAUSIBLE GEOGRAPHIC MARKET. ................. 18

CONCLUSION ................................................................................................... 22

Case 1:20-cv-00442-CCE-JLW   Document 41   Filed 07/07/20   Page 2 of 26

## INTRODUCTION

On May 19, 2020, Plaintiffs Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA") and Food Lion, LLC filed a Complaint under Section 16 of the Clayton Act alleging that Defendant Dairy Farmers of America, Inc. ("DFA")'s continuing course of anti-competitive conduct, including its acquisition of three Dean Foods processing plants in North and South Carolina (the "Carolinas plants") out of bankruptcy, violates the antitrust laws. At an initial June 4th hearing, DFA requested the opportunity to provide a "quick peek" of its defenses through a motion to dismiss before proceeding in earnest on Plaintiffs' request for expedited discovery and preliminary relief. The Court refused DFA's offer to slow the progress of the case, but did afford DFA the opportunity to present its arguments for dismissal. DFA has now done so, and its motion confirms that DFA lacks any viable argument for dismissal.

First, DFA conjures up a new argument not previously mentioned in its papers or at the hearing—antitrust injury—as a way to insulate the Asset Sale from antitrust scrutiny. But DFA's argument badly confuses the relevant legal standards and, if accepted, would turn the Clayton Act on its head. It also ignores controlling Supreme Court precedent directly on point, *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), as well as numerous detailed allegations in the Complaint establishing the actual injury already incurred by DFA's conduct and the future injury that will result if this conduct is not arrested in its incipiency.

DFA then turns to its "failing company" defense and market definition arguments. Both foreshadow what DFA will argue at trial, but are premature here. Each argument

necessarily requires consideration of significant, complex factual and legal issues for which discovery and expert testimony will be necessary. It is well established that neither should be resolved on a motion to dismiss. Indeed, as to its previously ballyhooed "failing company" defense, DFA remains unable to point to a single case in which this defense has been established on a motion to dismiss.

The inescapable reality is that the Clayton Act was designed for precisely this situation, and the only way to resolve the issues presented by DFA is through a trial on the merits. With the benefit of discovery, expert opinions, and trial testimony, the Court will be able to make a judgment based on a fully developed record instead of abstract arguments. At the Court's urging, the parties have now agreed upon an expedited discovery schedule and a consolidated Rule 65(a)(2) proceeding. Plaintiffs respectfully suggest that this is where the parties' efforts should now be focused.

## ARGUMENT

### I. PLAINTIFFS' ALLEGATIONS OF THREATENED INJURY ARE MORE THAN SUFFICIENT UNDER SECTION 16 OF THE CLAYTON ACT.

The primary argument advanced by DFA in support of its motion to dismiss is that Plaintiffs' claims of antitrust injury are speculative because they allege anti-competitive effects that "might" happen in the future. ECF No. 31 ("Br."), at 1. This argument seems to have been manufactured only recently, as it was not included in DFA's claimed "threshold legal issues" that needed to be addressed before expedited discovery could be ordered.[1] Its conspicuous prior absence was for good reason. As explained below,

---

[1] *See* ECF No. 25, DFA Resp. to Mot. for Expedited Disc., at 8-13.

- 2 -

DFA's argument ignores fundamental principles of antitrust law and is an apparent attempt to insulate the Asset Sale from antitrust scrutiny entirely.

### A. The Clayton Act Is Designed to Stop Anti-Competitive Acquisitions in Their Incipiency.

Count I asserts a claim under Section 16 of the Clayton Act to enjoin DFA from violating Section 7 of the Clayton Act, which prohibits mergers and acquisitions whose effect "*may be* substantially to lessen competition, or to tend to create a monopoly." *California v. Am. Stores Co.*, 485 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18) (emphasis in opinion). The Supreme Court has repeatedly recognized that the use of the words "may be" reflect Congress' conscious decision to enact a prophylactic antitrust statute. *See Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 485 (1977). Enacted against the backdrop of "a rising tide of economic concentration in the American economy," Section 7 was designed to "clamp down with vigor" on anticompetitive mergers to arrest "this rising tide towards concentration into too few hands and to halt the gradual demise of ... small business[]." *United States v. Von's Grocery Co.*, 384 U.S. 270, 276 (1966). Congress accomplished this goal by empowering plaintiffs to use Section 7 to "arrest[] mergers at a time when the trend to a lessening of competition … was still in its incipiency" in order "to brake this force at its outset and before it gathered momentum." *Brown Shoe,* 370 U.S. at 317-18.

