# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Food Lion, LLC, and Maryland and Virginia Milk Producers Cooperative Association, Inc.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DAIRY FARMERS OF AMERICA, INC.,<br><br>　　　　Defendants. | Docket No. 1:20-cv-442-CCE-JLW |

## DAIRY FARMERS OF AMERICA, INC.'S ANSWER AND DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant Dairy Farmers of America, Inc. ("DFA"), by and through its undersigned counsel, answer Plaintiffs' Complaint, ECF No. 1, as follows.

### Introduction

This matter involves failed bidders and failing competitors who are turning to the antitrust laws to try to change the marketplace.

On May 19, 2020, and after failing to convince the Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court") to block the sale of certain Dean Foods Company ("Dean") processing plants to DFA, Plaintiffs—Food Lion, LLC ("Food Lion") and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA")—

1

filed a Complaint seeking to undo this acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

The thrust of Plaintiffs' theory is that DFA's acquisition of bankrupt Dean's three processing plants in North and South Carolina (the "Carolina Plants") might, in 2021, prevent MDVA from competing to supply those plants with raw milk, and that as a result of MDVA perhaps not gaining that potential business, Food Lion might not receive as low prices as it would like for future purchases of processed fluid milk ("Processed Milk") from the Carolina Plants.

But the Plaintiffs also concede that competition remains unaffected in the market: the Carolina Plants still process raw milk from DFA (as they did prior to DFA's acquisition of these plants); MDVA still sells its raw milk to processors other than Dean or DFA; and Food Lion still purchases its Processed Milk from processors other than Dean or DFA. And there is no allegation that the competition, as it presently exists, is illegal or improper in any way.

The Plaintiffs also concede that the Carolina Plants were purchased by DFA through procedures governed and approved by the Bankruptcy Court and in an orderly, public process, overseen by the Bankruptcy Court. The Bankruptcy Court established bidding procedures. MDVA and DFA were two of several potential bidders. DFA sought to purchase the vast majority of Dean's assets, 44 facilities, including corporate headquarters and fluid milk and frozen operations across the country. MDVA sought to purchase a single plant, in High Point, North Carolina. Food Lion made no effort to bid for or acquire

2

any plant. The Court approved Dean's selection of DFA as the winning bidder of these facilities, with full awareness of MDVA's bid for the High Point, North Carolina plant, and over the objections of Plaintiffs.

The incontrovertible reality behind these admissions is that but for DFA stepping forward and buying these assets, all or most of the Carolina plants would have been liquidated and critical fluid milk capacity and output would have left the market supplying the Carolinas. Thus, the only "change" to the market and competition is that DFA preserved competitive supply that would have otherwise left the market. Simple economics says that is unambiguously procompetitive, not anticompetitive.

In order to claim that they could be harmed in the future, the Plaintiffs are forced to allege a geographic market that is implausible. Plaintiffs argue the geographic market is limited to North and South Carolina because of the Atlantic Ocean and Appalachian Mountains, omitting the existence of Virginia to the north and Georgia to the south. Plaintiffs admit participation in Federal Milk Marketing Order 5, which reflects the movement of milk throughout the Southeast. And further, Plaintiffs admit seeking milk from outside the Carolinas, such as Food Lion's 2017 request for proposal sent to MDVA's Virginia processing facility.

DFA is a cooperative made up of a diverse group of dairy farmers who seek to work together to achieve the best price and distribution that they can for their product. Because of its diversity and the large number of farmers who it represents, DFA has successfully advanced the interests of its farmers, enabling the survival of family and

3

small farms. It is laser-focused on both creating demand, and finding a home for farmers' milk, which includes capturing the plainly procompetitive vertical efficiencies of operating fluid milk processing plants. MDVA sues because it has been unable to compete in the marketplace; Food Lion, which is part of a $70 billion international conglomerate, sues because it seeks to extract the lowest possible prices to enhance its profit margins. This is an improper use of the antitrust laws.

The allegations and argument in Plaintiffs' eight introductory paragraphs constitute Plaintiffs' characterization of the facts and legal and economic arguments to which no response is required. To the extent a response is required, the allegations in these introductory paragraphs are denied. Further, the headings and sub-headings contained in Plaintiffs' Complaint are improper statements of fact or legal conclusion to which no response is required. To the extent a response is required, DFA denies those allegations.

## THE PARTIES

1.      **Plaintiff Food Lion is a North Carolina limited liability company headquartered in Salisbury, North Carolina. It operates more than 1,000 supermarkets, either directly or through affiliates, in ten states, including approximately 600 supermarkets in North and South Carolina and dozens more that purchase fluid milk from milk processing facilities in the Carolinas. Food Lion purchases processed fluid milk in interstate commerce and is one of the largest retail purchasers of processed fluid milk from processing facilities in North and South Carolina.**

**ANSWER:**   DFA is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 1, and on that basis, denies these allegations.

4

2.     Plaintiff MDVA is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Reston, Virginia. MDVA is a dairy cooperative with approximately 950 member farms in eleven states throughout the Mid-Atlantic and Southeast. MDVA also owns two fluid milk processing facilities outside of the Carolinas and two plants that produce bulk dairy ingredients for food manufacturers.

**ANSWER:**   DFA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, and on that basis, denies these allegations.

3.     Defendant DFA is a dairy cooperative organized and existing under the laws of the State of Kansas, with its principal place of business in Kansas City, Missouri. DFA is the largest dairy cooperative in the United States, representing over 14,000 dairy producers in forty-eight states and recognizing $13.6 billion in revenue in 2018. In the wake of the Asset Sale, DFA is also the nation's largest processor and direct-to-store distributor of fluid milk and other dairy and dairy case products. Now DFA not only engages in the production and marketing of raw milk, but it also manufactures, markets, and distributes processed milk to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the country, including from its legacy Dean plants in High Point, North Carolina; Winston Salem, North Carolina; and Spartanburg, South Carolina.

**ANSWER:**   DFA admits it is a not-for-profit corporation organized and existing under the laws of the State of Kansas.  DFA denies its principal place of business is in Kansas City, Missouri.  DFA admits it is a cooperative as defined under Chapter 17, Article 16 of the Kansas Cooperative Marketing Act.  DFA admits that it is the largest dairy cooperative in the United States with over 13,000 producer members as of the date of this response.  DFA admits that it had $13.6 billion in net sales in 2018.  DFA admits that it markets its producer-members' raw milk.  DFA further admits it has ownership interests in entities that operate certain milk processing plants in multiple states in the United States that manufacture fluid milk and other dairy-based products.  DFA further admits that the customers of these products include retailers, distributors, foodservice outlets, educational

5

institutions, and governmental entities in multiple states in the United States. DFA further admits that it owns the fluid milk processing plants in High Point, North Carolina, Winston-Salem, North Carolina and Spartanburg, South Carolina. DFA denies the remaining allegations in this introductory paragraph.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

**4.    This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 26; 28 U.S.C. § 1331; and/or 28 U.S.C. § 1337(a).**

**ANSWER:** DFA denies the allegations in Paragraph 4.

**5.    This Court has personal jurisdiction over DFA under 15 U.S.C. § 22, because DFA may be found and regularly transacts business in this judicial district.**

**ANSWER:** DFA admits the Court has personal jurisdiction over DFA.

**6.    Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), because DFA may be found and regularly transacts business in this judicial district. Two of the three legacy Dean milk processing facilities at issue in this Complaint are located in this judicial district, and the anticompetitive effects of the Asset Sale will be felt throughout this judicial district.**

**ANSWER:** Paragraph 6 calls for a legal conclusion to which no response is required. To the extent a response is required, DFA denies the allegations.

**7.    DFA is engaged in, and its activities substantially affect, interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, DFA purchases, markets, processes, and ships milk across state lines. DFA receives substantial payments across state lines for the sale of raw and/or processed milk. DFA's acquisition of three legacy Dean processing facilities in North and South Carolina will have adverse effects on competition and consumers, including for the production and processing of fluid milk sold, in the region.**

6

**ANSWER:** Paragraph 7 calls for a legal conclusion to which no response is required. To the extent a response is required, DFA denies the allegations. DFA denies the remaining allegations in Paragraph 7.

## RELEVANT MARKETS

### *The Relevant Product Markets*

8. There are two relevant product markets at issue in this case.

**ANSWER:** Paragraph 8 consists of a legal conclusion to which a response is not required. To the extent one is required, DFA denies the allegations in Paragraph 8.

9. **The first market is an upstream market for the supply of raw Grade A milk ("raw milk") by dairy producers, in which both DFA and MDVA compete, to milk processing plants like the legacy Dean facilities (the "raw milk market").**

**ANSWER:** Paragraph 9 consists of a legal conclusion and definition to which a response is not required. To the extent a response is required, DFA denies those allegations in Paragraph 9.

10. **The second market is the downstream market for the processing, co-packing, and delivery of fluid milk products to retailers like Food Lion and other customers (the "processed milk market" or "processed fluid milk market").**

**ANSWER:** Paragraph 10 consists of a legal conclusion and definition to which a response is not required. To the extent a response is required, DFA denies those allegations in Paragraph 10.

11. **The milk industry, including DFA and Dean, treat these two product markets as being distinct in the ordinary course of business. These relevant product markets also have been treated as being distinct by federal courts in prior litigation involving DFA and Dean.**

7

**ANSWER:** Paragraph 11 consists of legal conclusion to which a response is not required. To the extent a response is required, DFA denies those allegations in Paragraph 11. DFA denies the remaining allegations in Paragraph 11.

**12.      Raw milk is a fungible, homogenous, and highly perishable commodity. Dairy farmers milk their cows at least twice a day and the milk must be transported from farms to milk processors nearly every day and sometimes multiple times a day. Raw milk is typically stored in refrigerated tanks until it is picked up by a milk hauler who transports it in insulated trucks to milk processing plants. Milk processing plants process this milk for human consumption and package it for wholesale or retail sale.**

**ANSWER:** DFA admits that raw milk is highly perishable. DFA admits that dairy farmers generally milk their cows at least twice a day. DFA further admits that raw milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to raw milk processing plants. DFA further admits that milk processing plants process raw milk. DFA denies the remaining allegations in Paragraph 12.

**13.      Federal milk sanitation standards distinguish between milk eligible for use in fluid products—called raw Grade A milk—and milk eligible only for manufactured dairy products. Pursuant to the 1937 Agriculture Act, the U.S. Dairy Association ("USDA") classifies raw Grade A milk as milk that qualifies for use in fluid milk products for human consumption. The highest standards are established for raw Grade A milk because of safety risks associated with fluid milk products.**

**ANSWER:** DFA admits that federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, but aver that those rules and regulations speak for themselves. To the extent Plaintiffs' allegations in Paragraph 13 characterize or contradict those rules or regulations, DFA denies those allegations. DFA denies the remaining allegations in Paragraph 13.

8

14.     Each month, the USDA calculates minimum prices pursuant to its formula for raw milk marketed in different geographic regions, known as Federal Milk Marketing Orders ("FMMO"). Currently, there are ten FMMOs. The milk processing facilities at issue in this Complaint are included in FMMO 5.

ANSWER:  DFA admits that the United States Department of Agriculture calculates certain minimum prices for raw milk but avers that the United States Department of Agriculture regulations relating to such matters speak for themselves. To the extent Plaintiffs' allegations in Paragraph 14 characterize or contradict those regulations, DFA denies those allegations.  DFA further admits that there are currently ten FMMOs.  DFA further admits the High Point, North Carolina, Winston-Salem, North Carolina, and Spartanburg, South Carolina, fluid milk processing plants are in FMMO 5.  DFA denies the rest of the allegations in Paragraph 14.

15.     USDA regulations mandate that cooperatives and independent dairy farmers participating in the FMMO program receive at least the weighted uniform average or minimum "blend" price for raw Grade A milk that is "pooled" on an Order. Dairy farmers "pool" raw Grade A milk on an FMMO by delivering specified minimum quantities of such milk to USDA-regulated fluid milk processing plants associated with that FMMO.

ANSWER:  DFA admits that United States Department of Agriculture regulations govern certain aspects relating to the pooling and payment for milk but aver that those regulations speak for themselves.  To the extent Plaintiffs' allegations in Paragraph 15 characterize or contradict those regulations, DFA denies those allegations.

9

16. **USDA minimum prices for raw Grade A milk represent the minimum prices that milk processors must pay for such milk marketed pursuant to USDA regulation. These minimum prices, however, are less than the farmers' cost to produce the milk. Farmers must sell their raw milk for more than these minimum prices in order to survive.**

**ANSWER:** The first sentence of Paragraph 16 contains Plaintiffs' characterization of the operation of United States Department of Agriculture regulations. DFA avers that those regulations speak for themselves and does not require a response. To the extent Paragraph 16 is inconsistent with or contradicts those regulations, DFA denies those allegations. DFA denies the remaining allegations in Paragraph 16.

17. **On the processed milk side, consumers have long-held cultural and taste preferences for processed fluid milk over other beverages, and processed fluid milk has particular nutritional benefits and qualities for use in cooking. Consequently, consumer demand for processed fluid milk is relatively inelastic; that is, processed fluid milk consumption does not decrease significantly in response to a price increase. Fluid milk is distinct from extended shelf-life milk, ultra-high temperature milk, and aseptic milk, which are produced by different processes, have numerous significant differences, and generally cost significantly more than fluid milk.**

**ANSWER:** Paragraph 17 contains economic conclusions and characterizations regarding consumer behavior about which DFA is without sufficient knowledge or information to form a belief as to the truth of the allegations, and on those bases denies those allegations. DFA admits that extended shelf-life milk, ultra-high temperature milk and aseptic milk are produced by different processes. DFA denies the allegations in Paragraph 17.

