# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Food Lion, LLC, and Maryland and Virginia
Milk Producers Cooperative Association,
Inc.

*Plaintiffs*,

v.

Dairy Farmers of America, Inc.,

*Defendant*.

Case No. 1:20-cv-00442

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT DAIRY FARMERS OF AMERICA, INC.'S MOTION FOR PROTECTIVE ORDER AS TO PLAINTIFFS' SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS [ECF No. 52]

Defendant Dairy Farmers of America ("DFA") asks this Court to relieve it of its obligation to respond to one-fourth of the Requests for Production issued jointly by Plaintiffs Food Lion, LLC ("Food Lion") and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA"). *See* DFA's Mot. for Protective Order, ECF No. 52 (the "Motion"). DFA's arguments are baseless as to a majority of those Requests and premature as to the others. And undergirding its entire Motion is its malapropos effort to read Plaintiffs' Section 2 claim out of existence.

First, DFA has failed to meet its burden to show that Plaintiffs' Requests are overbroad under the "already liberal Rule 26 standard" that generally has "even greater latitude" in antitrust cases. *Seaman v. Duke Univ.*, No. 1:15-cv-462-CCE-JLW, 2018 WL 1441267, at *4 (M.D.N.C. Mar. 21, 2018). DFA fails to articulate why certain of

Plaintiffs' Requests, which seek information relevant to the core elements of their monopolization claim and/or DFA's defenses thereto, are irrelevant or disproportionate to the needs of the case. As to the remaining Requests, this Court's consideration is premature because the parties can address DFA's overbreadth concerns during negotiations regarding search terms and the identities of custodians, if DFA would permit those negotiations to proceed.

This Court should deny DFA's Motion.

## BACKGROUND

As DFA explains in its supporting Memorandum, ECF No. 54 ("Br."), at 3-4, the parties are on an expedited discovery schedule. The parties have agreed that all Requests that do not specify a different time period would require producing documents from January 1, 2017 to July 31, 2020, and that the "Relevant Area" for the purposes of discovery comprises the states of Virginia, North Carolina, South Carolina, Georgia, and the portion of Tennessee included in the boundaries of Federal Milk Marketing Order 5.

At issue here are Plaintiffs' Second Requests for Production, served on July 29. The parties initially discussed these Requests for several hours on August 18, over a week before DFA's objections and response were due, at which time Plaintiffs explained the relevance of and what they were seeking from each Request, and agreed to consider modifying six of the Requests now at issue. DFA memorialized the discussion in a letter to Plaintiffs sent August 24. Plaintiffs sent their revisions as to three Requests on August 26 and explained their hope that any further narrowing of the remaining three could be

accomplished through the search term and custodian negotiations. That same day, DFA served its objections and responses to the Requests. Without any further communication on the matter, DFA filed its Motion on September 1.

Plaintiffs informed DFA that its Motion was premature and asked if DFA would be willing to meet and confer regarding the Requests as to which DFA claimed the parties had reached impasse. The parties spoke on September 4, after which Plaintiffs sent DFA a letter on September 9 explaining the relevance of the documents sought and proposing to modify an additional twelve of the Requests ("Plaintiffs' Letter").[1] DFA responded on Monday, September 14 ("DFA's Letter"), agreeing that Request Nos. 31, 42, and 50 were no longer at issue, but maintaining its position as to the remaining thirteen Requests.

## ARGUMENT

Each of the thirteen Requests at issue, which DFA splits into six categories, is specifically designed to target documents that would prove the allegations in Plaintiffs' Complaint.

## I.    STANDARD OF REVIEW

Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P.

---

[1] Plaintiffs also offered via a separate letter to modify ten other Requests not subject to DFA's motion. Plaintiffs have been more than willing to make reasonable accommodations for DFA's overbreadth objections, but at some point they cannot winnow the Requests any further because they do, in fact, need Requests in place to which relevant documents will be responsive.

- 3 -

26(b)(1). DFA, as the party resisting discovery, bears the burden to show why it need not produce the discovery sought. *Armitage v. Biogen, Inc*., No. 1:17-cv-1133-LCB-JLW, 2019 WL 79037, at *2 (M.D.N.C. Jan. 2, 2019).