By its nature, the "incipiency" doctrine is forward looking; it requires "a prediction of [the acquisition's] impact upon competitive conditions in the future." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963). In other words, it

specifically protects against future injury that *might* occur. *F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) ("there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before §7 can be called into play"). Indeed, "[i]f the enforcement of § 7 turned on the existence of actual anticompetitive practices," as DFA contends, "the congressional policy of thwarting such practices in their incipiency would be frustrated." *Id.* at 577.

Section 16 works in tandem with Section 7 and other antitrust laws, including the Sherman Act, by extending the availability of injunctive relief to private parties for "threatened" injury. 15 U.S.C. § 26; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). By creating this private right of action, Congress intended to "enlist the business public as private attorneys general to aid the government in achieving the broad social object of the statute." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 415 (1st Cir. 1985). As with Section 7, Section 16 has a "prophylactic purpose" and "is designed to stop anticompetitive behavior in its incipiency." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1357-58 (6th Cir. 1985).

### B. DFA Improperly Conflates the Antitrust Injury Standards for Damages and Injunctive Actions.

Plaintiffs are seeking only injunctive relief under Section 16 here to reverse and arrest the anti-competitive effects of DFA's past and future conduct, respectively. As such, the prophylactic, "threatened injury" standard for injunctive relief under Section 16 applies to Plaintiffs' claims under both Section 7 of the Clayton Act and Section 2 of the

- 4 -

Sherman Act.[2]  Tellingly, DFA never acknowledges that Plaintiffs seek only ***injunctive*** relief under Section 16, not ***damages*** under Section 4 of the Clayton Act.  This distinction matters because the injury requirements are dramatically different.  *See Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 110-11 (1986); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 260 (1972).  Indeed, courts have repeatedly recognized that there is "a lower threshold standing requirement for Section 16 than for Section 4." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir. 1980).

A treble damages claim under Section 4 requires an "actual injury," 15 U.S.C. § 15, which is what DFA criticizes Plaintiffs for not showing.[3]  But a Section 16 claim for injunctive relief requires only "a significant threat of injury," *Zenith Radio*, 395 U.S. at 130, which is a "less stringent" requirement.  *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 13 (1st Cir. 2008).  The differing standards reflect Congress' intent that injunctive relief serve as "a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy." *B-S Steel of Kan. v. Tex. Indus.*, 439 F.3d 653,

---

[2] While DFA treats its standing argument under Article III separately, it is more properly viewed as encompassed by and built into the antitrust injury requirements under the Clayton Act. *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 n.16 (4th Cir. 2007) ("[T]he concept of antitrust standing [e.g. antitrust injury] is narrower than constitutional standing. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact."). Regardless, as demonstrated below, the threatened injuries alleged in the Complaint are more than sufficient to demonstrate both Article III standing and antitrust injury.

[3] DFA repeatedly characterizes Plaintiffs' injuries as "speculative" because they involve "allegations of future injury," Br. at 7, but ***all*** Section 7 cases seeking injunctive relief under Section 16 are predicated upon a court's determination of the likelihood of future harm, typically with the benefit of a full evidentiary record. *See Phila. Nat'l Bank*, 374 U.S. at 362. According to DFA, only an injury that has already resulted in damages can violate antitrust law.

- 5 -

667 (10th Cir. 2006). As such, injunctive relief under Section 16 is "available even though the plaintiff has not yet suffered actual injury." *Zenith Radio*, 395 U.S. at 130.

DFA is either confused by the different standards or attempting to conflate the two for argument's sake. In nearly five pages devoted to its antitrust injury argument, DFA cites ***only one*** case discussing standing under Section 16 and, in that case, the court ***rejected*** a similar attempt to conflate the standards for antitrust injury under the Clayton Act. *See B-S Steel*, 439 F.3d at 666 (reversible error to apply Section 4 standing analysis to Section 16 claim). Similarly, DFA's heavy reliance upon *Sureshot Golf Ventures v. Topgolf Int'l, Inc.*, 754 F. App'x 235 (5th Cir. 2018), is misplaced. *Sureshot* involved a Section 4 claim for damages, not a Section 16 claim for injunctive relief. DFA is left without a single argument under the applicable legal standard, or a single citation to an applicable Section 16 case, to support its motion.