10

18. **Retailers, supermarkets, distributors, and other processed fluid milk customers are unlikely to substitute other products for fluid milk because the individual consumers that they serve continue to demand fluid milk.**

**ANSWER:** DFA is without sufficient knowledge to form a belief as to the truth of

the allegations in Paragraph 18, and on that basis, denies those allegations.

19. **Dairy farmers and dairy cooperatives sell raw milk to milk processors who have no feasible substitutes. Similarly, milk processors sell processed fluid milk to retailers, who can sell other beverages, but none that are good substitutes for fluid milk.**

**ANSWER:** DFA admits that dairy farmers and dairy cooperatives can sell raw milk

to milk processors. DFA admits that fluid milk processors can sell fluid milk to retailers.

DFA denies the remaining allegations of Paragraph 19.

20. **The markets for raw and processed fluid milk satisfy the well-accepted "hypothetical monopolist" test set forth in Part 4.1 of the DOJ and Federal Trade Commission 2010 Horizontal Merger Guidelines, and incorporated by reference into Part 2 of the Draft Vertical Merger Guidelines (released for public comment on January 10, 2020). A hypothetical monopolist of raw milk could impose a small but significant non- transitory increase in price ("SSNIP") to milk processors. Processors have no reasonable substitute for raw milk that would render a SSNIP on raw milk unprofitable. A hypothetical monopolist of processed milk could impose a SSNIP to customers of processed milk, such as grocery retailers. Retailers and other processed milk customers could not turn to purchasing other products in sufficient quantity or numbers to render a SSNIP on processed milk unprofitable.**

**ANSWER:** Paragraph 20 consists of legal and economic conclusions to which no

response is required. To the extent a response is required, DFA denies those allegations.

21.     The relevant geographic market in this action for both the supply of **raw milk and its processing and co-packing consists of the milk processing plants in North and South Carolina. Dairies and cooperatives to which these plants may reasonably turn for supply of raw milk for these facilities are included in the geographic market for raw milk. Similarly, customers of processed milk including retailers that can reasonably turn to these facilities for the purchase of processed milk are included in the geographic market for processed milk.**

**ANSWER:** DFA denies the allegations in Paragraph 21.

22.     **Transportation costs and perishability limit the distance over which raw milk can profitably be shipped. As stated above, farmers generally milk their cows at least twice a day, and the milk must be stored in refrigerated tanks and transported to milk processors nearly every day and in some cases multiple times a day. Raw milk is highly perishable and is costly to transport because it must be shipped in insulated tanks. Shipping costs are estimated to increase by approximately $0.10 per gallon for every additional 100 miles shipped. This makes the need to transport milk to the closest processing facility even more important in order to manage transportation costs.**

**ANSWER:** DFA admits that raw milk is highly perishable. DFA further admits that dairy farmers generally milk their cows at least twice a day. DFA further admits that raw Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler to transports it in insulated trucks to raw Grade A milk processing plants. DFA denies the remaining allegations in Paragraph 22.

23.     **The region surrounding the milk processing facilities in North and South Carolina has two geographic features that limit the region within which milk can reasonably and profitably be shipped to and from milk processing facilities: the Atlantic Ocean to the East and the Appalachian Mountains to the West. Shipping across the Appalachian Mountains is not economically feasible because of the transportation costs associated with crossing the mountains.**

**ANSWER:** DFA admits the Atlantic Ocean is east of North and South Carolina. DFA further admits that the Appalachian Mountains run along the western edge of North and South Carolina. DFA denies the remaining allegations in this Paragraph.

**24. The economic and transportation costs of shipping milk dictate that the long-term viability and overall competitiveness of a dairy cooperative supplying raw milk to a milk processor in the Carolinas relies on the cooperative's ability to transport its members' milk to a local processing facility.**

**ANSWER:** DFA denies the allegations in Paragraph 24.

**25. These geographic and cost constraints leave dairy producers located near the processing facilities in North and South Carolina with only six processing and packaging facilities to which to sell raw milk: (1) the legacy Dean (now DFA) facility in Winston-Salem, North Carolina; (3) the legacy Dean (now DFA) facility in High Point, North Carolina; (3) the legacy Dean (now DFA) facility in Spartanburg, South Carolina; (4) Kroger's Hunter Farms facility in High Point, North Carolina; (5) Ingles' Milkco facility in Asheville, North Carolina; and (6) the Borden Dairy Co. facility in Charleston, South Carolina. Because geographic and transportation costs also constrain the shipment of processed milk, downstream purchasers of processed milk also rely on nearby milk processing facilities. Below is a map identifying these facilities' respective locations.**

13

**Figure One: Milk Processing Facilities in the Carolinas**



**ANSWER:** DFA denies the allegations in the first sentence of Paragraph 25. DFA admits Figure One purports to show six milk processing facilities in North and South Carolina. DFA is without sufficient information to form a belief as to the truth of the allegations, and thus on that basis, denies the remainder of the allegations in Paragraph 25.

**26.** **A hypothetical monopolist of cooperatives and independent dairies selling raw milk to the processors located in North and South Carolina could impose a SSNIP. This is because the high transportation costs associated with raw milk mean that processors cannot turn to more distant cooperatives to defeat a SSNIP.**

**ANSWER:** Paragraph 26 calls for legal and economic conclusions to which no response is required. In addition, DFA is without sufficient information to form a belief as to the truth of the allegations, and thus on both of these bases, denies the allegations in Paragraph 26.

Case 1:20-cv-00442-CCE-JLW   Document 45   Filed 08/14/20   Page 14 of 70

27.     A hypothetical monopolist of milk processors located in North and South Carolina could impose a SSNIP in price to customers such as retailers. This is because retailers, collectively, would not be able profitably to offset such a price increase by shipping milk from more distant milk processors. Even if some customers closer to the market boundary did find it economical to substitute more distant processors, this would not be sufficient to offset the aggregate profitability of a price increase.

**ANSWER:**  Paragraph 27 calls for legal and economic conclusions to which no response is required. In addition, DFA is without sufficient information to form a belief as to the truth of the allegations, and thus on both of these bases, denies the allegations in Paragraph 27.

## DFA'S CONSOLIDATION OF THE U.S. DAIRY INDUSTRY

### *Milk Cooperatives*

28.     The dairy industry in the United States is highly concentrated, at both the raw milk producer and processor levels, and has become increasingly concentrated over time as DFA has sought to monopolize the dairy supply chain.

**ANSWER:**  DFA is without sufficient information to form a belief as to the truth of the allegations regarding the dairy industry at large, and thus on that basis, denies the allegations in Paragraph 28.  DFA denies the remaining allegations in Paragraph 28.

29.     Dairy cooperatives are associations of dairy farmers who agree to market collectively their raw milk. Cooperatives are supposed to be voluntary associations— owned, operated, and controlled by their farmer members. Cooperatives "market" their farmers' raw milk, which usually consists of locating buyers, negotiating sales prices, coordinating hauling, performing testing, recording and reporting related data to milk market regulators, and paying member farmers for their raw milk.

15

**ANSWER:** DFA admits that dairy cooperatives are associations of dairy producers who agree to collectively market their dairy products and that such cooperatives are owned by their member-producers. DFA further admits that dairy cooperatives may locate buyers for their member-producers' raw Grade A milk, negotiate sales prices, coordinate the hauling, perform testing, record and report related data to milk market regulators, and process payments to member-producers for their raw Grade A milk. DFA denies the remaining allegations in Paragraph 29.

**30. One of the key responsibilities of cooperatives is to negotiate prices higher than the FMMO minimum prices. The amounts by which prices paid for raw Grade A milk exceed FMMO minimum prices are known generically as "over-order premiums." Access to milk processing plants in North and South Carolina and receipt of FMMO minimum prices and over-order premiums are necessary and essential to the economic viability of dairy farmers in the region.**

**ANSWER:** DFA admits dairy farmers and cooperatives, including DFA, attempt to negotiate prices for raw Grade A milk that exceed the FMMO minimum blend prices, and that the price negotiated above the minimum blend price is sometimes referred to as an "over-order premium." DFA denies the remainder of the allegations in Paragraph 30.

**31. Not all dairy farmers are cooperative members. Some dairy farmers seek to remain independent of cooperatives and are referred to as "independent dairy farmers." Independent dairy farmers seek to market their raw milk to fluid milk processing plants by contracting with processing plants either directly or through agents and/or marketing associations. Many independent dairy farms are family-owned and operated and have been so for generations.**

**ANSWER:** DFA admits that dairy producers may be members of a cooperative and some may be independent (i.e., not a member of a cooperative) and that some of these dairy farmers may be referred to as "independent dairy farmers." DFA admits that

16

independent dairy farmers may market their own raw milk directly to milk processors or may rely on a marketing agent or marketing association to market their milk. DFA denies the remaining allegations in Paragraph 31.

**32.     On January 1, 1998, DFA, a new marketing cooperative, was created from the merger of four competing dairy cooperatives. By 2000, DFA had emerged as the largest dairy cooperative in the United States and controlled more than 50% of the raw Grade A milk produced in the Southeast United States.**

**ANSWER:**  DFA admits that the creation of DFA was effective January 1, 1998, and that DFA was created from the merger of four cooperatives: the Southern Region of Associated Milk Producers, Inc. ("AMPI"), Mid-American Dairymen, Inc. ("Mid-Am"), Milk Marketing, Inc., and Western Dairymen Cooperative, Inc. DFA admits that by 2000, DFA was the largest dairy cooperative in the United States. DFA denies the remaining allegations in Paragraph 32.

**33.     Today, DFA is still the largest dairy cooperative and raw milk producer in the United States. DFA's members, all of which are producers of raw milk, include both individual dairy farmers and other member-owned milk marketing cooperatives. In 2018, DFA produced 52.7 billion pounds of raw milk— approximately 30% of all raw milk produced in the United States—making it more than three times larger than the next largest dairy cooperative, California Dairies Inc., which is a DFA partner. DFA had 2018 revenues of $13.6 billion. DFA recently started issuing non-voting preferred stock, and its equity from this stock comprises a large portion of DFA's total equity.**

**ANSWER:**  DFA admits it is the largest dairy cooperative in the United States as of the date of this Answer. DFA admits that its members are all producers of raw milk. DFA further admits that its members include individual dairy farmers. DFA admits that in 2018 it marketed 64.5 billion pounds of raw milk for both members and others, which represented approximately 30% of the total milk production in the United States. DFA

17

admits that in 2018, it had net sales of $13.6 billion. DFA denies the remaining allegations in Paragraph 33.

**34. Through various transactions, partnerships, joint ventures, and contractual relationships, DFA has expanded its dominance of the milk supply chain, establishing vertical relationships and interests in everything from production, to processing, to delivery. Thus, DFA currently controls two critical product markets within the milk supply chain—production and processing—in many of the geographic markets in which it operates. Until the Asset Sale was consummated, the geographic region at issue in this Complaint remained one in which DFA was not yet fully integrated.**

**ANSWER:** DFA admits that at the time of the sale of certain of Dean's assets to DFA, DFA did not own any fluid milk processing plants in North or South Carolina. DFA denies the remaining allegations in Paragraph 34.

**35. MDVA is a dairy cooperative with approximately 950 member-farms in eleven states throughout the Mid-Atlantic and Southeast. As a cooperative, MDVA supports its farmer-members by locating raw milk buyers, negotiating sales prices, coordinating hauling, performing testing, recording and reporting related data to milk market regulators and processors, and by paying member farmers for their raw milk.**

**ANSWER:** DFA is without information or knowledge sufficient to form a belief as to the truth of the allegations, and thus on that basis, denies the allegations.

36.     In 2018, MDVA produced approximately 1% of the raw milk in the United States. To compare their relative size, MDVA sold 2.9 billion pounds of raw milk in 2018 compared to DFA's 52.7 billion pounds, making MDVA only the thirteenth largest dairy cooperative in the United States. MDVA nevertheless acts as a competitive constraint on DFA in the states in which MDVA operates. In the market for the production and supply of raw milk to processing facilities in the Carolinas, MDVA is the only significant competitive constraint on DFA.

**ANSWER:** DFA is without information or knowledge sufficient to form a belief as to the truth of the allegations with respect to the first and second sentences, and thus on that basis, denies those allegations. DFA denies the remaining allegations in Paragraph 36.

### *Milk Processors*

37.     Milk processors process raw milk purchased from cooperatives, independent dairy farmers, or other supply plants into pasteurized milk for human consumption. Processors process milk into a variety of fluid products including whole milk, fat-free or skim milk, low and reduced-fat milk, chocolate milk, buttermilk, and cream. The processed milk is then packaged into a variety of consumer containers including gallon jugs, half-gallon cartons, and other smaller packages. Milk processing plants then sell the processed milk to retail outlets, like Food Lion, and other customers.

**ANSWER:** DFA admits that milk processors may process raw milk purchased from cooperatives, independent dairy farmers, or other supply plants into pasteurized milk products for human consumption, such as whole milk, fat-free or skim milk, low and reduced-fat milk, chocolate milk, buttermilk, and cream, but denies the allegations to the extent they are meant to be comprehensive statements regarding milk processing. DFA admits that processed fluid milk may be packaged into smaller packages, including gallon, half-gallon, and other smaller sizes, but denies the allegation to the extent it is meant to be a comprehensive statement regarding processed fluid milk packaging. DFA admits that

19

processed fluid milk may be sold to retail customers. DFA denies the remaining allegations in Paragraph 37.

**38. Milk processors include independent processing plants, processors owned by cooperatives or in joint ventures with cooperatives, and retail supermarket chains that own their own processing plants. The processing plants of supermarket chains process and bottle milk primarily for the retail banners owned by that chain.**

**ANSWER:** DFA admits that milk processors may include independent processing plants, processors owned by cooperatives or in joint ventures with cooperatives, and retail supermarket chains that own their own processing plants, but denies that those are the only types of milk processors. DFA is without information or knowledge sufficient to form a belief as to the truth of the allegations with respect to the second sentence, and on that basis, deny those allegations.