Although Plaintiffs' Requests are narrowly tailored, "[a]ntitrust is an area in which particularly broad discovery is encouraged." *SmithKline Beecham Corp. v. Apotex Corp*., No. CIV.A.00-CV-4888, 2006 WL 279073, at *4 (E.D. Pa. Jan. 31, 2006). "Particularly where allegations of conspiracy or monopolization are involved . . . broad discovery may be needed to uncover evidence of invidious design, pattern or intent." *Seaman*, 2018 WL 1441267, at *4 (quoting *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985); *see also Cyntegra, Inc. v. IDEXX Labs., Inc*., No. CV 06-4170, 2007 WL 9701999, at *4 (C.D. Cal. June 29, 2007) ("In antitrust cases, courts have generally allowed liberal discovery."). What matters is that the receiving party be able to identify with "reasonable particularity" what documents should be produced. *Donnelly v. Arringdon Dev., Inc.*, No. 1:04-cv-889-WLO-WWD, 2005 WL 8167556, at *1 (M.D.N.C. Nov. 8, 2005).

Pursuant to Rule 26(c) Federal Rules of Civil Procedure, the Court may, for good cause, issue an order to protect a party from undue burden or expense by "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P.26(c)(1). "Protective orders pursuant to Rule 26(c) should be sparingly used and cautiously granted." *Armitage*, 2019 WL 79037, at *2 (quotation marks omitted).

- 4 -

## II.   DFA REPEATEDLY MISREPRESENTS PLAINTIFFS' SECTION TWO CLAIM TO EVADE ITS DISCOVERY OBLIGATIONS.

In its Motion, DFA continues to misrepresent the claims in Plaintiffs' Complaint. In order to significantly narrow discovery, it distills Plaintiffs' separate Clayton Act Section 7 and Sherman Act Section 2 claims into an "allegation . . . that DFA's acquisition of three former Dean Foods [Company, ("Dean")] fluid milk processing plants in North and South Carolina will foreclose Plaintiffs' access to alleged markets for raw and fluid milk in those two states." Br. at 11; *see also* DFA's Letter at 2 ("[A]ny such agreement [to restrict purchases from non-DFA buyers] would be irrelevant to Plaintiffs' prospective foreclosure claim. . ."); DFA's Opp. to Mot. to Compel, ECF No. 55, at 20 (case is "purportedly being brought . . . to prevent a prospective 'foreclosure' of competition"); DFA's Mot. to Dismiss, ECF No. 31, at 1 ("The thrust of Plaintiffs' Complaint is that DFA's acquisition of bankrupt Dean's three processing plants in North and South Carolina *might*, in 2021, prevent MDVA from competing to supply those plants with raw milk. . .").[2]  This narrowed perception of Plaintiffs' case is the basis for most of DFA's objections here and for many other Requests not yet before the Court.

This is not Plaintiffs' claim. Instead, Plaintiffs allege that DFA's May 1, 2020 purchase of forty-four legacy Dean milk processing facilities (the "Asset Sale") was

---

[2] DFA deems it helpful to point out at the outset of in its argument, that "[t]his is not . . . a monopolization (or intent to monopolize) case where a plaintiff seeks monetary damages." Br. at 10.  This has no effect on DFA's discovery obligations; regardless of the relief they seek, Plaintiffs must show predatory or anticompetitive conduct to prove their attempted monopolization claim.

- 5 -

simply the latest action in DFA's multi-year anticompetitive campaign to monopolize the milk supply chain in the relevant market. Compl. ¶165-66. This campaign found its origins in the twenty-year, contingent, subordinated promissory note DFA secured from Dean Foods Company (the "Side Note"), which DFA used to foreclose rivals from access to milk processing plants in the years leading up to the Asset Sale. *Id*. ¶¶39-49, 59-62. After 2014, DFA began to enforce the Side Note to foreclose MDVA's access to the Carolinas plants. *Id*. ¶¶59-62, 113-14. This anticompetitive conduct—which began years before the Asset Sale and continues to the present— is central to Plaintiffs' claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act. *Id*. ¶¶136, 165-68.