### C. Plaintiffs Adequately Allege Antitrust Injury Under Section 16.

Although there are a wide variety of recognized antitrust injuries, the classic type in vertical merger and attempted monopolization cases is either the potential foreclosure of competitors or higher prices paid by customers. As the Supreme Court recognized in *Brown Shoe*, the "primary vice" of the type of conduct at issue here is foreclosure; specifically, by foreclosing competitors from a segment of the market that otherwise would be open to them, the conduct may act as a "clog on competition," which "depriv[es] rivals of a fair opportunity to compete." 370 U.S. at 321 n.36, 323-24.[4]

---

[4] Foreclosure is also sufficient antitrust injury to support a violation of Section 2 of the Sherman Act. *United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001) (a

- 6 -

Similarly, anti-competitive conduct that results in higher prices to customers is also a paradigmatic example of antitrust injury. *See U.S. Gypsum Co. v. Ind. Gas. Co.*, 350 F.3d 623, 627 (7th Cir. 2003). Plaintiffs have pled both types of threatened antitrust injury in significant detail. *See* ECF No. 1 ("Compl."), ¶¶114, 121, *generally* ¶¶97-151. The facts supporting these claims are presumed true on a motion to dismiss and all reasonable inferences are drawn in Plaintiffs' favor. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 253 (4th Cir. 2009).

### 1. *Plaintiffs sufficiently pled that MDVA has been foreclosed and that such foreclosure is made permanent by the Asset Sale.*

The Complaint alleges not only that MDVA faces a significant threat of foreclosure, but also that DFA has **already** foreclosed MDVA from access to the Carolinas plants and thus 59% of the milk-processing market. Compl. ¶¶61-63, 70. The Asset Sale serves to continue to foreclose MDVA and puts the final nail in the coffin by making that foreclosure permanent. *Id.* ¶¶96, 101, 109-11. The Complaint alleges that, consequently, MDVA is unlikely to survive as the sole regional competitor to DFA. *Id.* ¶¶139-40.

The Complaint's allegations of actual current foreclosure, presumed true on a motion to dismiss, are alone sufficient to satisfy Section 16's standing requirements. *See Zenith Radio*, 395 U.S. at 143. As for MDVA's additional claims about the threat of continued and permanent foreclosure, the significance of this threat—called "customer

---

"monopolist's use of exclusive contracts ... may give rise to a § 2 violation even though the contracts foreclose less than [a] roughly 40% or 50% share").

foreclosure" in antitrust parlance—is supported by numerous factual allegations, including DFA's prior actions in other regions (Compl. ¶112), its prior conduct with respect to the Carolinas plants (*id.* ¶¶61-63), its intention in acquiring the Carolinas plants (*id.* ¶¶88, 137), and the likelihood that the Asset Sale will further DFA's existing anti-competitive campaign (*id.* ¶147). *See generally id.* ¶¶97-148. Such allegations are plainly sufficient to establish antitrust injury. *See Zenith Radio*, 395 U.S. at 130 (plaintiff entitled to injunctive relief where future unlawful conduct could "fairly be anticipated from the defendant's conduct in the past"); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1148-49 (S.D.N.Y. 1996) (competitor has standing to challenge proposed merger based on defendants' past actions).

DFA claims this injury is "speculative" because it allegedly would not occur until 2021. Not true. As an initial matter, the Complaint alleges that, but for the Asset Sale, MDVA would have been able to compete to supply the Carolinas plants as of May 1, 2020.[5] Compl. ¶¶105, 139. Moreover, DFA itself ***acknowledges*** that it acquired the Carolinas plants to ensure an outlet for its members' raw milk. Br. at 16. Having paid hundreds of millions of dollars to acquire all forty-four Dean plants, including the Carolinas plants, it defies logic to suggest that DFA would now allow its primary competitor to source those plants instead. *See* Compl. ¶110. Far from being speculative,

---

[5] Because Dean's bankruptcy allowed it to sell the Carolinas plants free of any obligations to DFA, Compl. ¶96, the Complaint alleges that any non-DFA purchaser would have been free to make competitive raw-milk-purchasing decisions on the date the sale closed. *Id.* ¶¶105, 139.

- 8 -

therefore, this is the unique case in which MDVA's alleged injury is already being inflicted and is almost certain to become permanent.

DFA's arguments cannot be squared with Supreme Court precedent. The seminal case on vertical mergers is *Brown Shoe*, which DFA tellingly never mentions. There, the Supreme Court condemned a vertical merger between a shoe manufacturer and the nation's largest independent shoe retailer because, in the future, the combined entity was likely to foreclose other manufacturers from its retail stores. 370 U.S. at 331-32. This is precisely the antitrust injury MDVA alleges.