### The Old Dean/Suiza Merger and the Corrupt Bargain

**39. DFA's rise from regional dairy cooperative to a two-level dairy industry monopolist began with a "corrupt bargain" struck in 2001, just as DFA was emerging as a national cooperative.**

**ANSWER:** DFA denies the allegations in Paragraph 39.

**40. In 1996, there were 62 milk processing plants in the Southeast United States. Following a series of acquisitions, a Texas-based dairy company named Suiza Foods had become the largest fluid milk processor in the United States. At the time, Suiza owned 67 milk processing plants in 29 states with net sales of more than $5 billion.**

**ANSWER:** DFA is without knowledge or information sufficient to form a belief in the truth of the allegations, and on this basis, denies those allegations.

41.     Following its own series of acquisitions, a company that had the same name as Dean, referred to herein as "Old Dean," had become the second-largest buyer of raw milk and the second-largest bottler of processed milk in the United States, operating 43 dairy processing plants in 19 states and with net sales of approximately $4.4 billion.

ANSWER:  DFA is without knowledge or information sufficient to form a belief in the truth of the allegations, and on this basis, denies those allegations.

42.     By 2001, DFA was the largest dairy producer in the United States, Suiza was the largest processor, and Old Dean was the second-largest processor. DFA was supplying raw milk to Suiza, while independent dairy farmers supplied raw milk to Old Dean. Suiza's supply costs from DFA were significantly higher than Old Dean's independent sources of milk supply.

ANSWER:  DFA admits that it was supplying raw milk to Suiza in 2001.  DFA is without knowledge or information sufficient to form a belief in the truth of the allegations in the last sentence or the supply of Old Dean, and on that basis, denies those allegations. DFA denies the remaining allegations.

43.     In 2001, Suiza Foods announced a plan to merge with Old Dean and to thereafter operate the merged company under the name Dean Foods Company. The merger between the two processors has been described as "a case study in how unchecked mergers beget abusive monopolies that harm both farmers and consumers." Claire Kelloway, *The Monopolization of Milk, How America's Biggest Dairy Co-op is Trying to Become Even Bigger.* WASHINGTON MONTHLY, Nov. 21, 2019, *available at* https://washingtonmonthly.com/2019/11/21/the-monopolization-of-milk/.

ANSWER:  DFA admits that in 2001 Suiza announced it would acquire "Old Dean" and operate under the Dean name.  The second and third sentences in Paragraph 43 are Plaintiffs' interpretation of and citation to an article that speaks for itself and for which no response is required.  To the extent that the allegations are inconsistent with or contradict the article, DFA denies those allegations on that basis.  To the extent Plaintiffs attempt to

21

incorporate by reference the article into this Paragraph, such allegations are impermissibly vague and lack specificity to which DFA could respond. To the extent that a response is required, DFA denies the allegations. DFA denies the remaining allegations in Paragraph 43.

**44. In connection with the merger, the parties entered into a "corrupt bargain" consisting of two side deals: Suiza and Old Dean agreed to a long-term, exclusive-dealing arrangement in which the newly merged Dean entity would exclusively buy all of its raw milk from DFA (and thus incur a higher milk supply cost) for twenty years. DFA, in return, agreed that the divested milk processing plants it owned as part of a DOJ- mandated competitive constraint on the merger would not, in fact, compete with the newly merged Dean. In essence, DFA agreed not to compete with Dean at the processing level in exchange for gaining full supply rights to the combined company. Although the DFA plants were supposed to compete with Dean for business in the Southeast, for example, DFA would only submit "fake" or "no" bids to Food Lion, even though Food Lion was a significant potential customer for both companies.**

**ANSWER:** DFA denies the allegations in Paragraph 44.

**45. In its review of the merger, the DOJ raised, among other matters, the following two concerns relating to post-merger competition: (1) the need for open competition for the supply of raw milk to the newly created milk processing company, and (2) the need for Dean to divest certain plants to preserve competition at the milk processing level.**

**ANSWER:** DFA is without information sufficient to form a belief as to the truth of the allegations in Paragraph 45, on that basis, deny the allegations.

46.     The first concern was driven both by an analysis of the then-current state of competition among milk producers, as well as by the fact that DFA was a party to a 1977 consent decree limiting its ability to enter into contracts for the sale of raw milk with a duration more than one year. To address this concern, however, the parties to the merger made a deceptively limited presentation to the DOJ by disclosing a series of milk supply contracts between DFA and Dean. Those contracts each contained a one-year term, which would be renewed in successive years if not terminated by the parties, and "competitive pricing clauses" that would allow Dean to purchase milk from lower-cost providers.

**ANSWER:** DFA denies the allegations in Paragraph 46.

47.     But the parties hid from the DOJ that they also had entered into an unlawful separate agreement—a promissory side note—that imposed the very restriction on competition for raw milk purchases they said did not exist. On December 21, 2001, Dean issued a contingent, subordinated promissory note to DFA in the original principal amount of $40 million (the "Side Note"). The Side Note had a twenty-year term that bore interest based on the consumer price index. Interest would not be paid in cash but would be added to the principal amount of the note annually, up to a maximum principal amount of $96 million. The Side Note would become payable only if Dean materially breached or terminated its milk supply agreement with DFA without renewal or replacement. Otherwise, the Side Note would expire in April 2021, without any obligation to pay any portion of the principal or interest.[1] The Side Note thus effectively created a $96 million penalty if Dean did not purchase its raw milk from DFA, notwithstanding the terms of the relevant supply contracts.

**ANSWER:**  Paragraph 47 purports to characterize the promissory note, which is a written document the contents of which speak for itself.  To the extent Paragraph 47 is inconsistent with or contradicts the promissory note, DFA denies those allegations.  In Footnote 1 to Paragraph 47, Plaintiffs cite Docket Entry 1883 of the bankruptcy

---

[1] *See In re Southern Foods Group, LLC, et al.*, No. 19-36313-H2-11, ECF No. 1883 (Bankr. S.D. Tex.) (hereinafter "Bankr. Dkt.") at 67:21; Dean Foods Company, 2019 Form 10-K (Mar. 20, 2020), https://ir.deanfoods.com/sec-filings/sec-filing/10-k/0000931336-20-000006.

proceedings, which is a written document, the contents of which speak for itself. To the extent Paragraph 47 and the attendant footnote are inconsistent with or contradict the document, DFA denies those allegations. In Footnote 1, Plaintiffs cite Dean Foods Company 2019 Form 10-K, which as a written document the contents of which speak for itself and no response is required. To the extent Paragraph 47 and attendant Footnote 1 are inconsistent with or contradict the document, DFA denies those allegations. DFA notes the link provided for the Dean Form 10-K no longer functions, and DFA cannot respond. To the extent Footnote 1 seeks to incorporate by reference the documents cited, the allegations lack specificity to which DFA can respond and on that basis, DFA denies those allegations. DFA denies the remaining allegations in Paragraph 47.

**48.** **The *quid pro quo* for this Side Note was a second illegal side agreement that prevented competition between Dean and the processing plants being divested by Dean in the merger—undermining the second concern raised by the DOJ. In connection with the merger, the parties created a new company, controlled by DFA, that would own the milk processing plants divested in connection with the merger. They simultaneously entered into an illegal non-compete agreement pursuant to which those divested plants would not compete vigorously with Dean (the "Horizontal Non-Compete"). In other words, at the same time the merging parties were holding these plants out to the DOJ as viable plants that would preserve competition, they had agreed secretly that they would not vigorously compete. They were in fact aware at the time of the merger that some of those plants would close shortly after the merger.**

    **ANSWER:** DFA denies the allegations in Paragraph 48.

Case 1:20-cv-00442-CCE-JLW   Document 45   Filed 08/14/20   Page 24 of 70

**49.** To keep the secret, DFA went to great lengths to avoid detection and handsomely rewarded members of the conspiracy in order to buy their loyalty. *See generally* Leah Douglas, *How Rural America Got Milked*, WASHINGTON MONTHLY, Jan./Feb./Mar. 2018, *available at* https://washingtonmonthly.com/magazine/january-february-march-2018/how-rural-america-got-milked/.

**ANSWER:** The second sentence is a citation to an article, which is a written document the contents of which speak for itself. To the extent Plaintiffs incorporate by reference the article, DFA cannot determine what Plaintiffs seek to incorporate and the allegations lack specificity to which DFA could respond, and on that basis, deny the allegations. DFA denies the remaining allegations in Paragraph 49.

### Anti-competitive Effects of the Corrupt Bargain, and Related Litigation

**50.** The Side Note and other related anti-competitive conduct by DFA have materially harmed competition in the relevant markets and beyond throughout its almost twenty-year life.

**ANSWER:** DFA denies the allegations in Paragraph 50.

**51.** Immediately after the Suiza/Old Dean merger, DFA lacked sufficient raw milk capacity to supply milk to all of the Dean plants in the Carolinas. Thus, for the next few years, DFA refrained from exercising its right—under the Side Note and the various one-year supply agreements locked in place thereby—to be the exclusive supplier to the Dean plants in the Carolinas.

**ANSWER:** DFA denies the allegations in Paragraph 51.

52.     Instead, DFA coordinated the creation of an organization known as the Southern Marketing Agency ("SMA"), which was an association of milk cooperatives including DFA, MDVA, and others. Those cooperatives pooled their milk, shared revenues and expenses equally, and with DFA's acquiescence notwithstanding its exclusive rights, sold raw milk to the Dean plants in the Carolinas.

**ANSWER:**   DFA admits that SMA is a not-for-profit corporation of dairy cooperatives.  DFA admits that it and MDVA are members.  DFA denies the remaining allegations in Paragraph 52.

53.     This arrangement served to benefit DFA. DFA had a higher cost structure than MDVA and other cooperatives. By agreeing to share costs equally, the other cooperatives effectively subsidized DFA's inefficiencies. But for DFA's exclusive supply rights created by the Side Note, MDVA would not have agreed to this arrangement, which effectively "taxed" lower-cost producers and "subsidized" higher-cost ones.

**ANSWER:**  DFA denies the allegations in Paragraph 53.

54.     In 2007, two class action lawsuits were filed that (i) challenged the unlawful Side Note and Horizontal Non-Compete and also (ii) temporarily mitigated the anti-competitive effects of the Side Note, at least in part, because DFA and Dean wanted to present the artificial appearance of competition during the pendency of those lawsuits. *See generally In re: Southeastern Milk Antitrust Litig.*, No. 2:08-md-1000 (E.D. Tenn.).

**ANSWER:**  DFA admits that it was named as a defendant in two purported class action litigations in 2007.  Paragraph 54 purports to characterize the litigations and cites generally to the entire multidistrict litigation.  To the extent Plaintiffs incorporate the litigations by reference, Plaintiffs' allegations lack specificity, and on that basis, DFA denies the allegations.  DFA denies the remaining allegations in Paragraph 54.

**55.** First, a putative class of dairy farmers filed a suit captioned *Sweetwater Valley Farm, Inc. et al. v. Dean Foods Co. et al.*, No. 2:07-cv-208 (E.D. Tenn.). The farmers alleged that Dean, DFA, and several other dairy marketing service providers conspired to control the milk supply chain and prices for milk in the Southeast by requiring farmers to use DFA-controlled marketing entities (e.g. SMA) in exchange for access to processing plants, punishing cooperatives and processors, and other conduct.

**ANSWER:** DFA admits that it, Dean, and other dairy entities were named as defendants in the suit *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, No. 2:07-cv-208 (E.D. Tenn.), filed by a purported class of dairy farmers. The remainder of Paragraph 55 consists of Plaintiffs' interpretation of the litigation, to which no response is required. To the extent a response is required, DFA denies the allegations. DFA denies the remaining allegations in Paragraph 55.

**56.** The dairy farmers' litigation resulted in a settlement of $140 million with Dean in July 2011 and an additional $140 million settlement with DFA in late 2013.

**ANSWER:** On information and belief, Dean entered into a settlement with the *Sweetwater* class plaintiffs on July 12, 2011 for approximately $140 million in exchange for full release from the class. DFA admits that in 2013, DFA together with defendant National Diary Holdings, LP, Gary Hanman, Dairy Marketing Services, LLC, and Mid-Am Capital, LLC entered into a settlement with the *Sweetwater* class plaintiffs for an amount of $140 million, of which $50 million was allocated to DFA, in exchange for full release. The *Sweetwater* settlement agreement is attached as Exhibit A. DFA denies the remaining allegations in Paragraph 56.

27

57.     A related class action case filed by dairy farmers in the Northeast settled for $30 million from Dean in 2011 and $50 million from DFA in 2013. *See Allen et al. v. Dairy Farmers of America, Inc. et al.*, No. 2:09-cv-230 (D. Vt.) (filed Oct., 8, 2009). The opt-outs of the Northeast settlement are continuing to pursue their antitrust claims in *Sitts v. Dairy Farmers of America, Inc.*, No. 2:16-cv-287 (D. Vt.).

ANSWER:  DFA admits that it and Dean was named as a defendant in *Allen v. Dairy Farmers of America, Inc., et al.*, No.  2:09-cv-230 (D.Vt.), filed by a purported class of dairy farmers.  DFA admits it entered into a settlement of $50 million with the plaintiffs in the *Allen* case.  On information and belief, Dean entered into a settlement with plaintiffs in the *Allen* case for $30 million.  DFA admits it is a defendant in *Sitts v. Dairy Farmers of America, Inc.,* No. 2:16-cv-287 (D. Vt.), and the plaintiffs purport to be opt-out class members from the *Allen* litigation.  DFA further admits the *Sitts* litigation is ongoing as of the date of this Answer.  DFA denies the remaining allegations in Paragraph 57.