It is "[a] plaintiff's allegations [which] define the extent of [her] claims in [a] case, and, therefore, the appropriate scope of discovery," not the Defendant's wishful reading of those claims. *Seaman*, 2018 WL 1441267, at *4 (quotation marks omitted). DFA's refusal to acknowledge Plaintiffs' allegations that DFA engaged in pre-Asset Sale monopolistic behavior underlies its miserly production of pre-Asset Sale documents and its wholesale refusal to produce documents created before 2017. This dispute alone underlies many of the parties' current disputes and has resulted in time-consuming and expensive discovery battles.

## III. DFA HAS NOT SHOWN "GOOD CAUSE" FOR THIS COURT TO ISSUE A PROTECTIVE ORDER.

### A. DFA's broad objections to the relevance, time period, and scope of the Requests fail to show why a protective order is merited.

- 6 -

DFA objects to the relevance and burden of several Requests' form, time period, and geographic scope. Plaintiffs address these broader points before turning to specific Requests.

At the outset, DFA takes the position that "requests for 'all documents concerning or related to' various topics are inherently overbroad." DFA's Letter at 1; Br. at 10 (quoting *Donnelly*, 2005 WL 8167556, at *1).[3] But the Court in *Donnelly* did not elevate form over substance; what matters, it explained, is that Requests have "reasonable particularity" so as to "place[] a party upon reasonable notice of what is called for and what is not." *Id*. Plaintiffs have discussed each of these Requests extensively with DFA, including on a three-hour call on August 18, a two-hour call on September 4, and in their September 9 letter, explaining what sort of documents are sought. After these discussions, DFA cannot genuinely claim that it lacks notice as to what Plaintiffs seek.[4] Where certain Requests could be interpreted to seek information beyond what Plaintiffs

---

[3] To arrive at this pronouncement of law, DFA again twists this Court's case law, arguing that "this Court recognized that 'requests seeking 'any and all' documents 'relating to' are overly broad.'" It quotes *Donnelly*, 2005 WL 8167556, at *1, but omits the first half of the sentence, which recognizes that such a principle "has been held" by other courts—not this Court.

[4] DFA has propounded to Plaintiffs many requests in the same form it here decries. Its Request No. 22 to Food Lion, for example, seeks "Documents and Data supporting, contradicting, regarding, referring to, relating to, constituting, or pertaining to Your allegations that Plaintiffs are threatened by loss or damage as a result of the Asset Sale (see, e.g., Complaint at ¶¶ 163, 172)." That DFA omits the word "all" before this request and several others does not narrow the requests' scope. DFA cannot genuinely complain about requests seeking "all documents" "relating to" a topic, and then propound essentially identical requests to Plaintiffs.

are targeting, Plaintiffs have offered to negotiate acceptable search terms for each Request, which DFA has declined to do as to the Requests at issue here. Finally, Plaintiffs have assured DFA that many of its overbreadth objections can be addressed by the parties' custodian negotiations because Plaintiffs will only be targeting individuals who worked in the departments and on the aspects of DFA or Dean's business relevant to this case. *See, e.g.*, *Country Vintner of N. Carolina, LLC v. E. & J. Gallo Winery*, No. 5:09-CV-326, 2010 WL 11565920, at *3 (E.D.N.C. Jan. 20, 2010) (denying defendants' motion for protective order in favor of Plaintiffs' recommendation to run searches based on negotiated search terms and custodians).

Next, DFA takes the position that documents predating January 1, 2017—the parties' negotiated default time period for document requests, in the event a date is not otherwise specified—are irrelevant to Plaintiffs' claims and overly burdensome to produce. It attempts to spin Plaintiffs' agreement to a default time period as an agreement that anything before this date is irrelevant and off-bounds. There was no such agreement. DFA's attempt to avoid the production of documents that predate January 2017 and are critical to Plaintiffs' claims is baseless.

First, "[d]iscovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). "Where there is doubt over relevance . . . [in antitrust cases], the rule indicates that the court should be permissive." *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-cv-04168, 2012 WL 628320, at *2 (D.N.J. Feb. 27, 2012).