### 2. *Plaintiffs sufficiently pled a significant threat of Food Lion incurring higher prices because of the Asset Sale.*

The Complaint also alleges that, because of the Asset Sale and related conduct, Food Lion will incur higher prices, which consumers will ultimately feel at the retail level. Compl. ¶¶142-43. The Asset Sale combines DFA's market power over an input (raw milk) with legacy Dean's market power over a product made from that input (processed milk). DFA therefore now has both the ability and incentive to engage in "input" foreclosure in an attempt to raise its rivals' costs in the processed milk market where Food Lion procures its milk. *Id.* ¶¶99, 121-24. DFA can either raise raw milk prices to processing plants competing with the legacy Dean plants, or refuse to sell to competing plants altogether. *Id.* ¶143.[6] By raising its rivals' costs, DFA will reduce or eliminate competition, which will result in higher prices to customers like Food Lion. *Id.*

---

[6] DFA argues that charging higher prices to downstream rivals would advantage MDVA. Br. at 10. This ignores Plaintiffs' allegations that MDVA has already been foreclosed from the Carolinas plants, that its current "patchwork system" of selling its raw

- 9 -

The Complaint alleges that DFA will inevitably engage in such tactics because excess capacity in the Carolinas plants ensures an outlet for any diverted DFA milk, and any profits that DFA would lose by not selling its milk to rivals could be more than offset by the higher prices it can charge customers because of decreased competition. *Id.* ¶¶122, 126. While DFA may dispute these allegations, a motion to dismiss is not the proper vehicle for litigating that dispute. For now, it is enough that Food Lion has plausibly alleged legally cognizable antitrust injury based on the likelihood of higher prices through input foreclosure. *See, e.g.*, *Sprint Nextel Corp. v. AT & T Inc.*, 821 F. Supp. 2d 308, 321 (D.D.C. 2011) (mobile wireless carriers sufficiently pled antitrust injury by alleging that a AT&T/T-Mobile would be able to coerce exclusionary deals from suppliers of wireless devices, who would then refuse to sell those devices to carriers like plaintiffs); *see also* DOJ & FTC, Vertical Merger Guidelines, Example 2 (2020) ("Vertical Merger Guidelines"), *available at* https://www.ftc.gov/system/files/documents/ reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/ vertical _merger_guidelines_6-30-20.pdf.

Finally, DFA's recycled claims of speculative injury as applied to Food Lion repeat its misstatement of the legal standard. The harm to Food Lion may occur in the future, as it does in all Section 16 cases, but that does not render it speculative. As the

---

milk is "not sustainable," and that "many MDVA farmers will be forced to leave MDVA and join DFA." Compl. ¶¶115-16; *see also id.* ¶¶73-78. The Complaint further alleges that DFA will wait until it has sufficiently weakened MDVA before taking advantage of its power to raise raw-milk prices (*id.* ¶117), just as it waited until it had capacity to supply Dean's plants, and until the prior class litigation was over, to exercise its right to kick MDVA out of the Dean plants beginning in 2015. *Id.* ¶¶59-62.

Supreme Court has recognized, the injury analysis in every Section 16 case requires "prediction," *Phila. Nat'l Bank*, 374 U.S. at 362, and this one is no different. If DFA wishes to contest Plaintiffs' predictions, it may do so. But not on a motion to dismiss.

### D. DFA's Antitrust Injury Arguments Would Render the Clayton Act Useless.

To put DFA's motion in context, it is important to highlight that DFA is essentially claiming that the Asset Sale is immune from antitrust scrutiny by private parties. Indeed, in order to push the deal through, DFA and Dean successfully convinced the bankruptcy court that it should neither consider the antitrust aspects of the Asset Sale nor lift the automatic stay of bankruptcy for Plaintiffs to pursue this case before the transaction closed. In so doing, both DFA and Dean repeatedly emphasized that Plaintiffs "remain[ed] free to pursue" their antitrust claim as well as "the very same divestiture remedy" after the Asset Sale closed.[7] Ultimately, the parties entered into a stipulation approved by the bankruptcy court preserving Plaintiffs' rights "to challenge the Sale Transaction under the antitrust laws." Compl. ¶93.

Now, however, DFA takes the opposite position, arguing that this Court lacks even subject matter jurisdiction to hear the case. Br. at 7. To do so, DFA is forced to take the extreme position that neither a competitor nor a customer has standing to assert their claims. But, if *neither* competitors *nor* customers have standing, and others in the supply chain are even more remote, then the natural consequence of DFA's position is

---

[7] *See, e.g.*, *In re Southern Food Grps.*, No. 19-36313 (Bankr. S.D. Tex.) ("Bankr. Dkt"), ECF No. 1804, at 10.