58.     Also in August 2007, a putative class of retailers filed a suit captioned *Food Lion et al. v. Dean Foods Co. et al.*, No. 2:07-cv-188 (E.D. Tenn.). The retailers alleged that Dean and DFA had violated Section 1 of the Sherman Act by, *inter alia*, entering into the illegal Horizontal Non-Compete as the quid pro quo for the Side Note. Food Lion's case was settled on undisclosed terms in March 2017.

ANSWER:  DFA admits a putative class of retailers filed a suit captioned *Food Lion et al. v. Dean Foods Co. et al.*, No. 2:07-cv-188 (E.D. Tenn.).  Paragraph 58 consists of Plaintiffs' characterization of the allegations in the *Food Lion* litigation, the contents of which are written and speak for themselves.  To the extent the allegations in Paragraph 58 are inconsistent with or contradict the allegations in the Food Lion litigation, DFA denies

those allegations. DFA admits the *Food Lion* case was settled in 2017. DFA denies the

remaining allegations in Paragraph 58.

**59.    By the time of DFA's settlements with dairy farmers in late 2013, the supply and demand factors that had existed immediately after the Dean-Suiza merger had changed. Consumer demand for processed milk had decreased, whereas DFA's production capacity had increased. DFA was thus able, and incentivized, at that time to take full advantage of the anti-competitive Side Note, and caused Dean to first reduce and then eliminate MDVA's supply to the Dean plants in the Carolinas.**

ANSWER: DFA denies the allegations in Paragraph 59.

**60.    Until that point, MDVA had been permitted to obtain raw milk access at Dean's Carolinas facilities in exchange for a cost-sharing agreement that heavily favored DFA. Following the settlements, Dean began to limit MDVA's and other non-DFA cooperatives' access to these facilities.**

ANSWER: DFA is without knowledge to form a belief of the truth of the

allegations regarding MDVA, Dean, and other non-DFA cooperatives, and on that basis,

denies the allegations. DFA denies the remaining allegations in Paragraph 60.

**61.    In 2013, MDVA sold 1.142 billion pounds of raw milk to Dean plants in the Carolinas. At the end of 2014, Dean notified MDVA that it would be moving raw milk volume from MDVA to DFA pursuant to the long-term supply commitment between Dean and DFA. MDVA's CEO was informed by Dean that, while MDVA's quality and service were excellent, DFA had told Dean that it wanted to replace MDVA's volume at the Dean plants.**

ANSWER: DFA is without knowledge to form a belief of the truth of the remaining

allegations in Paragraph 61, and on that basis, denies the allegations.

62.     Dean began to reduce its purchases from MDVA because of DFA's direction that it do so, regardless of price, service, and other competitive factors. Consequently, in 2015, MDVA lost access to processing over 300 million pounds of raw milk volume at the Dean Carolinas plants to DFA. By the end of 2018, MDVA's raw milk supply to Dean facilities in the Carolinas had dropped to just over 200 million pounds, with MDVA's former business moving to DFA. By 2019, Dean was no longer purchasing any of its raw milk from MDVA.

**ANSWER:** DFA denies the allegations in Paragraph 62.

63.     Dean's and DFA's conduct toward MDVA after the settlement of the *Sweetwater Valley Farms* case demonstrates exactly what will happen in the wake of the recent Asset Sale. When DFA has been able to exert control over the raw milk purchasing decisions of Dean's three plants in the Carolinas, as it did because of the Side Note and as it can now continue to do unfettered due to the Asset Sale, DFA has cut off its rival cooperatives' raw milk processing access to Dean plants.

**ANSWER:** DFA denies the allegations in Paragraph 63.

### Current Raw Milk Suppliers for the
### North and South Carolina Milk Processing Plants

64.     There are currently only two competitively significant suppliers of raw milk to processing facilities in North and South Carolina: DFA and MDVA. DFA and MDVA, together with their partner cooperatives, account for virtually all of the raw milk supply to milk processing facilities in North Carolina and South Carolina, with DFA holding the dominant share in both states.

**ANSWER:** DFA denies the allegations in Paragraph 64.

65.     While DFA's operations span the country, its control over the supply of raw milk is particularly strong to milk processing facilities in the Carolinas. As shown in Figure 2 below, in 2018, DFA with its partner cooperatives accounted for 65% of North Carolina's raw milk production (611 of 937 million pounds) and 59% of South Carolina's raw milk production (143 of 242 million pounds). Such high market share is presumptive indicia of DFA's market power.

**Figure Two: Raw Milk Supply in North and South Carolina, 2018**

| 2018 | State Milk Volume (millions lbs.) | DFA with Partners Milk Volume (millions lbs.) | % DFA with Partners | MDVA with Partners Milk Volume (millions lbs.) | % MDVA with Partners | MDVA with Partners + DFA with Partners |
|---|---|---|---|---|---|---|
| NC | 937 | 611 | 65% | 326 | 35% | 100% |
| SC | 242 | 143 | 59% | 99 | 41% | 100% |

**ANSWER:** Paragraph 65 cites and incorporates to Figure Two, and DFA is without knowledge or information sufficient to form a belief of the truth of the allegations and Figure Two, and on this basis, denies the allegations. DFA denies the remaining allegations in Paragraph 65.

66. **No other dairy cooperative or independent dairy farmer supplying milk to processing facilities in the Carolinas has sufficient presence or size to impede the exercise of market power of DFA.**

**ANSWER:** DFA denies the allegations in Paragraph 66.

67. **DFA and MDVA also compete to recruit member dairy farms. Many farmers prefer to be members of MDVA, among other reasons, because MDVA historically and typically operates at a lower cost than DFA and can pass along those efficiencies to its members.**

**ANSWER:** On information and belief, DFA admits that DFA and MDVA recruit member dairy farms. DFA denies the remaining allegations in Paragraph 67.

68.     The milk supply chain in the relevant geographic region has been consolidating for years as a result of Dean's and DFA's complicity and exclusive dealing arrangements, causing the Dean milk processing facilities in North and South Carolina to become an increasingly important source both for raw milk suppliers looking to market their raw milk, and for retailers looking for processors from which to purchase fluid milk.

**ANSWER:**  DFA denies the allegations in Paragraph 68.

69.     The milk processing plants located in North and South Carolina are shown in Figure One above. Figure Three lists the competitively significant milk processors in North and South Carolina, stating their owner, location, share of milk processing in the Carolinas, and current estimated processing level as a percentage of total capacity.

**Figure Three: Processing Facility Capacity Utilization in the Carolinas**

| Facility | Current Volumes | | Maximum Capacity | Est. Utilization % |
|---|---|---|---|---|
| | Annualized gals. | Share | Annualized gals. | |
| **Dean** | **165,348,837** | **59%** | **246,976,744** | |
| Spartanburg, SC | 83,720,930 | | 115,116,279 | 73% |
| High Point, NC | 29,302,326 | | 58,604,651 | 50% |
| Winston Salem, NC | 52,325,581 | | 73,255,814 | 71% |
| **Kroger (High Point)** | **46,046,512** | **16%** | **50,232,558** | 92% |
| High Point, NC | | | | |
| **Ingles (Milkco)** | **50,232,558** | **18%** | **66,976,744** | 75% |
| Asheville, NC | | | | |
| **Borden** | **20,930,233** | **7 %** | **41,860,465** | 50% |
| Charleston, SC | | | | |
| **Total** | **282,558,140** | | **406,046,511** | |

**ANSWER:** The first sentence is Plaintiffs' description of Figure One in the Complaint, the contents of which speak for themselves and to which no response is required. To the extent a response is required, DFA is without information sufficient to form a belief of the truth of the allegation, and on that basis, denies the allegation and Figure One. The second sentence is a description of Figure Three in the Complaint, the contents of which are written and speak for themselves, and no response it required. To the extent a response is required, DFA is without information sufficient to form a belief of the truth of the allegation, and on that basis denies the allegation and the contents of Figure Three. DFA denies the remaining allegations in Paragraph 69.

**70. Before the Asset Sale, Dean owned three critical fluid milk processing plants in the Carolinas: the High Point and Winston-Salem plants in North Carolina and the Spartanburg plant in South Carolina. In North and South Carolina, the legacy Dean facilities are centrally located and control a combined 59% of milk processing.**

**ANSWER:** DFA admits that prior to May 1, 2020, Dean owned a fluid milk processing plant in High Point, North Carolina, a fluid milk processing plant in Winston-Salem, North Carolina, and a fluid milk processing plant in Spartanburg, South Carolina. DFA is without knowledge or information sufficient to form a belief as to the truth of matter regarding the allegations on capacity and on that basis denies the allegations. DFA denies the remaining allegations.

33

71.     Dean's competitive significance as a milk processor in the Carolinas is
even stronger than indicated by this market share because 34% of milk processing in
the Carolinas is controlled by facilities owned and operated by supermarket chains.
Hunter Farms, which is owned by the supermarket chain Kroger, possesses a 16%
share and is operating at 90% of its capacity. Although Hunter Farms does not
exclusively sell to Kroger, and in fact currently sells to Food Lion, its principal
purpose is to provide a reliable source of milk to its owner Kroger and to Kroger's
other banners. Likewise, Milkco's Asheville, North Carolina facility possess an 18%
share, is owned by and affiliated with supermarket chain Ingles Markets, and serves
first and foremost as a source for Ingles Markets' milk.

**ANSWER:** DFA is without sufficient knowledge or information to form a belief

of the truth of the first sentence of Paragraph 71, and on that basis, denies the allegations.

DFA admits upon information and belief that Hunter Farms is owned by Kroger.  DFA

further admits that Hunter Farms does not sell exclusively to Kroger.  DFA further admits

upon information and belief that Ingles owns and is affiliated with a milk processing plant

in Asheville, North Carolina.  DFA is without knowledge or information sufficient to form

a belief of the truth of the remaining allegations in Paragraph 71, and on this basis denies

the allegations.

72.     Until the Asset Sale was consummated, neither DFA nor MDVA owned
any milk processing facilities in the Carolinas.

**ANSWER:** DFA admits that as of May 1, 2020, the date Dean and DFA closed the

asset sale with DFA, it did not own any milk processing facilities in the Carolinas.  On

information and belief, MDVA owned a milk processing plant in North Carolina but shut

down operations in 2014.  DFA is without knowledge or information sufficient to form a

belief of the truth of the remaining allegations in Paragraph 72, and on that basis denies the

allegations.

34

**73.** Dean's concentration worked to the detriment of DFA's only competitor in the region, MDVA. Following MDVA's loss of access to the Dean facilities in the Carolinas described above, it was forced to develop a patchwork system of processing facilities to market its farmers' raw milk. Currently, this patchwork system includes Hunter Farms, Milkco, and Borden. This system is not sustainable in the long term.

**ANSWER:** DFA is without knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 73, and on that basis, denies the allegations.

**74.** Because of the Asset Sale and DFA's anti-competitive campaign, MDVA is at serious risk of soon losing access to the Hunter Farms processing facility for a substantial portion of the raw milk volume that MDVA currently supplies to that plant.

**ANSWER:** DFA is without knowledge or information sufficient to form a belief of the truth of the allegations regarding MDVA's access to Hunter Farms in Paragraph 74, and on that basis denies the allegations. DFA denies the remaining allegations.

**75.** The other non-legacy-Dean facility in North Carolina—Milkco—is operating at 75% capacity and purchases most of its milk from a DFA affiliate. Milkco also processes its milk into corrugated boxes rather than milk crates, which greatly reduces the number of potential purchasers from that facility due to incompatible packaging. Food Lion, for example, is unable to purchase from Milkco due to these packaging limitations.

**ANSWER:** DFA denies the allegation that Milkco's packaging reduced the number of potential purchasers from that facility. DFA is without knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 75, and on that basis, deny those allegations.

**76.** The final option, Borden, is owned by currently the second-largest fluid milk processor in the U.S. Borden filed for Chapter 11 bankruptcy in January 2020, however, and it is difficult to predict the long-term viability of Borden's facilities. Furthermore, while Borden may be an option for some dairy farmers that sell raw milk to plants in the Carolinas, Borden is not a sustainable option for MDVA because

35

it is located on the South Carolina coast in Charleston, far away from the vast majority of MDVA's farmers. Borden's proximity to the Atlantic Ocean cuts its serviceable area in half, and shipping to this facility results in higher hauling costs and logistical problems. Finally, many of Borden's facilities are viewed as inferior by dairy farmers and retailers.

ANSWER: On information and belief, DFA admits that Borden filed for Chapter 11 bankruptcy in January 2020. DFA admits Borden owns a fluid milk processing plant in Charleston, South Carolina. DFA is without knowledge or information sufficient to form a belief in the truth of the remaining allegations in Paragraph 76, and on that basis, denies the allegations.

77. **Sending raw milk north is also not a viable option long-term for MDVA farmers because the shipping costs associated with transporting raw milk that distance sharply cuts into the already thin margins for MDVA farmers. This undesirable alternative would also work against the intent of the Federal Order system in this part of the country, which is designed to encourage the flow of milk from North to South.**

ANSWER: DFA is without knowledge or information sufficient to form a belief in the truth of the allegations in Paragraph 77, and on that basis, denies the allegations.

78. **Because MDVA does not believe that it will be able to continue to utilize the Hunter Farms, Milkco, and Borden plants located in the Carolinas at anywhere near the current aggregate levels of MDVA's raw milk sales to those plants, MDVA was relying heavily on the prospect of competing for access to Dean plants in the Carolinas once the Side Note and DFA's contractual supply commitments expired. Without the ability to compete for the supply to legacy Dean facilities in the Carolinas, MDVA will cease to be a viable cooperative in the region.**

ANSWER: DFA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78, and on that basis, denies the allegations.