- 8 -

Next, numerous cases explain that—particularly in monopolization cases—discovery is appropriate for a significant period of time ***before the unlawful conduct is alleged to have begun***. *See, e.g.*, *Cyntegra*, 2007 WL 9701999, at *4 (permitting discovery for period five years prior to plaintiff's entry into the industry which "should be sufficient to show, for example, the impact of defendant's alleged practices on the market into which plaintiff entered and evidence concerning defendant's supracompetitive pricing or customer complaints."); *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410-JAR, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003) ("[I]n antitrust cases . . . [a] plaintiff is ordinarily permitted to discover defendant's activities for a reasonable period of time antedating the earliest possible date of the actionable wrong.") (quotation marks omitted); *cf. Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135 (4th Cir. 1980) (permitting discovery into alleged antitrust violation for period of years preceding limitations period). Which makes sense, particularly in attempted monopolization claims where Plaintiffs seek to "uncover evidence of invidious design, pattern, or intent," *Seaman*, 2018 WL 1441267, at *4 (quoting *Kellam*, 616 F. Supp. at 217), information that "is generally covert." *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996).

Third, courts often use the benefit of past experience when evaluating the anticompetitive merits of a transaction. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 332 (1962) ("Moreover, it is apparent both from past behavior of Brown . . . that Brown would use its ownership of Kinney to force Brown shoes into Kinney

- 9 -

stores."); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 788 (9th Cir. 2015) (discussing "that statements and past actions by the merging parties made it likely that St. Luke's would raise reimbursement rates"); *F.T.C. v. Magazine Sols., LLC*, No. CIVA 7-692, 2010 WL 1009442, at \*14 (W.D. Pa. Mar. 15, 2010), *aff'd*, 432 F. App'x 155 (3d Cir. 2011) ("Courts have broad authority to enjoin unlawful acts that may be anticipated from the Defendants' past conduct . . ."). This also makes sense, as an alleged monopolists' past behavior can show its intent or probable course of conduct, in addition to informing predictions about the future that are necessary in cases alleging Section 7 claims.

Further, antitrust plaintiffs generally must—and are permitted to—seek discovery beyond the Complaint's alleged time period and geographic market. "[T]he boundaries of [this] market do not set the geographic limits of discovery—any more than the statute of limitations sets the temporal limit of discovery." *Kellam*, 616 F. Supp. at 219; *see also In re Loestrin 24 Fe Antitrust Litig*., No. 1:13-MD-2472-S-PAS, 2017 WL 1491911, at \*4 (D.R.I. Mar. 15, 2017) ("Courts should be wary of conflating the scope of discovery" with market definition allegations in a complaint).

This case law establishes that Plaintiffs would be entitled to the requested discovery even if they did not allege that the attempted monopolization began as early as 2013 and 2014, and even if the events in the years preceding the Asset Sale were only necessary to show design, pattern, intent, or course of conduct. But that is not the case here. Although the information sought is relevant and discoverable to Plaintiffs' Section

7 claim, here Plaintiffs' discovery requests are specifically targeted to obtain documents that relate to DFA's anticompetitive conduct alleged in the Complaint.

Specifically, Plaintiffs allege that DFA "with specific intent attempted to acquire [monopoly] power," began "in late 2013 . . . caus[ing] Dean to first reduce and then eliminate MDVA's supply to the Dean plants in the Carolinas." Compl. ¶¶166, 59. In 2013, MDVA supplied 1.142 billion pounds of raw milk to Dean plants in the Carolinas. *Id*. ¶61. Plaintiffs allege that "[a]t the end of 2014, Dean notified MDVA that it would be moving raw milk volume from MDVA to DFA pursuant to the long-term supply commitment between Dean and DFA." *Id*. At that time, Dean informed MDVA's CEO that, while MDVA's service and quality were excellent, DFA had told Dean it wanted to replace MDVA's volume at the Dean plants. *Id.* Plaintiffs allege that Dean began to reduce its purchases from MDVA because DFA directed it to do so. *Id*. ¶62. In 2015, MDVA lost access to processing over 300 million pounds of raw milk volume at the Dean Carolinas plants to DFA. *Id*. By the end of 2018, MDVA's raw milk supply to the Dean Carolinas plants was down to just over 200 million pounds, and by 2019, Dean was no longer purchasing any milk from MDVA. *Id*. Accordingly, DFA and Dean's relationship and coordination in the years ***before*** 2017 are central to this case. *See Kellam*, 616 F. Supp. at 218 ("[Plaintiff] is alleging harm from a conspiracy to restrain trade and a scheme of monopolization that may have begun as early as 1975. [Plaintiff] should therefore be allowed to obtain documents originating as early as that year.").