- 11 -

that **no private party** has standing to challenge the Asset Sale.  This argument directly contradicts the plain language of the Clayton Act and undermines its aim of empowering a private party to have its day in court to arrest an anti-competitive acquisition in its incipiency, thereby furthering the public interest.

## II.    DFA'S GENERALIZED ATTACKS ON VERTICAL MERGER CHALLENGES HAVE NO PLACE IN A RULE 12(B) MOTION.

DFA eventually resorts to an abstract and highly generalized attack on all vertical merger challenges and seems to be asking the Court, on a motion to dismiss no less, to accept that all vertical mergers are pro-competitive. Br. at 12-13. The Supreme Court, however, has never adopted such an extreme view.  To the contrary, in *Brown Shoe,* the Supreme Court held that a vertical merger presenting far less extreme circumstances than the Asset Sale violated the antitrust laws.

In *Brown Shoe*, the nation's fourth-largest shoe manufacturer sought to merge with the nation's largest independent chain of family shoe stores.  *Id*. at 331.  In declaring the merger unlawful, the Court relied on both the sizeable market share foreclosed to competing manufacturers by the sale and the trend toward concentration in the industry. *Id*.  As here, the industry had been for years consolidating as a "result of deliberate policies of Brown and other leading shoe manufacturers," which caused the "acquiring manufacturers to become increasingly important sources of supply for their acquired outlets."  *Id*. at 332.  Against this backdrop, the Court was troubled by the manufacturer's historic practice of "forcing its own shoes upon its retail subsidiaries" and determined

- 12 -

that the merger was clearly designed to allow the manufacturer to do the same with the nation's largest shoe retailer. *Id*. at 332-34.

Plaintiffs' case is even stronger than *Brown Shoe*. While many of the same factors are present here—decades of consolidation (Compl. ¶¶68, 134), significant barriers to entry (*id.* ¶¶129-34), an intent to foreclose competition by securing exclusive supply rights to downstream outlets (*id.* ¶44), and a history of doing same (*id.* ¶¶61-62)—the amount of permanent market foreclosure here far exceeds that deemed problematic in *Brown Shoe*. At the time of the Asset Sale, DFA was already an industry behemoth, far larger in size and market share than the manufacturer in *Brown Shoe*. *Id.* ¶¶33, 65. DFA has now grown even bigger and secured control over a majority of both the raw and processed milk markets. Indeed, the Complaint alleges that MDVA will be foreclosed from **over half of the market**—a far greater "clog on competition" than the Court was concerned about in *Brown Shoe* or the other cases cited by DFA.[8]

DFA has no answer to this. It cannot distinguish *Brown Shoe* and therefore has not deigned to try. Instead, DFA ignores it, trying to distract the Court's attention with broad-based attacks on vertical mergers and false statements about DOJ enforcement priorities.[9] Br. at 13. To be clear, Plaintiffs do not dispute that some vertical mergers are

---

[8] A degree of foreclosure greater than 50% is far more than in any of the cases cited by DFA, including *Alberta Gas* (3% foreclosure) and *Freuhauf* (5.8%), and is presumptively sufficient foreclosure. *See Microsoft*, 253 F.3d at 70.

[9] Notably, since DFA filed its motion, DOJ and FTC issued new guidelines, *see* Vertical Merger Guidelines, *supra* p.10, reflecting their continued emphasis on vertical merger enforcement. *See also* S. Salop & D. Culley, *Vertical Merger Enforcement Actions: 1994–April 2020*, *available at* https://scholarship.law.georgetown.edu/facpub/1529

pro-competitive, but—as *Brown Shoe* proves—some are also anti-competitive.  This is why this case needs to be litigated: to determine, based on the facts and expert evidence presented, whether the Asset Sale is pro- or anti-competitive.  Trials, not motions to dismiss, are the appropriate venues for such determinations.

## III.   "FAILING COMPANY" IS AN AFFIRMATIVE DEFENSE THAT IS NOT SUITABLE FOR DETERMINATION ON THE PLEADINGS.

Once presented as DFA's primary argument—indeed, its silver bullet—DFA's "failing company" argument has now been relegated to an afterthought.  And rightfully so.  DFA's "failing company" argument is an affirmative defense upon which DFA bears the burden of proof, *see United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974), and is inappropriate for determination on a motion to dismiss.