79.     **At the other end of the supply chain, there is no economically viable source of processed milk in the Carolinas other than these six plants for the vast majority of customers that purchase processed milk from the Carolinas.**

**ANSWER:** DFA denies the allegations in Paragraph 79.

80.     **By way of example, at the end of 2017, Food Lion issued a Request for Proposal seeking an alternative processed milk supplier for several of its distribution centers, two of which were in North Carolina. At the time, Dean was supplying the two North Carolina distribution centers, but at non-competitive prices. Food Lion received bids for one of the distribution centers (Salisbury, North Carolina) from Kroger (Hunter Farms), from Dean, and from Milkco, and bids for the other distribution center (Dunn, North Carolina) from Kroger (Hunter Farms), from Dean, from Borden, and from a MDVA milk processing facility in Newport News, Virginia. Borden was not a viable option because its freight costs from the coast were too high; Milkco was not an option because of its corrugated boxing; and Hunter Farms made clear that it only had the capacity to provide milk to one of the two distribution centers for which it bid.**

**ANSWER:**  DFA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80, and on that basis, denies the allegations.

81.     **The current Dean price, and the price that Dean bid, were higher than the Hunter Farms bid for Salisbury by more than 10% and more than 7%, respectively. The current Dean price, and the Dean bid, were higher than the MDVA bid for Dunn by more than 8% and more than 4%, respectively.**

**ANSWER:** DFA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, and on that basis, denies the allegations.

82.     **Dean's 2017 bid to Food Lion demonstrates its practice of seeking supra- competitive pricing, despite the fact that it has substantial excess capacity, when it believed it was the only viable processing plant for a retailer. Food Lion's Salisbury distribution center was forced to contract with a plant (Hunter Farms) owned by its direct competitor, and which operates at over 90% of its capacity. Food Lion's Dunn distribution center was forced to contract with a MDVA facility 3.5 hours away, all while Dean's nearby High Point facility was operating at only 50% of its capacity.**

**ANSWER:** DFA is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 82, and on that basis, denies the allegations.

83.     **Neither the MDVA facility nor Hunter Farms is an economical long-term source for Food Lion's distribution centers. Food Lion already faces thin profit margins on processed milk. To continue sourcing affordable milk, Food Lion's key Salisbury distribution center has resorted to buying milk from a processing plant owned by one of its fiercest competitors. This is not a long-term solution, since Kroger's Hunter Farms facility is already operating near capacity (92% utilization), and Kroger will always be the preferred customer for its processor. In addition, Hunter Farms' competitive pricing is due in part to the fact that it currently purchases raw milk from MDVA, and as stated above, MDVA is at serious risk of soon losing access to the facility in favor of DFA.**

**ANSWER:** DFA is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 83, and on that basis, denies the allegations.

84.     **MDVA's Newport News facility was not in 2017, and is not now, a competitive source for Food Lion's Salisbury distribution center because it is much farther away than legacy Dean or Hunter Farms, and the transportation costs are too high. And although the MDVA facility currently supplies Food Lion's distribution center in Dunn, North Carolina, it is still approximately 215 miles—or an estimated 3.5-hour drive—away, leading to high transportation costs, compared to the closest legacy Dean plant that is 105 miles away.**

**ANSWER:** DFA is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 84, and on that basis, denies the

allegations.

85.     **As for the two other non-legacy-Dean milk processing facilities, the Borden plant in Charleston is in bankruptcy, making it difficult to predict its long-term viability, and its transportation costs to Food Lion's North Carolina distribution centers are high because of its location in coastal South Carolina. The Milkco plant in Asheville is not a preferred source of processed milk for Food Lion because of its incompatible packaging. Thus, once the effects of the Asset Sale set in, Food Lion will have no viable, long-term alternative to submitting to DFA plants' supra-competitive pricing.**

**ANSWER:** On information and belief, DFA admits the Charleston milk processing plant is included in the Borden bankruptcy. DFA denies the allegations in last sentence. DFA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85, and on that basis, denies the allegations.

### *DFA's Acquisition of Dean's Assets*

**86.     The Asset Sale (including the processing plants in North and South Carolina) by Dean to DFA was accomplished through a bankruptcy proceeding initiated by Dean on November 12, 2019, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 19-36313. At the time the bankruptcy case was filed, Dean issued a press release stating that it was in advanced negotiations with DFA—*and only DFA*—to sell substantially all of its assets to DFA in a bankruptcy process designed to avoid antitrust scrutiny. In essence, the parties were once again turning to each other—just as they did at the time of the Suiza-Dean merger—to further their joint anti-competitive goals and deflect the harsh light of antitrust review and challenge.**

**ANSWER:** On information and belief, DFA admits Dean initiated bankruptcy proceedings on November 12, 2019, in the United States Bankruptcy Court for the Southern District of Texas. DFA further admits that Paragraph 86 purports to characterize the bankruptcy proceedings, the contents of which are public documents and speak for themselves. DFA further admits Paragraph 86 purports to characterize a press release issued by Dean, the contents of which speak for itself. To the extent Paragraph 86 is inconsistent with or contradicts the press release, DFA denies the allegations. To the extent Paragraph 86 is inconsistent with or contradicts the bankruptcy proceedings, DFA denies those allegations. DFA admits that the sale of Dean assets to DFA included, among other

39

operations, the Dean headquarters operations and certain fluid and frozen operations, which included the Dean fluid milk processing plants in North and South Carolina. DFA denies the remaining allegations in Paragraph 86.

**87. On March 30, 2020, several parties submitted bids for various of Dean's assets, including (a) DFA, which submitted a bid to purchase most of Dean's assets across the United States, including Dean's three milk processing plants in North and South Carolina, and (b) MDVA, which submitted a bid to purchase only the processing plant in High Point, North Carolina.**

**ANSWER:** DFA admits that it submitted a bid, pursuant to the bidding procedures approved by the Bankruptcy Court, to purchase Dean assets including Dean's headquarter operations, certain fluid and frozen operations, and related facilities, equipment, and assets. DFA admits that MDVA also submitted a bid to purchase the processing plant in High Point, North Carolina under the bidding procedures approved by the Bankruptcy Court. On information and belief, DFA admits that Dean received 35 bids in the Bidding Procedures approved by the Bankruptcy Court, and that only DFA submitted a bid for the vast majority of Dean's assets. DFA admits Paragraph 87 purports to summarize the Dean bankruptcy proceedings, the contents of which are public documents and speak for themselves. To the extent Paragraph 87 is inconsistent with or contradicts the bankruptcy proceedings, DFA denies the allegations.

**88. The legacy Dean High Point plant operates at only 50% capacity. Taking advantage of the size and resources that its anti-competitive campaign allowed it to accumulate, DFA steadfastly insisted on buying that plant as part of a "take it or leave it" package deal that included either all forty-four legacy Dean plants or none. Upon information and belief, DFA did so not because its business goal is to operate the plant, but rather for the purpose of creating the anti-competitive effects described herein. Specifically, the only purpose for this tactic—and the only reason that DFA was interested in the High Point plant—is because of its strategic role in**

40

helping DFA to suppress competition from its only remaining competitor in the region.

**ANSWER:** DFA denies the allegations in Paragraph 88.

89. **MDVA was and is a willing and viable buyer for the High Point plant who could operate that plant effectively and whose ownership thereof would avoid or mitigate the anti-competitive effects complained of herein.**

**ANSWER:** DFA denies the allegations in Paragraph 89.

90. **Shortly after midnight on March 31, 2020, however, Dean predictably announced DFA as the winning bidder for assets it bid on, including the processing plant in High Point, North Carolina, and identified MDVA as the backup bidder for the processing plant in High Point.**

**ANSWER:** DFA admits that on March 31, 2020, Dean announced DFA as the winning bidder for the assets identified in the "Notice of Bid" [Bankruptcy Docket No. 1270]. DFA admits that, in the same document, MDVA was named an "Alternate Bidder" for the High Point, North Carolina plant. DFA denies the remaining allegations in Paragraph 90.

91. **On April 1, 2020, Food Lion and a related corporate entity filed a Limited Objection [Bankr. Dkt. 1406] to the proposed sale of certain of Dean's assets to DFA due to the potential anti-competitive impact the sale would have on the raw and processed milk markets in and around the Carolinas. On the same date, MDVA filed a similar Objection [Bankr. Dkt. 1415] to the proposed sale of certain assets by Dean to DFA.**

**ANSWER:** DFA admits that Paragraph 91 purports to characterize documents filed in the Dean bankruptcy proceeding, and as written documents the contents of which speak for themselves. To the extent Paragraph 91 is inconsistent with or contradicts the documents, DFA denies the allegations. DFA denies the remaining allegations.

Case 1:20-cv-00442-CCE-JLW   Document 45   Filed 08/14/20   Page 41 of 70

92.     The Bankruptcy Court authorized Dean to sell the majority of its assets to DFA,[2] but expressly did not address the issues under the antitrust laws presented by the present complaint. The Bankruptcy Court entered an order dated April 5, 2020 permitting the sale to proceed pursuant to the terms of the asset purchase agreement (the "Sale Order," Bankr. Dkt. 1572). The Sale Order further authorized Dean, in the event DFA failed to close on its Asset Purchase Agreement ("APA"), to sell assets to the backup bidders, including the processing plant in High Point, North Carolina, to MDVA.

ANSWER:   DFA admits the Bankruptcy Court entered an "Order (a) Authorizing Sale of Certain of Debtors' Assets to Dairy Farmers of America, Inc., Free and Clear of All Claims, Liens, Interest, and Encumbrances, (b) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement And Related Documents, and (c) Granting Related Relief," dated April 5, 2020. DFA admits that Paragraph 92 purports to characterize documents filed in the Dean bankruptcy proceeding, and as written documents the contents of which speak for themselves.  To the extent Paragraph 92 is inconsistent with or contradicts the documents, DFA denies the allegations. Footnote 2 purports to characterizes the sale of certain Dean assets to DFA and other bidders.  DFA admits that other winning bidders include Prairie Farms Dairy, Inc., Mana Saves McArthur, LC, Producers Dairy Foods, Harmoni, Inc., and Industrial Realty Group, LLC.  To the extent Paragraph 92 is inconsistent with or contradicts those documents, DFA

---

[2] DFA agreed to purchase forty-four of Dean's fifty-seven fluid milk plants, along with various other assets, for a total value of $433 million. The purchase price consists of $325 million in cash and $108 million in forgiveness of debt owed by Dean to DFA. The Bankruptcy Court also approved the sale of eight facilities and two distribution centers to Prairie Farms Dairy, Inc., and the sale of one facility to Mana Saves McArthur, LLC.

42

denies those allegations. To the extent Footnote 2 seeks to incorporate by reference the bankruptcy proceedings, such allegations lack specificity to which DFA could respond, and on that basis denies the allegations. DFA denies the remaining allegations.

93. **To resolve Food Lion's and MDVA's objections to the Sale Motion, the Bankruptcy Court included in the Sale Order the following provisions to preserve Food Lion's and MDVA's rights to challenge the Asset Sale**:

> **<u>Anti-Trust Enforcement.</u> Notwithstanding anything to the contrary contained herein, no provision of this [Sale] Order or the APA shall operate to impair, prejudice, or otherwise abrogate the rights (if any) of The Stop & Shop Supermarket Company LLC and Food Lion LLC, the Maryland and Virginia Milk Producers Cooperative Association, Inc. and the California Dairies, Inc. and any of their affiliates, subsidiaries, successors, or assigns, to challenge the Sale Transaction under the antitrust laws of the United States. All such rights are explicitly reserved pursuant to this order.**

**ANSWER:** DFA admits that the Sale Order contains the quoted language, as modified. Paragraph 93 purports to characterize documents filed in the Dean bankruptcy proceeding, and as written documents the contents of which speak for themselves. To the extent Paragraph 93 is inconsistent with or contradicts the documents, DFA denies the allegations. DFA denies the remaining allegations.

94. **As such, while the Sale Order authorized Dean to sell certain assets to DFA, the order further preserved Food Lion's and MDVA's rights to file the present challenge to the Asset Sale.**

**ANSWER:** DFA admits that Paragraph 94 purports to characterize documents filed in the Dean bankruptcy proceeding, and as written documents the contents of which speak for themselves. To the extent Paragraph 94 is inconsistent with or contradicts the documents, DFA denies the allegations. DFA denies the remaining allegations.

43

**95.** On May 1, 2020, DFA and Dean closed on the Asset Sale, making DFA both the largest milk producer and the largest milk processor in the United States.[3] A dairy conglomerate was born.

**ANSWER:** DFA admits that DFA and Dean closed the sale of certain Dean assets pursuant to the Asset Purchase Agreement on May 1, 2020. DFA admits that on May 1, 2020, the Department of Justice filed a complaint and proposed final judgment in which DFA agreed to make certain divestitures in *United States et al. v. Dairy Farmers of America, Inc.*, et al, No. 1:20-cv-2658 (N.D. Ill.), the contents of which speak for themselves. To the extent Paragraph 95 and Footnote 3 are inconsistent with or contradict the documents, DFA denies those allegations. To the extent Paragraph 95 and Footnote 3 incorporate by reference the litigation or any part thereof, the allegations lack specificity to which DFA can respond, and on that basis deny those allegations. DFA denies the remaining allegations in Paragraph 95.

**96.** Upon information and belief, Dean's bankruptcy filing gave it the right and opportunity to extinguish the obligations of the Side Note by conveying its milk processing plants free and clear of the pre-bankruptcy obligation of those plants, created by the Side Note or otherwise, to purchase milk from DFA. Had Dean accepted a bid from MDVA or any other non-DFA entity for the Carolinas facilities, that entity would have taken ownership of the plant(s) without any obligation to purchase raw milk from DFA. But now, DFA's acquisition of the majority of the legacy Dean plants will have even greater anti-competitive effects on the milk supply chain than did the Side Note, because it allows DFA to now control supply rights to the legacy Dean plants forever.