DFA's relevance arguments not only ignore that discovery is generally broad by necessity in antitrust cases, *see, e.g.*, *Seamen*, 2018 WL 1441267, at *4; they also defy common sense. Plaintiffs allege that the Asset Sale is only one in a series of anticompetitive actions in DFA's long-running scheme to monopolize the raw milk market. DFA made the decision all the way back in 2014 to force Dean to foreclose MDVA's access to its processing plants. Naturally, Plaintiffs seek documents from that era, not only to show DFA's anticompetitive actions, but also to gather evidence regarding DFA's intent to monopolize and its efforts leverage its market power to the detriment of competition and to recruit farmer members from rival cooperatives.

### B. Any burden on DFA is minimal, self-imposed, or necessary because DFA is searching two companies' records.

DFA's burden arguments are likewise disingenuous and inadequate. In cases involving proportionality concerns, a party must "show specifically how . . . [the discovery sought is] overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Alberts v. Wheeling Jesuit Univ.*, No. CIV.A. 5:09-CV-109, 2010 WL 1539852, at *8 (N.D.W. Va. Apr. 19, 2010). Thus, a "one-line statement in a brief (which fails to allege, much less establish, that the requested production would cost a substantial amount of money or pose real logistical difficulties) [would be] insufficient." *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 249 (M.D.N.C. 2010). This practical rule helps the court determine whether the "burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

- 12 -

DFA never explains why Plaintiffs' Requests allegedly impose a disproportionate burden, aside from the obvious fact that searching a longer time period and broader area will yield more (in this case, highly relevant) documents than a shorter period and smaller area.[5] Such a cursory claim is insufficient in this Court. *See, e.g., Kinetic Concepts*, 268 F.R.D. at 248.

Further, much of DFA's "burden" is self-imposed. For each of these Requests, Plaintiffs have repeatedly offered to negotiate search terms and custodian identities. It is, after all, the search terms and custodians that define the scope of a party's search. DFA's squabbles over the scope of the Requests can be addressed in this manner. If DFA genuinely was interested in fulfilling its obligation to work out this discovery dispute, it would engage in these negotiations with Plaintiffs and seek redress only if Plaintiffs were to demand unreasonable search terms and custodians. Unfortunately, DFA is not interested in doing that.

Finally, any burden imposed on DFA by nature of its purchase of legacy Dean records and the concomitant responsibility to search those records is unavoidable. Plaintiffs are cognizant of this responsibility and are working with Dean to obtain relevant documents in Dean's possession. However, Dean has communicated that it

---

[5] Local Rule 7.2(a) forbids DFA from providing new facts showing the extent of any burden in its reply brief, but should it do so, Plaintiffs respectfully request that they be permitted to respond.

- 13 -

transferred most of its records involving milk processing to DFA,[6] and DFA is obligated

to produce documents in its possession as appropriate under Rule 26(b)(1).

### C. DFA cannot show why it should not produce documents and data related to its strategy and efforts to compete with MDVA, which are directly at issue here.

DFA's first category of Requests, Nos. 27 and 43,[7] seek documents related to

DFA's efforts to compete with MDVA and recruit MDVA member farmers. As revised,

Plaintiffs' Request No. 27 seeks:

> All documents created since January 1, 2014, concerning or relating to DFA's or Dean's strategy in the Relevant Area that mention or relate to MDVA or DFA's efforts to compete with MDVA in the Relevant Area or MDVA's availability as a supplier to Dean.

In addition to the arguments addressed above, DFA writes that that Plaintiffs' Request

Nos. 4 and 22 "are likely to capture any strategy documents related to competition with

---

[6] Dean's counsel has represented that, in connection with the Asset Sale, DFA took physical possession of Dean's corporate headquarters and all of Dean's email servers, except for the specific files that were transferred to other buyers of Dean assets. The only documents still in Dean's physical possession are those residing with its attorneys: Dean's documents from the bankruptcy proceedings, and Dean's documents from the DOJ investigation into the Asset Sale. Dean said that DFA has offered to return certain of Dean's board minutes and corporate governance documents for production in this litigation, but otherwise referred Plaintiffs to DFA to obtain legacy Dean documents. The day before this opposition brief was filed, DFA indicated that it will be returning certain unspecified files to Dean for Dean to produce in this case. Plaintiffs are working to uncover more information about this exchange but, regardless, DFA remains in possession of the legacy Dean documents related to the Carolinas plants and those of the many legacy Dean employees who have joined DFA.