The Supreme Court, moreover, has emphasized that the defense has a "narrow scope."  *Citizen Pub. Co. v. United States*, 394 U.S. 131, 139 (1969).  To establish the defense, DFA must show that (1) Dean faced "a grave probability of a business failure"; (2) Dean's prospects for reorganization in bankruptcy were "dim or nonexistent"; and (3) Dean "tried and failed to merge with a company other than the acquiring one."  *Steves & Sons v. JELD-WEN, Inc.*, 290 F. Supp. 3d 507, 511-12 (E.D. Va. 2018) (internal citations omitted).  For the third element, DFA must typically show that it was "the only available purchaser" and that Dean did not have alternative offers that "pose a less severe danger to

_____

(detailing 66 vertical merger challenges since 1994, including several divestiture orders obtained over the past two years).

- 14 -

competition." *Id.* at 512 n.2 (quoting DOJ & FTC, Horizontal Merger Guidelines § 11 (2010) ("Horizontal Merger Guidelines")).

Given these strict requirements, the failing company defense "rarely succeeds." *Id.* at 512 (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* 951e (4th ed. 2016)). The chances of success, moreover, are far bleaker on a motion to dismiss. Indeed, DFA is unable to cite a single case that has ***ever*** granted a motion to dismiss based on the defense.[10] This is because any evaluation of the defense is necessarily a complex, fact-intensive exercise, requiring findings as to the viability of reorganization, the extent of the search for other purchasers (and attempts to stifle such offers), the existence and earnestness of alternative purchasers, and the comparative competitive effects of alternative purchasers. It is unsurprising, therefore, that courts typically view this issue as more properly suited for trial. *See, e.g.*, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (material questions of fact existed as to whether defendant "was the only bona fide prospective purchaser for [the company's] business"); *U.S. Steel Corp. v. F.T.C.,* 426 F.2d 592, 606-10 (6th Cir. 1970).

DFA, moreover, has not—and cannot in the context of this motion—establish the elements of the defense. As an initial matter, a bankruptcy alone is insufficient to

---

[10] None of the cases cited by DFA were decided on motions to dismiss. *See Cal. v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1133 (N.D. Cal. Jan. 29, 2001) (relying on four days of evidentiary hearings, expert reports, and proposed findings of fact, including regarding the company's three-year search for purchasers); *United States v. Culbro Corp.*, 504 F. Supp. 661, 668-69 (S.D.N.Y. 1981) (relying on evidentiary hearing, declarations, and depositions bearing on the defense, including that "no other offer to invest in [the company] ... has been made by any responsible source").

- 15 -

establish a failing company defense. *See Culbro*, 504 F. Supp. at 668 ("mere insolvency of a company or its seeking refuge in a bankruptcy court does not by itself" establish defense). The purpose of a bankruptcy court's review is far different from a district court reviewing a transaction for antitrust concerns,[11] which is precisely why the bankruptcy court here expressly carved out the antitrust questions. *See* Compl. ¶¶92-94. It is therefore misleading for DFA to suggest that the bankruptcy court "made factual findings that establish the required elements" of the defense. Br. at 18. In fact, the bankruptcy court never discussed the failing company defense, let alone conducted any analysis of its elements, or determined whether there were alternatives available that would have solved the antitrust concerns. It left those questions to this Court.

As to the elements of the defense, DFA does not even attempt to address the complex factual inquiries bearing on the viability of Dean reorganizing under Chapter 11. *See U.S. Steel Corp.*, 426 F.2d at 609 (relevant factors included company's long-term contracts, goodwill and reputation, equity interests, and merger history). Debtors regularly pursue a dual-track exploration of bids and restructuring, and there are indications that Dean did so here. *See* Bankr. Dkt. 46, Decl. of Gary Rahlfs, ¶¶5-6 (Dean was "explor[ing] all alternative options for a stand-alone restructuring"); Bankr. Dkt.

---

[11] A bankruptcy court assesses whether an asset sale "constitutes valid and sound exercise of the Debtors' business judgment." Defs' Ex. D, ECF No. 30-4, at 7. Here, the court found that DFA submitted the "highest and best offer" and presented "the best opportunity to maximize and realize the value of the Acquired Assets for the benefit of the Debtors and their estates," *id.*, not that DFA made the only offer. This is not the same as a finding that there was no viable restructuring or alternative purchaser of the Dean assets. *Cf. United States v. Energy Solutions*, 265 F. Supp. 3d 415, 446 (D. Del. 2017).