---

[3] The Asset Sale contemplates the sale of forty-four legacy Dean plants to DFA. On the evening that the Asset Sale closed, however, DFA and the DOJ consented to the divestiture of three of the forty-four legacy Dean plants within thirty days, in order to preserve competition in Northeastern Illinois, Wisconsin, and New England. *See United States et al. v. Dairy Farmers of Am., Inc. et al.*, No. 1:20-cv-2658 (N.D. Ill.), ECF Dkt. 4 (filed May 1, 2020).

**ANSWER:** Paragraph 96 asserts a legal conclusion to which no response is required. To the extent that a response is required, DFA denies the allegation in Paragraph 96.

## ANTI-COMPETITIVE EFFECTS

**97. Section 7 of the Clayton Act prohibits mergers if "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. This prohibition includes vertical mergers, as Congress made plain in the 1950 amendments to the Clayton Act. A vertical merger may violate antitrust laws where the merging parties would—by means of their control of an input that their competitors need—have the incentive and ability to substantially lessen competition by raising the price for or reducing that input.**

**ANSWER:** Paragraph 97 asserts a legal conclusion to which no response is required. To the extent that a response is required, DFA denies the allegation in Paragraph 97.

**98. A potential negative effect of vertical acquisitions, such as those of a raw milk producer acquiring a milk processor, is when the combined entity takes actions to raise its rivals' costs of doing business. This occurs because the combined entity either offers worse terms to rival firms for the purchase and sale of their goods than they would if they were not integrated, or refuses to deal with rival firms, resulting in foreclosure.**

**ANSWER**: Paragraph 98 asserts legal and economic conclusions to which to response is required. To the extent a response is required, DFA denies those allegations. DFA is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 and, on that basis, denies those allegations.

**99. Foreclosure can take two forms. First is "customer foreclosure." The combined entity can refuse to buy (or give worse conditions for the purchase of) raw milk from rival cooperatives. Second is "input foreclosure." The combined entity can sell its own raw milk to rival processors at higher prices or reduce raw milk sales to rival processors, with the intent of raising their costs of obtaining raw milk, thus**

45

**making them less competitive at the processing level to the benefit of the combined entity.**

ANSWER: Paragraph 99 asserts a legal conclusion to which no response is required. To the extent that a response is required, DFA denies the allegation in Paragraph 99.

**100.     The Government Accountability Office ("GAO") recognized the potential of customer foreclosure in the milk industry, concluding in a 2019 report that cooperatives' "[i]nvestments in processing facilities can benefit farmers within a cooperative while reducing market access for farmers outside of the cooperative." U.S. Government Accountability Office (2019),** *Dairy Cooperatives: Potential Implications of Consolidation and Investments in Dairy Processing for Farmers***, GAO-19-695R (27 Sept), at 6, available at https://www.gao.gov/assets/ 710/701795.pdf. The GAO specifically cited as an example a joint venture that included DFA, and that may "restrict market access, for farmers who are not members of the cooperative." While the GAO noted that this harm should be weighed against benefits resulting from new market access from a new plant being built, those benefits do not apply when DFA acquires** *existing* **plants, such as the legacy Dean facilities in the Carolinas.**

ANSWER: DFA admits that the 2019 GAO Report to which Plaintiffs link contains the language quoted by Plaintiffs, as modified; that the report cited a joint venture that included DFA, and further states that the GAO stated regarding that joint venture that "USDA noted that, while these investment opportunities may not allow non-members market access, market outlets resulting from these investments did not exist before the cooperative and its members decided to make the investment." To the extent that Paragraph 100 is inconsistent with or contradicts the 2019 GAO report, DFA denies those allegations. DFA denies the remaining allegations in Paragraph 100.

**101.     Absent DFA's incentives to consolidate power in both the raw milk and processed milk markets brought about by the Asset Sale, both its raw milk cooperative and its milk processing plants would find it profitable to supply to the lowest-cost processors or to buy from the lowest-cost cooperatives. But with the Asset**

46

**Sale, DFA has every incentive to make these markets less competitive. In short, the window for competition that would otherwise have opened by expiration of the Side Note has now been permanently closed by the Asset Sale.**

**ANSWER:** DFA denies the allegations in Paragraph 101.

**102.    As set forth below, the Asset Sale will substantially lessen competition for the production, processing, and distribution of fluid milk in the region and cause significant losses and harm to MDVA and Food Lion.**

**ANSWER:** DFA denies the allegations in Paragraph 102.

*Effect on Raw Milk Market*

**103.    In the upstream raw milk market, the Asset Sale will reduce potential sources of raw milk and/or increase the price of raw milk to non-legacy-Dean processing plants and reduce or eliminate DFA's one remaining competitor (and its only check on pricing) in the region.**

**ANSWER:**   DFA denies the allegations in Paragraph 103.

**104.    Dean was only a milk processor and relied on dairy cooperatives and independent farms for its supply of raw milk. Therefore, even though Dean recently stopped purchasing MDVA raw milk, absent the sale of the legacy Dean assets to DFA, MDVA would have the opportunity to compete for raw milk supply access to the legacy Dean plants in the future.**

**ANSWER:** DFA admits the allegations in the first sentence of Paragraph 104.  DFA

denies the remaining allegations in Paragraph 104.

**105.    This is not merely theoretical competition. The dissolution of the Side Note in connection with Dean's bankruptcy would permit MDVA to compete to supply raw milk to the legacy Dean North and South Carolina milk processing facilities. Because of its lower cost structure, high quality product and service, and competitive pricing, MDVA was well positioned to compete for access to legacy Dean facilities if those plants had remained independent from DFA.**

47

**ANSWER:** DFA denies the allegations in Paragraph 105.

106.    But for the sale of Dean assets to DFA, some or all of the following effects would have been likely at the time the Carolinas plants gained the right to purchase raw milk free of the obligations of the Side Note:

- o    The legacy Dean plants would select the most efficient way of purchasing raw milk;
- o    DFA competitors such as MDVA would have access to legacy Dean processing plants when those plants are the most efficient or cost-effective option;
- o    DFA competitors such as MDVA would be able to recruit dairy farmers to join their cooperatives as an alternative to DFA, as those farmers would have the potential to better market their milk through more efficient cooperatives.
- o    Non-legacy-Dean plants would have multiple, competitive suppliers of raw milk, which would allow those plants to seek efficient, low-cost raw milk supplier agreements.

**ANSWER:** DFA denies the allegations in Paragraph 106.

107.    The expected result of the above is that raw milk would be provided to each processing plant by the closest, most efficient dairies or cooperatives, reducing market waste through excessive transportation and through continued support of inefficient dairies and cooperatives.

**ANSWER:** DFA denies the premise on which the allegations in Paragraph 107 are based, as noted in its response to Paragraph 106, and on that basis, denies the allegations in Paragraph 107.

108.    The resulting greater competition at the raw milk level would result in better raw milk prices to milk processors. To try to gain and retain members, DFA and MDVA would have to compete to offer the best prices to processors.

**ANSWER:** DFA denies the premise on which the allegations in Paragraph 108 are based, as noted in its response to Paragraph 106, and on that basis, denies the allegations in Paragraph 108.

**109.** But with the Asset Sale, none of these effects will be realized, and raw milk prices will increase. MDVA will lose both an outlet for sales of its raw milk and its members, weakening or eliminating its ability to be a check on DFA's market power.

**ANSWER:** DFA denies the premise on which the allegations in Paragraph 109 are based, as noted in its response to Paragraph 106, and on that basis, denies the allegations in Paragraph 109.

**110.** First, the Asset Sale has decisively and permanently foreclosed any hope that MDVA would have access to legacy Dean processing facilities. As a direct result of the Asset Sale, MDVA will suffer a permanent loss of access to the legacy Dean facilities in the Carolinas because DFA will never allow a rival to access its facilities, irrespective of capacity.

**ANSWER:** DFA denies the allegations in Paragraph 110.

**111.** Non-DFA dairy producers selling to milk processing facilities in the Carolinas require the ability to compete for access to the legacy Dean facilities to stay in business. Now that the Asset Sale has closed, DFA can and will anti-competitively leverage its newfound downstream market power in milk processing into additional upstream market power in milk production, at the expense of its only significant competitor in the region. DFA has the ability and incentive to foreclose MDVA from access to supplying raw milk to the acquired legacy Dean facilities in the Carolinas.

**ANSWER:** DFA denies the allegations in Paragraph 111.

**112.** Similar events have unfolded for the last several years as DFA has purchased milk processors in other parts of the country. For example, in 2017, DFA purchased Cumberland Dairy, a former independent processor located in New Jersey, with whom MDVA had previously enjoyed a profitable and mutually beneficial relationship that included the sale of raw milk and a successful co-packing partnership. Almost immediately following DFA's takeover of the facility, MDVA lost all of its raw milk business as Cumberland quickly switched to DFA for its milk supply.

**ANSWER:** DFA denies the allegations in the first sentence for Paragraph 112. With respect to the second sentence of Paragraph 112, DFA admits that it acquired in 2017 Cumberland Dairy, a New Jersey processor of ultra-pasteurized dairy products, but DFA is without information sufficient to form a belief as to the truth of the remaining allegations in that sentence and, on that basis, denies those allegations. With respect to the third sentence of Paragraph 112, DFA denies this allegation.

**113. Historically, MDVA and DFA have competed closely in the market for the supply of raw milk to processing facilities in North and South Carolina. MDVA successfully competed against DFA on price and maintained exclusive access to the legacy Dean High Point facility from 2006 until 2015, at which point Dean gave approximately half of the supply to DFA because the latter exercised its rights under the anti-competitive Side Note.**

**ANSWER:** With respect to the first sentence of Paragraph 113, DFA admits that MDVA and DFA have competed for supplying raw milk to processing facilities in North and South Carolina, but further states that whether that constitutes a "market" is a legal conclusion to which no response is required; to the extent a response is required, DFA denies the allegation. DFA denies the allegations in the second sentence.

**114. Until 2019, when MDVA's access was finally cut off, MDVA and DFA continued to supply raw milk to the Dean facilities. Now that DFA has acquired all of the Dean facilities in the Carolinas, MDVA will be permanently foreclosed from the ability to compete to supply these three crucial facilities, forcing it to turn to more distant plants, making its bids at those plants less competitive and less profitable due to its higher transportation costs. DFA has the ability and incentive to raise MDVA's costs and lower its farmers' profits by forcing inefficient "cross-shipments"—i.e., preventing MDVA and its farmers from accessing the closest milk processing facilities.**

**ANSWER:** DFA denies the allegations in Paragraph 114.

50

**115.** In addition, as described herein, MDVA's current patchwork system of processing facilities in North and South Carolina that will purchase its farmers' milk is not sustainable. Without the ability to compete for access to the legacy Dean facilities in the Carolinas, MDVA will be substantially foreclosed from access to milk processing facilities in North and South Carolina.

**ANSWER:** With respect to the first sentence of Paragraph 115, DFA is without information sufficient to form a belief as to the truth of the allegations in that sentence and, on that basis, denies those allegations. The second sentence of Paragraph 115 contains a legal conclusion to which no response is required. To the extent a response is required, DFA denies the remaining allegations in Paragraph 115.

**116.** Due to the prospect of and/or as a result of this foreclosure, many MDVA farmers will be forced to leave MDVA and join DFA, because the potential to sell raw milk to local processing facilities will only be available if a dairy farmer is a member of DFA. As it loses members to DFA, MDVA eventually will be significantly weakened or pushed out of the market for the supply of raw milk to processing facilities in North and South Carolina, thus eliminating choice for farmers. Dairy farmers not within DFA will have no other independent processing plants to sell their raw milk—both depressing their prices and forcing them to join DFA or potentially be forced out of business.

**ANSWER:** Paragraph 116 contains legal conclusions and unfounded speculation to which no response is required. To the extent a response is required, DFA denies the allegations in Paragraph 116.

**117.** This customer foreclosure will cause higher prices for raw milk. By using its access to the legacy Dean plants and the lack of viable economic alternative facilities to compel farmers to leave MDVA, DFA will weaken or eliminate its only rival cooperative in the supply of the region's raw milk. As a result of this enhanced market power in raw milk, and as the only economically significant dairy cooperative in the Carolinas, DFA will have the ability and incentive to raise raw milk prices to processors and, in turn, processed milk prices to retailers and other customers.

**ANSWER:** DFA denies the allegations in Paragraph 117.

51

118.    In addition to DFA having both the ability and incentive to disadvantage its rival cooperative, Plaintiffs also have the benefit of past experience suggesting that DFA will in fact act on these incentives in the wake of the Asset Sale. DFA's behavior in other regions (Cumberland Dairy) and its pre-acquisition behavior in the Carolinas under its supply agreement with legacy Dean (forcing Dean to drop MDVA supply) demonstrate that DFA has found foreclosure to be a profitable practice because of its effect on competitors and because it provides leverage to compel farmers to switch to DFA. DFA has a history of anti-competitively leveraging its supply agreement to restrict and eventually eliminate competitors' access to legacy Dean plants; and of anti-competitively leveraging downstream market power in milk processing into additional upstream market power in milk production. This past conduct provides insight into the post-Asset-Sale world and guidance about the feasibility and likelihood of foreclosure.

**ANSWER:**  DFA denies the allegations in Paragraph 118.

119.    Post-acquisition, DFA's ability to foreclose rivals is only strengthened, as outright ownership will allow more control over the legacy Dean processing facilities than a contract. This is because prior to the acquisition, Dean maintained the ability to breach or threaten to breach the contract which would allow Dean to keep some of DFA's anticompetitive pursuits in check. Following the acquisition, DFA's desired foreclosure strategy can no longer be constrained by Dean's independent interests.