[7] Plaintiffs agreed to withdraw Request No. 42 and so it is omitted here.

- 14 -

MDVA in the Relevant Area." DFA's Letter at 1. There is no basis for DFA to claim that

this will capture all relevant documents.[8]

First, putting aside that DFA is currently refusing to run search terms on Request

No. 4 in favor of a "targeted pull,"[9] Request Nos. 4 and 22 do not purport to seek the

same content as Request No. 27. Request No. 4 seeks:

> All documents reflecting DFA's actual or contemplated business plans or
> analyses concerning or relating to the supply of raw or processed milk in
> the relevant geographic region during the relevant time period.

And Request No. 22 seeks:

> To the extent not produced in response to Plaintiffs' First Request No. 4, all
> documents concerning or relating to DFA's integration of and future plans
> for the Carolinas plants.

These requests do not cover all of the documents sought by Request No. 27, which seeks

documents regarding DFA's assessments of MDVA and "efforts to compete with

---

[8] Nor do negotiations with DFA related to custodians and search terms encourage any such optimism. DFA's proposals for Plaintiffs' First Set of Requests are narrow, at best, and DFA has refused to engage in a custodial search for Request No. 4, which is aimed at uncovering DFA's contemplated business plans, which are clearly relevant to DFA's conduct and motives. Thus, not only is DFA attempting to evade its discovery obligations by calling Requests "duplicative," as if it were free to consolidate Plaintiffs' Requests, DFA also is refusing to engage in fulsome searches. Unless this conduct changes, Plaintiffs will be forced to seek redress before the Court.

[9] DFA refuses to engage in a custodial search for Request No. 4 on the basis that it can conduct a "targeted pull" of its actual and contemplated business plans in the Relevant Area, a central issue in this case. Few requests are more suitable for a custodial search than Request No. 4, and indeed, Plaintiffs have agreed to a reciprocal request of their own documents. Thus, not only is DFA attempting to evade its discovery obligations by calling Requests "duplicative," as if it were free to consolidate Plaintiffs' Requests, DFA also is refusing to engage in fulsome searches.

MDVA" as well as documents concerning **_Dean's_** strategies with respect to MDVA and its availability as a supplier. Second, DFA has refused to fully respond to Request Nos. 4 and 22 by refusing to produce documents concerning its integration of the Carolinas plants due to its insistence that any such relevant documents are encompassed within its "future plans." In short, DFA argues that it need not answer a Request because two other Requests—that it is not fully responding to—seek documents that may overlap with that Request. This construction disregards DFA's obligations under the Federal Rules.

Next, Plaintiffs' revised Request No. 43 seeks:

> Documents created since January 1, 2014, reflecting DFA's efforts to attract or recruit MDVA farmers who produce raw milk in or ship raw milk to the Relevant Area, including all communications between DFA and MDVA farmers.

DFA's arguments to the relevance, time period and geographic scope of this Request are addressed above. [10] DFA recognizes Plaintiffs' allegation that "some MDVA farmers may switch to DFA as a result of the acquisition of the Carolinas Plants," Br. at 13. Plaintiffs allege that the foreclosure of access to the Carolinas plants will increase MDVA's transportation costs, which are borne by MDVA's member farmers, forcing them to choose between less profitable processing facilities or joining DFA. Compl. ¶¶ 24-25, 77, 114, 138, 140. These allegations are central to both Plaintiffs' Section 2 and

_____

[10] DFA again improperly shifts the burden to Plaintiffs to explain how its Requests seek relevant information. Br. at 14 ("Nor have Plaintiffs explained how documents . . . are relevant to their allegations that some MDVA farmers may switch to DFA as a result of the acquisition of the Carolinas Plants."). DFA never tries to meet its burden to articulate why Plaintiffs' requests are overbroad.