- 16 -

1069 (Dean noteholders objecting to bid procedures due to feasibility of a stand-alone restructuring).  The bankruptcy court made no findings regarding Dean's ability to reorganize for purposes of the failing company defense, however, and it is thus of no help to DFA in establishing this critical element.

Nor do DFA's fragmented cites to the bankruptcy record establish that DFA was "the only available purchaser" of Dean's assets.  To the contrary, there were alternative bidders for fifteen plants ultimately sold to DFA, including MDVA's bid for one of the Carolinas plants.  Compl. ¶¶87, 89; Bankr. Dkt. 1270, Notice of Bid Results, at 2.  Borden later proposed to purchase up to fifty-five Dean facilities to help address the antitrust concerns raised by Plaintiffs and others.  *See* Bankr. Dkt. 1750, Resp. to Emer. Mot. ¶47.  While DFA argues that it was the only bid for the "vast majority" of Dean's assets, there is no "vast majority" exception under the failing company defense.  The relevant antitrust inquiry is whether there was an alternative purchaser for one or more of the Carolinas plants that would have solved the antitrust concern.  There was.  To the extent DFA claims that these alternative purchasers were not bona fide, additional fact finding would at best be required for DFA to prove the lack of alternative bidders.  *See Dr. Pepper/Seven-Up Cos. v. F.T.C.*, 991 F.2d 859, 866 (D.C. Cir. 1993).

Notably, the Complaint also alleges that DFA and Dean proceeded in a way that deterred and disadvantaged other potential purchasers, including DFA's insistence on an all-or-nothing bid and refusing to disclose its valuation of each plant. Compl. ¶88.  *See also* Bankr. Dkt. 1069, Noteholders Obj. to Bid Procedures, ¶3 ("[A]t every turn the Debtors have maintained a myopic focus on selling their assets to DFA and rebuffed or

- 17 -

hindered the Ad Hoc Group's efforts to prepare a plan-based restructuring alternative to the DFA sale."). Myriad factual questions exist regarding whether DFA strategically manipulated the bid process and the prospects of reorganization and alternative purchasers absent such tactics.

Finally, the "failing company" defense only applies to Section 7 claims, not to attempted monopolization claims. *ABS Global, Inc. v. Inguran, LLC*, No. 14-503, 2016 WL 3963246, at \*19 n.12 (W.D. Wis. July 21, 2016). Even if DFA were later to prevail on this defense, therefore, it would not result in dismissal of the case.

## IV.   PLAINTIFFS ALLEGE A PLAUSIBLE GEOGRAPHIC MARKET.

DFA's final argument for dismissal is that Plaintiffs' alleged geographic market is implausible. This argument ignores both the applicable legal standard and the allegations in the Complaint. The Fourth Circuit has held that "market definition is a question of fact." *E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 442 (4th Cir. 2011) (collecting cases). As such, "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic," because determining a geographic market "is a fact-intensive exercise centered on the commercial realities of the market and competition." *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 453 (1992)).

A plausible geographic market is one "within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output." *Id.* at 441. Relevant commercial realities bearing on this analysis include consideration of myriad facts such

- 18 -

as "where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product." *Id.* at 442-43.

Because this complex factual analysis is required, "dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of 'glaring deficiencies,' such as failing to allege a relevant market." *Id.* at 444 (quoting *Allen v. DFA*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010)). The cases cited by DFA fall into this narrow category of glaring deficiencies. *See, e.g., Shred-It Am. v. MacNaughton*, No. 10-547, 2011 WL 1842997, at *5 (D. Haw. May 13, 2011) ("Shred-it devoted merely seven words of its thirty-two page complaint to defining the relevant market. ... [T]he complaint is utterly devoid of any explanation or elaboration to support this contention.").[12]

There are no glaring deficiencies here. Plaintiffs have followed a well-established methodology for identifying the relevant geographic market, grounded in facts concerning the commercial and competitive landscape that are presumed true for purposes of this motion. Courts evaluate a geographic market based on whether a

---

[12] *See also Downeast Builders & Realty v. Essex Homes Se.*, No. 11-cv-2653, 2012 WL 2572204, at *4 (D.S.C. July 3, 2012) (market "served by Essex" did not address competitors); *Little Rock Cardiology Clinic v. Baptist Health*, 573 F. Supp. 2d 1125, 1150 (E.D. Ark. 2008) (market of city limits was based on where "defendant's customers *actually* go for services, not where the customers could practically turn for services"); *Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1100 (S.D. Iowa 1998) (market surrounding a hospital did not address where customers "could reasonably turn for alternative care").