**ANSWER:**  DFA denies the allegations in Paragraph 119.

120.    Upon information and belief, DFA already has, or at a minimum has a dangerous probability of achieving, monopoly power of over 60% of the market for the production of raw Grade A milk in the relevant geographic region. The suppression of competition alleged herein will have the effect of skyrocketing this share in the coming years, as it will weaken or eliminate the viability of DFA's only remaining competitor, leaving DFA with no supply- or demand-side constraints on its power over price.

**ANSWER:** The first sentence of Paragraph 120 contains legal conclusions to which no response is required.  To the extent a response is required, DFA denies the allegations in that sentence.  DFA denies the remaining allegations in Paragraph 120.

***Effect on Processed Milk Market***

**121.** DFA's ownership of the legacy Dean Carolinas milk processing plants will also create an incentive for DFA to advantage those plants by engaging in input foreclosure, i.e., reducing competing processing plants' access to raw milk. With milk processing plants of its own, DFA will have the ability and the incentive, if it is more profitable, to raise the cost of or simply reduce the raw milk supply to competing plants. This will raise rivals' costs, which will allow DFA to sell milk at higher prices.

**ANSWER:** DFA denies the allegations in Paragraph 121.

**122.** DFA will engage in this second form of foreclosure because the tradeoff between any lost profits in the upstream market from selling raw milk to rivals at higher- than-optimal prices or reducing the sale of raw milk to rivals will be outweighed by DFA's increased profits in the downstream market from facing less competition in the market for processed milk. In the recently released FTC-DOJ Draft Vertical Merger Guidelines, an example highlights the Agencies' concerns with exactly this situation:

> [Following a merger of an orange orchard and orange juice producer] the merged firm may be able to profitably stop supplying oranges . . . to rival orange juice suppliers . . . The merged firm will lose the margin on the foregone sales of oranges but may benefit from increased sales of orange juice … If the benefits outweighed the costs, the merged firm would find it profitable to foreclose.

**ANSWER:** DFA admits that the language selectively quoted in Paragraph 122 was contained in the FTC-DOJ Draft Vertical Merger Guidelines but notes that the language was altered prior to the release of the official Vertical Merger Guidelines. To the extent Paragraph 122 is inconsistent with or contradicts the Draft Vertical Merger Guidelines, DFA denies those allegations. DFA denies the remaining allegations in Paragraph 122.

**123.** Absent the sale of the legacy Dean milk processing facilities in the Carolinas to DFA, competition would increase at the downstream processed milk level as processors competed to have retailers buy their products.

**ANSWER:** DFA denies the allegations in Paragraph 123.

**124.** Without competition following the Asset Sale, however, DFA's milk processing plants will have no valid and independent check on the amounts it charges retailers for processed milk. Higher input costs will result in higher processed fluid milk prices offered by both DFA's legacy Dean plants and by DFA's rivals, thereby raising prices to processed milk customers, including retailers. In addition, many customers will be left with no alternative option but to accept DFA's supra-competitive pricing.

**ANSWER:** DFA denies the allegations in Paragraph 124.

**125.** Moreover, even if DFA's own costs go down as a result of the Asset Sale, due to the nature of competition in the processed milk market (or lack thereof), processed milk prices offered by DFA would still be likely to go up because DFA's competitors would see their costs for raw milk go up. Because processors will naturally sell products at the highest price possible without losing business, the second-most competitive processor will significantly influence the price offered by the winning bidder. The higher costs of DFA's rivals would force those rivals to raise their prices to retailers, and this would allow DFA to bid and win at higher prices.

**ANSWER:** DFA denies the allegations in Paragraph 125.

**126.** As shown in above in Figure Three, the legacy Dean plants in North and South Carolina are operating well below their capacity: the legacy Dean High Point plant operates at 50% of capacity; the Spartanburg plant at 73% of capacity and the Winston Salem plant at 71%. This extra capacity adds an increased opportunity and incentive for DFA to divert some milk supply and customer demand away from its rival processing plants to increase rivals' costs.

**ANSWER:** With respect to the first sentence of Paragraph 126, DFA is without information sufficient to form a belief as to the truth of the allegations in that sentence and, on that basis, denies those allegations. DFA denies the remaining allegations in Paragraph 126.

**127.** The movement of farmers to DFA will cut off those farmers' supply of raw milk to rival processing plants that are not supplied by DFA, and send that raw milk to the three legacy Dean plants operating below capacity. Now that DFA controls enough of the raw milk supply and processing plants that can handle all of its raw

54

milk, DFA has the ability and incentive to favor its own processors over its rivals with respect to the supply of raw milk, thus reducing sales of raw milk to rival processors. If that option is more profitable than merely raising its rivals' cost of raw milk, then that is what DFA will do.

**ANSWER:** DFA denies the allegations in Paragraph 127.

128. **Currently the Hunter Farms milk processing facility in High Point, North Carolina, is the only plant able to sell milk to Food Lion's key Salisbury, North Carolina distribution center at a competitive and economically viable price, taking into account transportation and other costs. The anticompetitive effects described above will either compel Hunter Farms to switch to DFA for its supply of raw milk, thus eliminating all competition for the supply of raw milk in the region and allowing DFA to raise its raw milk prices, or cause a decline in Hunter Farms' production of processed milk. And because Hunter Farms is owned by a grocery chain, it will serve itself first, leaving customers like Food Lion with a reduced volume or no milk at all, and/or the ability to purchase milk only at supra-competitive prices from DFA.**

**ANSWER:** With respect to the first sentence of Paragraph 128, DFA is without information sufficient to form a belief as to the truth of the allegations in that sentence and, on that basis, denies those allegations. DFA denies the remaining allegations in Paragraph 128.

### *Significant Barriers to Entry to the Relevant Markets*

129. **The Asset Sale will make it extremely difficult for any new milk processor to enter the market, which already faces substantial barriers. DFA's degree of control over the supply of raw milk to processing facilities in the Carolinas will prevent sufficient competition from milk producers for any prospective milk processor to be able to seek competitive prices.**

**ANSWER:** DFA denies the allegations in Paragraph 129.

130. **Due to the region's geography and the relatively high transportation costs, most milk processors located outside of the Carolinas are not economically viable options for dairy farmers and cooperatives that supply the legacy Dean Carolinas facilities.**

**ANSWER:** DFA is without information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and, on that basis, denies those allegations.

**131. Moreover, due to the Carolinas' relatively low dairy production as compared to the national average, the construction of a new local milk processing facility is not economically feasible. Upon information and belief, only one of the six facilities currently serving the region is above 80% utilization. National dairy demand has been declining consistently over the last few years. The dairy processing industry in the Carolinas is currently facing an over-capacity problem that makes the region an unlikely target for entry of additional milk processors. The two largest independent milk processors—Dean and Borden—recently filed for bankruptcy protection, which would likely make financing such a project nearly impossible.**

**ANSWER:** DFA admits that Dean and Borden both recently filed for bankruptcy. DFA is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 131 and, on that basis, denies those allegations.

**132. MDVA previously analyzed whether building a new processing facility in the region would be a financially viable option and, after careful consideration, has determined that it would not be feasible, particularly in the face of high costs and declining milk demand. Upon information and belief, other participants in the milk supply chain have reached a similar conclusion concerning a new processing plant.**

**ANSWER:** DFA is without information sufficient to form a belief as to the truth of the allegations in Paragraph 132 and, on that basis, denies those allegations.

**133. The sale of the legacy Dean Carolinas facilities to DFA has made a new milk processing facility's entry into the market even less likely. Absent the sale of the legacy Dean Carolinas facilities to DFA, a potential new entrant to the milk processing market would have had MDVA, DFA, and their affiliated cooperatives as available options to compete as sources of raw milk for its facility. Even with DFA's long-standing relationship with Dean, DFA currently still competes for access to other facilities in the region. Following the Asset Sale, however, DFA and its affiliated cooperatives now have no incentive to supply raw milk at competitive prices to non-legacy-Dean facilities. The Asset Sale therefore increases the already high barriers to entry as a milk processor in the Carolinas.**

56

**ANSWER:** DFA competes for access to supply raw milk to other milk processing facilities in the Carolinas and surrounding geographic region. DFA denies the allegations in Paragraph 133.

134. **Entry into the raw milk production market in the region also is unlikely. Dairy farming entails high fixed costs and a lead time of about two years from calf to a revenue-generating cow. Dairy farmers have seen significant consolidation, years of oversupply, eroding profit margins, and exit, which are not conducive to new entry.**

**ANSWER:** DFA denies the allegations in Paragraph 134.

## ANTITRUST INJURY

135. **DFA's conduct threatens to and will result in antitrust injury to Plaintiffs Food Lion and MDVA, as it tends to and will substantially lessen competition. DFA now has the ability both to foreclose rival cooperatives in the milk production market from a majority share of raw milk buyers (i.e. milk processing facilities) in North and South Carolina, while also foreclosing rival processing plants in North and South Carolina from a majority share of raw milk suppliers.**

**ANSWER:** DFA denies the allegations in Paragraph 135.

136. **The foreclosure and reduction in competition described above has caused antitrust injury to MDVA by, among other things: (i) causing MDVA to be unable to sell raw milk to nearby processing facilities; and (ii) increasing shipping costs to ship raw milk to processing facilities that are much further away than the legacy Dean facilities. MDVA has suffered and will suffer antitrust injury due to its foreclosure from access to economically viable milk processing.**

**ANSWER:** DFA denies the allegations in Paragraph 136.

137. **The entire premise behind DFA's acquisition of all three of the legacy Dean milk processing plants in North Carolina is for DFA to consolidate its already gained monopoly or near-monopoly power, increase control over dairy farmers, and increase the likelihood that MDVA, and its affiliated milk cooperatives, will be foreclosed from access to milk processing. DFA's intention is to reduce MDVA's access to processing facilities that it can supply efficiently, making their milk production businesses not economically viable. In the wake of the DFA-Dean**

57

transaction, DFA now has the ability and incentive to foreclose MDVA from access to the legacy Dean facilities.

**ANSWER:** DFA denies the allegations in Paragraph 137.

**138.     The most important factor influencing the long-term viability and overall competitiveness of a dairy cooperative is the cooperative's ability to transport its members' milk to local processing facilities. To continue as a viable competitor, MDVA's farmers must have access to local processing facilities to sell their milk.**

**ANSWER:** DFA is without information sufficient to form a belief as to the truth of

the allegations in Paragraph 138 and, on that basis, denies those allegations.

**139.     Now that DFA has acquired all three Dean facilities in the Carolinas, MDVA will be permanently cut off from access to DFA-owned processing facilities in the region because DFA will not allow a direct competitor to have access to a DFA-owned processing facility. MDVA will lack access to the legacy Dean plants regardless of price, quality or other pro-competitive factors and solely because of the anti-competitive incentives of DFA's ownership. Moreover, MDVA's access to non-Dean facilities in the Carolinas is untenable and unsustainable in the long run.**

**ANSWER:**   DFA is without information sufficient to form a belief as to the truth

of the allegations in the third sentence of Paragraph 139 and, on that basis, denies those

allegations.  DFA denies the remaining allegations in Paragraph 139.

**140.     This lack of access will also make it unlikely that MDVA will be able to continue as an independent cooperative serving the Carolinas. In the short term, many farmers will face a choice between less profitable, more distant processing partners, or joining DFA. As it loses members to DFA, MDVA will eventually be significantly weakened or pushed out of the market for the supply of raw milk, leaving DFA as the only economically significant dairy cooperative in the region.**

**ANSWER:** DFA denies the allegations in Paragraph 140.

**141.     MDVA's substantial foreclosure from access to critical processing facilities, its loss of members to DFA, and its reduction in or elimination from the raw milk market in the region constitute antitrust injury.**

**ANSWER:** Paragraph 141 contains legal conclusions to which no response is required. To the extent a response is required, DFA denies the allegations in Paragraph 141.

142. **The Asset Sale will also harm downstream purchasers of processed milk, such as Food Lion, and ultimately consumers who purchase fluid milk at grocery stores.**

**ANSWER:** DFA denies the allegations in Paragraph 142.

143. **The Asset Sale and the resulting harm to competition in the relevant geographic markets for both raw and processed milk will cause Food Lion to pay higher prices for processed milk due to increased raw milk prices, reduced competition among milk processors, and reduced access to raw milk by milk processors. As described above, the result of the Asset Sale will be to allow DFA to raise its processing rivals' costs for raw milk, either through reducing sales of DFA raw milk or by eliminating non-DFA options entirely. The reduction of competition from, or elimination of, MDVA will bring about the "downstream" effect of higher prices for processed milk, both because higher raw milk prices will be passed on by milk processors, and because competition between milk processors will be reduced. As a result, processed milk prices to retailers such as Food Lion, and ultimately to consumers, will increase.**

**ANSWER:** DFA denies the allegations in Paragraph 143.

144. **In order to win a procurement contract, the winning supplier has to bid lower than its rivals. The price of processed fluid milk increases because the losing bidder's costs determine the winner's final bid. Thus, the price Food Lion can expect a RFP process to yield is not based on the lowest price a processor would be willing to offer but the second-lowest price. This is because playing the best two firms off each other only works until one of them drops out. Thus, even if DFA (as processor) is the winning bidder because it has lower costs, the price Food Lion must pay will be based not on the price that DFA could have offered but based on DFA's processor rivals' bids. If those rival bids are higher as a result of the DFA's foreclosure strategy, the price paid by customers of processed milk would be expected to increase. If DFA can raise the costs of rival processing suppliers, then DFA can bid higher and still win.**

59

**ANSWER:** With respect to the first, second, third, fourth, fifth, and seventh sentence of Paragraph 144, DFA is without information sufficient to form a belief as to the truth of the allegations in those sentences and, on that basis, denies those allegations. DFA denies the remaining allegations in Paragraph 144.