Section 7 claims, as DFA's long-term efforts to recruit MDVA's member–farmers and thereby weaken MDVA both make up part of DFA's monopolization efforts and signal reduced competition in the raw milk market. Plaintiffs are entitled to discovery of documents relating to DFA's efforts to recruit MDVA farmers as part of its anticompetitive conduct.

### D. DFA has not shown why it may withhold documents related to specific examples of analogous situations in other states.

DFA addresses Request Nos. 40 and 41 together, which seek documents that show DFA's leverage of its market power to systematically foreclose rival cooperatives from processing facilities in the past. Request No. 40 relates to Cumberland Dairy, a formerly independent processor in New Jersey with which MDVA had previously enjoyed a profitable relationship including the sale of raw milk and a successful co-packing relationship. Compl. ¶112. Almost immediately after DFA acquired the plant (as it has now done with the Carolinas plants), Cumberland Dairy cut off MDVA's access and switched its purchase volume entirely to DFA. *Id*. Likewise, Plaintiffs' revised Request No. 41 seeks information related to a former Dean processing facility in Murray, Kentucky, where MDVA lost access due to DFA's market power, incurred higher transportation costs, and ultimately lost members to DFA in the surrounding area.

As addressed above, DFA's strained relevance and proportionality arguments fail to meet its burden. Although antitrust plaintiffs are regularly permitted to seek documents dating years before the anticompetitive conduct allegedly began, *e.g. Cyntegra*, 2007 WL 9701999, at *4, Plaintiffs tailored their requests to seek documents dating back to the

- 17 -

time when DFA took action to foreclose MDVA from processing facilities. DFA's proportionality argument similarly fails. DFA decries Request No. 41 as dating "all the way back" to 2013, but that is the time period when DFA's actions occurred. Likewise with respect to Request No. 40. And true that these probative transactions occurred outside Plaintiffs' proposed market, but that is precisely the point—this evidence is valuable because DFA's past conduct in other markets reveals its likely intent and probable future conduct in the market alleged here. In *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc*., No. 1:14-CV-182, 2015 WL 10891939, at *2 (N.D. Ga. Nov. 6, 2015), for example, a theatre accused larger competitor AMC of monopolizing the theatre market by coercing exclusive deals with film distributors and theatre landlords. The Court compelled AMC to produce evidence of its conduct in areas outside the alleged market so the plaintiff theatre could "bolster [its] case that AMC could make good on its threats to use its full weight and power to prevent Cobb from developing new theaters." *Id*. at *2 (quotation marks omitted). So here.

### E.  DFA's concerns that can be allayed by search term negotiations are not ready for adjudication.

Plaintiffs revised Request No. 49[11] to mirror DFA's reciprocal request. It seeks:

Documents and Data supporting, contradicting, referring to, or relating to DFA's affirmative defenses or Plaintiffs' allegations that the Asset Sale will have the effect of substantially lessening competition, or to Plaintiffs' allegations that DFA has attempted to monopolize the market for raw fluid milk in the relevant geographic area.

---

[11] The parties reached accord on Request No. 50 and so it is omitted.

On the parties' September 4 call and in Plaintiffs' Letter, Plaintiffs agreed to address any remaining issues with alleged overbreadth in the context of search term negotiations. Plaintiffs also agreed that, as to affirmative defenses, this Requests calls only for a search of terms specific to the enumerated defenses—they used as an example searches incorporating "restructur*" and/or "reorganiz*" for Dean's failing firm defense—and not for a fishing expedition as to any document that could conceivably bear on an affirmative defense. Because the parties' ongoing negotiations should dispense with DFA's concerns, a protective order is not appropriate. Further, the only "impasse" the parties have reached that would ready this dispute for the Court's adjudication is that DFA has refused to engage in these search term negotiations.

### F. DFA has not shown why it may withhold studies and analyses of the relevant markets.

DFA seeks to withhold documents related to its strategies in the relevant markets from 2014 to the present that are responsive to Request Nos. 25 and 26. DFA sensibly does not dispute the relevance of these documents, which relate to DFA's years-long process of pushing MDVA out of Dean's processing plants and go to the heart of Plaintiffs' Section 2 claim. Instead, DFA argues that the Requests are overly broad and impose a disproportionate burden because they date back to 2014 and cover the parties' agreed-upon geographic area for discovery, which includes the Carolinas and neighboring states. Br. at 18. Plaintiffs address these arguments generally in Section III.A., and provide further explanation below.