- 19 -

hypothetical monopolist controlling all facilities therein could impose a "small but significant non-transitory increase in price" ("SSNIP"), without causing enough customers to turn to sources outside the market as to make the SSNIP unprofitable.  *See F.T.C. v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019); *F.T.C. v. Advocate Health Care Network*, 841 F.3d 460, 468-71 (7th Cir. 2016).  In implementing the test, the use of a facility- or supplier-based market, such as the Complaint alleges here, has long been approved and encouraged.  *See Advocate*, 841 F.3d at 466 (approving expert conclusion "that the area around the eleven hospitals is a relevant geographic market"); Horizontal Merger Guidelines § 4.2.1 (Geographic Markets Based on Location of Suppliers) (offering example of market "defined around the plants in City X").

The Complaint defines the relevant geographic market by reference to the milk processing plants in the Carolinas. *See* Compl. ¶21.  Plaintiffs describe physical geographic features (*id.* ¶23), transportation and perishability concerns (*id.* ¶¶22-24), and a government policy (*id.* ¶77) making it difficult for milk to travel far distances from or to these plants.  Plaintiffs also address the state of competition (*id.* ¶¶25, 64-85) and barriers to entry (*id.* ¶¶129-34).  They allege that, due to these market features, producers and customers could not practically turn to more distant sources if a hypothetical monopolist imposed a SSNIP.  *Id.* ¶¶26-27.  This is more than enough to survive a motion to dismiss.  *Cf. E.I. DuPont*, 637 F.3d at 444-47; *K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 735 (E.D.N.C. 2017).

- 20 -

While DFA pokes at the edges of Plaintiffs' market definition,[13] decades of antitrust jurisprudence make clear that markets "need not—indeed cannot—be defined with scientific precision." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974); *see also United States v. Pabst Brewing Co.,* 384 U.S. 546, 549 (1966) (antitrust law does not require "delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground"). DFA will have more than enough opportunity to make these arguments at trial, and the court will have the benefit of a fuller record to help make a concrete determination. But, once again, DFA is asking the court to ignore the standard of review and make a factual determination on a motion to dismiss.

Finally, DFA argues that it is "insincere" for Food Lion to allege a geographic market narrower than in *In re Southeastern Milk Antitrust Litigation*. This is not a legal argument, as no authority prohibits plaintiffs from alleging different markets in different circumstances, or even from alleging geographic submarkets. *See Brown Shoe*, 370 U.S. at 336; *Oberweis Dairy v. Assoc. Milk Prods.,* 553 F. Supp. 962, 969 (N.D. Ill. 1982) (geographic market shrunk from entire Midwest in first action to only Chicago in second). *Southeastern Milk* was based on completely different facts and legal theories

_____

[13] For example, DFA claims that it is common for milk to move between plants in the Carolinas and parts of Virginia and Georgia and accuses Plaintiffs of pretending that "Georgia and Virginia do not exist." Expressly included in Plaintiffs' geographic market, however, are "dairies and cooperatives to which these plants may reasonably turn for supply of raw milk for these facilities" and "customers of processed milk ... that can reasonably turn to these facilities for the purchase of processed milk." Compl. ¶21. Plaintiffs do not dispute that some producers and customers who fall within these parameters will likely be located in Virginia and Georgia, and that is entirely consistent with their market definition.

- 21 -

than those outlined in the Complaint, and the conduct at issue there necessarily affected the contours of the current market, as it now exists twenty years later. The Complaint plausibly alleges a geographic market, according to today's market dynamics, encompassing the three Carolinas plants and their regional competitors. To the extent DFA believes there is inconsistency, this would be a proper subject for cross-examination at trial, not the basis for a motion to dismiss.

## **CONCLUSION**

For the foregoing reasons, DFA's motion to dismiss should be denied.

Date: July 7, 2020                    Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

s/ Ryan G. Rich
A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (admitted *pro hac vice)*
John S. Martin (admitted *pro hac vice)*
Kevin Hahm (admitted *pro hac vice)*
Carter C. Simpson (admitted *pro hac vice)*
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN SANDERS LLP**

s/ Jason D. Evans
Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (admitted *pro hac vice)*
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362
james.lamberth@troutman.com

*Attorneys for Maryland and Virginia Milk
Producers Cooperative Association, Inc.*

- 23 -

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing memorandum does not exceed 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

This the 7th day of July, 2020.

<u>/s/ Ryan G. Rich</u>
Ryan G. Rich

- 24 -