**145. This raising of processed milk prices and other potential harm that will result in either or both the raw milk and processed milk markets constitutes threatened injury to Food Lion under Section 16 of the Clayton Act.**

**ANSWER:** Paragraph 145 contains legal conclusions to which no response is required. To the extent a response is required, DFA denies the allegations in Paragraph 145.

**146. Because the injury to MDVA (foreclosure) and Food Lion (increased prices) flows directly from both the reduction in competition caused by DFA's foreclosure of MDVA's access to the legacy Dean Carolinas facilities prior to the Asset Sale and the further reduction in competition likely to be caused as a result of the Asset Sale transaction, as well as from anti-competitive acts made possible by that illegal transaction, the threatened injuries to MDVA and Food Lion from the transaction constitute antitrust injury.**

**ANSWER:** Paragraph 146 contains legal conclusions to which no response is required. To the extent a response is required, DFA denies the allegations in Paragraph 146.

**147. These future anti-competitive results are likely to occur because they are the economically rational result of placing under combined ownership a company that possesses market power over an input (DFA, and raw milk) and a company that possesses market power over a product made from that input (legacy Dean and processed milk).**

**ANSWER:** DFA denies the allegations in Paragraph 147.

60

148.     This case, however, presents the rare scenario where a court considering an asset acquisition need not base its decision solely on economic consequences likely to occur in the future. Here, the market is already lacking in competition for the same reasons that are perpetuated by the Asset Sale: a shared interest between DFA and Dean. The Side Note and DFA's ability to cause Dean to foreclose MDVA access to its plants up to the very day of the closing of the Asset Sale, whether by exercising the power gained by the Side Note, through other agreements, or otherwise, created a lack of competition that, without the Asset Sale, would have gone away and been replaced with greater competition with the discharge of the Side Note. With the Asset Sale, the competitive environment will worsen because of joint ownership.

**ANSWER:**  DFA denies the allegations in Paragraph 148.

149.     The injuries to MDVA, Food Lion, and the public at large will be irreparable. Those injuries will not be adequately compensable by money damages.

**ANSWER:** DFA denies the allegations in Paragraph 149.

150.     The public interest, including the interest in ensuring competition, weigh heavily in favor of a divestiture.

**ANSWER:** DFA denies the allegations in Paragraph 150.

151.     DFA had no legitimate and cognizable interest in completing its illegal acquisition of the legacy Dean plants in the Carolinas.

**ANSWER:**  Paragraph 151 contains legal conclusions to which no response is required.  To the extent a response is required, DFA denies the allegations in Paragraph 151.

### *Injunctive Relief is Narrowly Tailored to Ensure Competition*

152.     The three legacy Dean processing facilities in North and South Carolina were included in the Asset Sale to DFA. Due to the structure and composition of the markets described herein, the Asset Sale allows DFA effectively to control the markets for both the supply of raw milk and for processed and packaged dairy products in the region. In fact, DFA's control of the milk supply chain is now even stronger than that of Dean following the Dean-Suiza divestiture.

61

**ANSWER:** DFA admits the first sentence of Paragraph 152. DFA denies the remaining allegations in Paragraph 152.

153. **It is critical that at least one of DFA's three legacy Dean facilities located in the Carolinas be divested to an independent and qualified buyer, and that the divested facility be one that ensures competition in the supply of raw milk and processed fluid milk products in the region going forward. The long-term anti-competitive consequences of the Dean-Suiza merger have shown what will happen in the absence of a robust divestiture here.**

**ANSWER:** DFA denies the allegations in Paragraph 153.

154. **Such a divestiture buyer should: (i) be independent from DFA; (ii) be a true and capable competitor in the region; and (iii) have a proven track record and experience with processing and co-packing consumer products.**

**ANSWER:** DFA denies the allegations in Paragraph 154.

155. **To effectively utilize one of the legacy Dean processing facilities to increase competition, the divestiture buyer must be incentivized to compete vigorously as a dairy producer in the area. A processor without dairy production in the area will have perverse incentives to deal exclusively with the largest cooperative in the area, DFA, in hopes of gaining favor that could benefit the purchaser in the regions where DFA and the purchaser actually compete.**

**ANSWER:** DFA denies the allegations in Paragraph 155.

156. **To ensure that competition is effective and sustainable into the future, the divestiture buyer should also have a proven track record and past experience with processing and co-packing consumer products.**

**ANSWER:** DFA denies the allegations in Paragraph 156.

157. **The relief sought is narrowly tailored. If granted, DFA could keep all but one of the facilities gained in the Asset Sale, including two of the legacy Dean facilities in the Carolinas. DFA will continue to maintain a substantial presence in the Carolinas.**

62

**ANSWER:** Paragraph 157 contains legal conclusions to which no response is required. To the extent a response is required, DFA denies the allegations in Paragraph 157.

## COUNT ONE

**(Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18)**

**158. The foregoing allegations are incorporated as though re-alleged herein.**

**ANSWER:** The foregoing responses are incorporated as though set forth herein.

**159. MDVA and Food Lion bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the DFA from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The effect of the Asset Sale will be substantially to lessen competition or to tend to create a monopoly in the relevant markets described above, or in another line of commerce, in violation of Section 7 of the Clayton Act.**

**ANSWER:** DFA admits that MDVA and Food Lion purport to bring this action under Section 16 of the Clayton Act and Section 7 of the Clayton Act. DFA denies the remaining allegations in Paragraph 159.

**160. The Asset Sale will decisively and permanently foreclose MDVA, other non-DFA cooperatives, and independent dairy farms from accessing the legacy Dean milk processing facilities in the Carolinas. It also increases DFA's market power in the upstream market such that more MDVA farmers will be forced to switch to DFA, and places DFA in the position immediately to restrict its competitors' access to the downstream fluid milk processing and packaging market.**

**ANSWER:** DFA denies the allegations in Paragraph 160.

**161. The relevant markets are highly concentrated; barriers to entry and expansion are high; and new entry would not be timely, likely or economical to replace the competition that will be lost as a result of the Asset Sale.**

**ANSWER:** DFA denies the allegations in Paragraph 161.

63

162.    There are no efficiencies that are transaction-specific, let alone sufficient to overcome the permanent loss of competition.

**ANSWER:** DFA denies the allegations in Paragraph 162.

163.    Plaintiffs are threatened with further loss or damage by reason of the actual or likely lessening of competition described above and are entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to ensure competition in the relevant markets.

**ANSWER:** DFA denies the allegations in Paragraph 163.

## COUNT TWO

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

164.    The foregoing allegations are incorporated as though re-alleged herein.

**ANSWER:** The foregoing responses are incorporate as though set forth herein.

165.    As detailed above, DFA has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the supply of raw Grade A milk to milk processing facilities in the Carolinas, including the power to control prices and exclude competition. Upon information and belief, DFA already possesses 60% or more of the market share for the supply of raw Grade A milk to milk processing facilities in the Carolinas. The Asset Sale, moreover, creates a dynamic whereby DFA's already-dominant share of the relevant market is likely to increase rapidly as DFA consolidates its power and weakens or eliminates its only competitor in the region, and the market tips accordingly.

**ANSWER:** DFA denies the allegations in Paragraph 165.

166.    **DFA has made the willful acquisition and maintenance of that market power, or has willfully, knowingly, and with specific intent attempted to acquire that market power, by, inter alia, entering into long-term exclusive dealing contracts with Dean, which the Asset Sale has effectively made permanent, and causing Dean not to purchase raw Grade A milk from MDVA, whether by exercising its rights under the Side Note, entering into and enforcing other anticompetitive agreements with Dean, or through other means including the May 1, 2020, purchase of the legacy Dean Carolinas facilities.**

    **ANSWER:**  DFA denies the allegations in Paragraph 166.

167.    **DFA's monopoly power in the relevant market, or its dangerous probability of success in acquiring monopoly power, was and is not a consequence of its superior product, business acumen, or historic accident.**

    **ANSWER:**  DFA denies the allegations in Paragraph 167.

168.    **MDVA is a competitor of DFA and has been and will continue to be harmed by DFA's unlawful conduct, which has foreclosed MDVA from access to half of the milk processing facilities in the Carolinas. The anticompetitive Asset Sale also increases DFA's market power such that more MDVA farmers will be forced to switch to DFA, eventually eliminating MDVA as a viable competitor in the region.**

    **ANSWER:**  DFA denies the allegations in Paragraph 168.

169.    **Food Lion, a downstream purchaser of processed fluid milk, will be harmed by DFA's unlawful conduct because DFA has acquired or has a dangerous probability of acquiring the power to exclude competition and raise the price of processed fluid milk products.**

    **ANSWER:**   DFA denies the allegations in Paragraph 169.

170.    **The market for the supply of raw Grade A milk to milk processing facilities in the Carolinas is highly concentrated because DFA only has one competitor in the region, MDVA; barriers to entry and expansion are high; and a new entrant would be unable to compete with DFA as a result of the Asset Sale and other conduct and market conditions described herein.**

    **ANSWER:** DFA denies the allegations in Paragraph 170.

171.     There are no efficiencies that are transaction-specific, let alone sufficient to outweigh the anticompetitive effect of the Asset Sale.

**ANSWER:** DFA denies the allegations in Paragraph 171.

172.     Both Plaintiffs are threatened with loss or damage by DFA's violation of 15 U.S.C. § 2 and are entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to ensure competition in the relevant market.

**ANSWER:** DFA denies the allegations in Paragraph 172.

## REQUESTED RELIEF

173.     In light of the foregoing, Plaintiffs MDVA and Food Lion respectfully request that the Court enter a judgment in their favor and against DFA and grant the following relief:

a. DFA's acquisition of all three legacy Dean facilities in North and South Carolina be adjudged and decreed to have violated Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2; and the acquisition and DFA's other conduct described herein to be adjudged to have violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

b. Plaintiffs be granted a preliminary injunction that will preserve the status quo, protect the relevant assets, and ensure the viability of a divestiture remedy until the conclusion of this matter;

c. Plaintiffs be granted permanent injunctive relief requiring DFA to divest at least one of the three legacy Dean processing facilities in the Carolinas—which facility is sufficient to ensure competition in the relevant geographic market—to a viable, qualified, and independent purchaser unaffiliated with DFA, or in the alternative be subjected to such other injunctive relief as would be sufficient to remedy the anti-competitive effects of the Asset Sale and DFA's violation of the Sherman Act;

d. Plaintiffs be awarded reasonable attorneys' fees and costs of this action, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; and

66

**e. Plaintiffs receive such other relief as the Court deems just and proper.**

**ANSWER:** DFA admits that Plaintiffs seek the relief listed in Paragraph 173 but denies that Plaintiffs are entitled to any such relief. DFA denies the remaining allegations in Paragraph 173.

## GENERAL DENIAL

DFA denies every allegation in the Complaint not expressly admitted in this Answer

## DEFENSES

DFA expressly reserves the right to plead additional affirmative and other defenses should discovery reveal any such defenses in this case. DFA asserts the following affirmative defenses without assuming the burden of proof as to any issue that would otherwise rest upon Plaintiffs:

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the "failing firm" doctrine.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches, in that plaintiffs have unreasonably delayed asserting their alleged damages, and such delay has caused prejudice to DFA.

## FOURTH DEFENSE

Plaintiffs' claims are barred in whole or in part because they are subject to a settlement and release executed in the matters of *Food Lion et al. v. Dean Foods Co. et al.*, No. 2:07-cv-188 (E.D. Tenn.) and/or *Sweetwater Valley Farm, Inc., et al v. Dean Foods Company, et al.*, No. 2:07-cv-208 (E.D. Tenn.). DFA adopts by reference and incorporates Exhibit A.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole in part, by the doctrines of judicial or collateral estoppel and waiver.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they are precluded and/or preempted by governmental oversight including by the application of filed-rate doctrine.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands and/or *in pari delicto*.

## EIGHTH DEFENSE

Plaintiffs' claims are barred because there is no "case or controversy" as required for the exercise of federal courts' jurisdiction by Article III of the U.S. Constitution.

## NINTH DEFENSE

Plaintiffs' claims are barred in whole or in part because the conduct of which they complain created merger-specific efficiencies that outweigh any potential harm to competition.

## RESERVATION OF DEFENSES

DFA has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter. DFA reserves the right to amend or seek to amend its Answer and/or defenses.

## PRAYER FOR RELIEF

WHEREFORE, DFA prays for judgement as follows:

1.      That the Court dismiss plaintiffs' Complaint with prejudice;

2.      That the Court enter judgment in favor of DFA and against plaintiffs on each and cause of action set forth in the Complaint;

3.      That DFA recover the costs, expenses, and disbursements that it has incurred in defending this action; and

4.      That DFA be granted such further relief as the Court deems just and proper.

This the 14th day of August, 2020.

**BAKER & MILLER PLLC**
W. Todd Miller*
Amber McDonald *
2401 Pennsylvania Avenue NW
Suite 300
Washington, DC 20037
Phone: 202-663-7820
Fax: 202-663-7849
TMiller@bakerandmiller.com
AMcDonald@bakerandmiller.com

**LATHAM & WATKINS LLP**
Michael G. Egg*
555 Eleventh Street, NW
Washington, DC 20004-1304
Phone: 202-637-2285
Michael.Egg@lw.com
*By Special Appearance*

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Brent F. Powell*
James P. Cooney III
N.C. State Bar No. 12140
Sarah Motley Stone
N.C. State Bar No. 34117
Charlotte, North Carolina 28202
Phone: 704-331-4900
Fax: 704-331-4955
Jim.Cooney@wbd-us.com
Sarah.Stone@wbd-us.com

Brent F. Powell
N.C. State Bar No. 41938
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: 336-721-3600
Fax: 336-721-3660
Brent.Powell@wbd-us.com

*Attorneys for Dairy Farmers of America, Inc.*