- 19 -

Both the date and geographic scope of these Requests are tailored to obtain documents directly relevant to Plaintiffs' claims. The reason "analyses of market conditions or market shares from 2014 are probative of markets for raw and processed milk as they exist today," Br. at 18, is because 2014 marked the last year before DFA pressured Dean to foreclose MDVA's access to Dean plants and to undermine competition in the raw milk market. And the geographic scope is the one DFA has used for all its own discovery requests. Plaintiffs initially confined their requests for production to the geographic market alleged in the Complaint, but DFA has repeatedly contested this market definition and sought documents from a broader area. Plaintiffs agreed to an expanded region for discovery purposes, and now understandably seek reciprocal productions. It follows that Requests seeking documents central to Plaintiffs' claims would use the same geographic area employed by virtually all other Requests issued by all parties. Finally, DFA's conclusory complaints about proportionality fall short of DFA's legal burden to show that Plaintiffs are not entitled to discovery. *Kinetic Concepts*, 268 F.R.D. at 248.

### G. DFA fails to show why Requests seeking documents exhibiting its similar conduct with other dairy cooperatives are overbroad.

DFA also takes issue with Request Nos. 44-48, which seek documents created since 2014 that are related to other dairy cooperatives. Plaintiffs' Letter proposed narrowed language for each of these Requests, to which DFA remains opposed on relevance grounds. Again, DFA does not explain why these documents are irrelevant. Indeed, DFA has propounded requests for admission to Plaintiffs that address issues

- 20 -

related to each of these cooperatives. These Requests relate to DFA's strategies with respect to other dairy cooperatives that were operating or seeking to operate in the Relevant Area, and DFA's efforts to compete with MDVA during the time period that DFA was actively seeking to foreclose MDVA from relevant milk processing facilities. Such evidence is directly relevant to Plaintiffs' claims in this case. As explained above, examples like these, which involve the defendant and the same acts at issue, inform the Court's analysis for both Section 2 and Section 7 claims. *See, e.g.*, *Brown Shoe Co.*, 370 U.S. at 332.

### H. *The parties have not reached impasse as to Plaintiffs' Request related to the supply of processed milk to major customers.*

The final category, Request No. 29,[12] seeks documents related to the supply of processed milk specifically to Plaintiff Food Lion and legacy Dean's other major customers in the Relevant Area. This is the ***only*** of Plaintiffs' Requests that specifies Plaintiff Food Lion, who the Complaint alleges will see a rise in prices from reduced competition in the region's milk supply chain. Plaintiffs nevertheless narrowed this Request via email on August 26 at Defendants' urging, and expressed on the September 4 call that search term negotiations could address any further concerns. In response to DFA's specific concern about the phrase "major customers," Plaintiffs said they did not see this as a fishing expedition as to all "customers" (as a search term), but instead that searches could be crafted around the names of legacy Dean's highest-volume purchasers

---

[12] The parties reached accord on Request No. 30 and so it is omitted.

in the region. DFA has declined to engage in such negotiations thus far, however, reciting that DFA "continues to view this request as an improper, overbroad 'catch all' request" and that it is "concerned about the absence of a limiting principle . . . and that Plaintiffs will seek to use this request to demand production of documents that have little relevance to the case." DFA's Letter at 3. Plaintiffs respectfully submit that search term negotiations and the identities of DFA's custodians can address DFA's concerns with the breadth of the Request.

## CONCLUSION

Plaintiffs respectfully ask this Court to deny DFA's Motion.

DATED: September 17, 2020

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

s/ Ryan G. Rich
A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*admitted pro hac vice*)
John S. Martin (*admitted pro hac vice*)
Kevin Hahm (*admitted pro hac vice*)
Carter C. Simpson (*admitted pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com

- 22 -

khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN SANDERS LLP**

s/ Jason D. Evans
Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (*admitted pro hac vice*)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362
james.lamberth@troutman.com

*Attorneys for Maryland and Virginia Milk
Producers Cooperative Association, Inc.*

- 23 -

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing memorandum does not exceed 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

This the 17th day of September 2020.

s/ Ryan G. Rich
Ryan G. Rich
