# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Food Lion, LLC, and Maryland and Virginia
Milk Producers Cooperative Association,
Inc.,

                    *Plaintiffs*,

v.

Dairy Farmers of America, Inc.,

                    *Defendant*.

Case No. 1:20-cv-00442

**EXPEDITED CONSIDERATION
REQUEST**

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANT DFA TO EXTRACT AND REVIEW DOCUMENTS RESPONSIVE TO SEARCH TERMS

Plaintiffs Food Lion, LLC ("Food Lion") and Maryland and Virginia Milk Producers Cooperative Association ("MDVA"), through undersigned counsel, hereby move the Court on an expedited basis for an order compelling Defendant Dairy Farmers of America, Inc. ("DFA") to (1) extract and review document responsive to five categories of search strings across its custodians' documents and (2) provide metrics, substantive justification, and proposed narrowing principles within three days of disposition of this motion concerning the remainder of Plaintiffs' search proposals. This motion is necessitated by DFA's delay in responding to search term proposals for its documents, and refusal to engage in good faith negotiations concerning the same.

## BACKGROUND

This litigation concerns Plaintiffs' claims that DFA's acquisition of milk processing assets (the "Asset Sale") from Dean Foods Company ("Dean") violates

- 1 -

Section 7 of the Clayton Act, and is the culmination of a multi-year campaign to monopolize the raw milk supply market in violation of Section 2 of the Sherman Act. Discovery is proceeding on an expedited basis. On June 10, 2020, after Plaintiffs moved for a preliminary injunction and associated expedited discovery, the Court granted Plaintiffs the ability to serve limited discovery requests on DFA by June 17, 2020. ECF No. 28. On June 17, Plaintiffs served an initial set of eight requests, aimed at topics at issue in their preliminary injunction motion. On July 1, the parties filed (1) a Stipulated Notice of Material Change Order [ECF No. 38] that allowed the case to proceed to merits discovery, and (2) a schedule for an abbreviated, four-month merits discovery period in light of expediency concerns from both sides. DFA responded to Plaintiffs' First Requests on July 17. *See* Exhibit A, "First Requests."

Plaintiffs issued a comprehensive second set of forty-six requests on July 27, to which DFA responded on August 26. *See* Exhibit B, "Second Requests." The Second Requests address the bulk of Plaintiffs' case with respect to DFA, and in August and early September the parties engaged in three meet-and-confer calls regarding their scope, culminating in Plaintiffs' offering to narrow twenty-three of them. *See* correspondence at Exhibits C, D, E, F. Finally, Plaintiffs served a final set of five requests on August 31. *See* Exhibit G, "Third Requests." The Third Requests concern two subjects: (1) consultants whom DFA's Department of Justice ("DOJ") production indicated worked on the Asset Sale; and (2) Plaintiffs' incorporation of certain requests originally sent to third-party Dean, in light of Dean's representation on an August 20 call that DFA took

- 2 -

physical possession of most of its company records.[1] Five of the twelve DFA custodians at issue in this motion are legacy Dean employees whose files are implicated by the Dean topics incorporated by the Third Requests.

The parties agreed on August 25 to exchange initial proposals for search terms. In response to DFA's request that the parties exchange terms "for the parties' First Set of RFPs," Plaintiffs urged that, since DFA had received Plaintiffs' Second Requests a month earlier and the parties had held a meet-and-confer on them, "the first round of search terms can encompass both our First and Second RFPs." *See* Exhibit H, at 4. When DFA sent its initial search terms on August 28, however, it only proposed terms for ***three of Plaintiffs' eight First Requests***; and for those three, DFA only offered its DOJ production as a source for Request No. 1, six custodians for Request No. 3, and a single custodian for Request No. 7. *See id.* at 11-16. DFA did not offer any search terms or custodians for Request No. 4, which seeks "actual or contemplated business plans or analyses concerning or relating to the supply of raw or processed milk in the relevant geographic region during the relevant time period," but instead insisted in later correspondence that business plans could be obtained through a targeted search.[2] Plaintiffs submitted counterproposals on the First Requests search terms on September 9.

---

[1] The delineation of the DFA-Dean divide for purposes of custodial sources, non-custodial sources, and document productions is still unresolved. DFA has committed to filing a consent order setting forth a procedure whereby it will return certain Dean files to Dean for production, and maintain possession of the remainder of Dean custodial and non-custodial files. It is for this reason that Plaintiffs incorporated requests from its Dean subpoena into their Third Requests to DFA.

[2] DFA responded to this Request on July 17, 2020, by indicating that it would "search the files of DFA custodians who are reasonably likely to have non-duplicative

- 3 -

Plaintiffs asked (1) on a September 2 teleconference for an update on DFA's proposals for custodians and search terms warranted by Plaintiffs' Second and Third Requests; (2) in a September 3 e-mail when DFA would be identifying which custodians DFA would be willing to search under Plaintiffs' Second and Third Requests; and (3) in a September 11 e-mail again whether DFA would agree to proceeding with search term negotiations on Plaintiffs' Second Requests.[3] *See* Exhibit I, at 2. DFA responded only that it would not entertain negotiations on the Second Requests that were subject to a motion for a protective order that it had filed on September 1. *See id.* at 1.

On September 21, DFA finally provided initial proposals for search terms and custodians warranted by Plaintiffs' Second Requests. Remarkably, despite stating in its August 26 written responses that it was amenable to custodial searches on twenty of the Second Requests, and after two meet-and-confers on which the parties discussed resolving outstanding disputes as to other Requests through the search-term negotiation process, DFA proposed search terms under only ***two of Plaintiffs' forty-six Second Requests***. *See* Exhibit J, at 3-4. For these two, DFA offered only five custodians for Request No. 11 and six custodians for Request No. 22. When Plaintiffs asked about the remainder of the Second Requests on a September 23 teleconference, DFA responded

---

documents responsive to this Request." *See* Exhibit A, at 11. But even after flipping to say the Request is suitable only for a targeted search, ***DFA has yet to produce a single document in response to Request No. 4***.

[3] On September 1, DFA moved for a protective order concerning sixteen Second Requests. [ECF No 52.]

- 4 -

that it had proposed search terms for those requests it deemed suitable for custodial searches, but that it was amenable to counterproposals from Plaintiffs.

Plaintiffs acted quickly. Less than a week later, on September 29, Plaintiffs responded with an omnibus list of 222 search terms that it deemed appropriate under their First, Second, and Third Requests, excepting the thirteen requests still subject to DFA's pending motion.[4] *See* Exhibit K, at 4-14. This list included permutations and/or expansions of the requests DFA had already offered, in addition to searches that Plaintiffs deemed appropriate under the remainder of the requests for which DFA had committed either in its written responses or on meet-and-confer calls to run custodial searches.

On an October 3 teleconference, the parties agreed that DFA would respond in a way that would allow the parties to identify where certain search terms were either inappropriate or overbroad as applied to a specific custodian. DFA followed up with a letter later that evening confirming that it would not be offering to run all eventually-agreed-upon searches across all custodians. *See* Exhibit L. DFA confirmed, however, that it was "reviewing the search terms proposed in your September 29, 2020 letter and will consider them in connection with Plaintiffs' requests." *See id*. at 3.

Plaintiffs followed up on their September 29 proposals on two teleconferences and in two more e-mails over the next few weeks. On October 21, DFA responded that its delay in responding was because it was "undertak[ing] to apply Plaintiffs' search terms on a custodian-by-custodian basis," and "it can take time to test search terms, . . . This is

---

[4] Plaintiffs withdrew one request subject to the motion, and narrowed two requests to DFA's satisfaction. *See* Exhibits E, F.

especially true when testing more than 220 search strings across numerous custodians." *See* Exhibit M, at 1.

Last Friday, October 23, DFA sent its response to Plaintiffs' September 29 chart. *See id.* at 7-43. But rather than addressing each of Plaintiffs' proposals, DFA based its new offers on its original proposals from early September, incorporating select new searches or terms in red text where DFA deemed appropriate. DFA completely ignored over half of Plaintiffs' new September 29 proposals, and adopted only in part, without explanation, most of the proposals it did not ignore. Yet DFA provided no hit metrics, information based on sampling, or factual justification for its narrowing or wholesale rejection of Plaintiffs' proposals. Plaintiffs quickly took the weekend to match up DFA's new proposals with their September 29 proposals, sent the combined chart to DFA on Monday, and asked DFA to provide substantive justification for its counterproposals by Wednesday, October 28. *See* Exhibit N, at 1, 8-64.

On Thursday, October 29, DFA sent a letter providing select metrics for nine allegedly overbroad requests contained in Plaintiffs' September 29 proposals, again ignoring the rest. *See* Exhibit O.[5] DFA offers no proposals as to specific terms that are leading to unwieldy and unwarranted hit counts; no proposals as to more appropriate

---

[5] DFA's letter misconstrues the extent of the searches it has agreed to run. It refers to its proposal to run "more than 100 search strings," neglecting to mention that 76 of these strings require use of the word "antitrust," "competition," or "DOJ," and are only geared to addressing a single request (Lines 2-76). Forty more are aimed only at uncovering bids or proposals (Lines 124-163), leaving very few searches addressing the remainder of Plaintiffs' Requests. DFA has completely ignored the majority of the *new* requests proposed by Plaintiffs on September 29.

- 6 -

limiters; and no sampling or substantive reasoning why the hit counts are disproportionate with the relevance of the terms. With less than two weeks remaining in document discovery, Plaintiffs cannot allow DFA to waste more time ignoring Plaintiffs' thorough, good faith search term requests.

The combined chart that Plaintiffs created of the parties' current proposals is attached as **Exhibit P**, and is now color-coded to correspond with the categories set forth below. Column A contains Plaintiffs' September 29 proposals; Column B contains DFA's October 23 proposals that correspond with one of Plaintiffs' offers; Columns C-Q indicate with a "Y" those custodians whose files DFA is offering to search; and Columns R-S indicate where there is more than one issue tag. Adjustments made to concerns raised in DFA's October 29 letter appear in red text. Plaintiffs are amenable to receiving concrete, justified narrowing proposals from DFA as to the search terms subject to this motion while it is pending, and the parties will update the Court in their Response and Reply if any of the below issues are resolved.

## ARGUMENT

Plaintiffs have devoted substantial time and resources to devising search terms under their First, Second, and Third Requests. DFA has completely ignored the majority of these requests, and refused to engage in a good-faith negotiation concerning those that it seeks to narrow or adopt only in part. As set forth below, many of the searches strike at the heart of Plaintiffs' claims, and are identical to those DFA has asked Plaintiff Food

Lion to search.[6] Although Plaintiffs are remiss to involve the Court in something as straightforward as search term negotiations, they simply have no other choice given that two weeks remain in document discovery. Plaintiffs respectfully request that the Court order DFA to run the five categories of searches described below against its custodians and to negotiate in good faith regarding the remainder of the proposed terms.

## A. Search terms concerning DFA and Dean's work in connection with Dean's filing for bankruptcy and the Asset Sale (Exhibit P, blue highlights)

Plaintiffs have issued over a dozen requests for documents concerning work performed by DFA and Dean surrounding Dean's filing for bankruptcy and the business proposals, events, and discussions that led up to the Asset Sale. Included in this category are requests concerning (1) DFA's and Dean's discussions internally, with each other, or with third parties regarding aspects of the Asset Sale or any other proposed business venture that relates to or bears on the Relevant Area (Request Nos. 12-16, as revised; Request No. 21; Request No 23; Request No. 55, Dean Specifications 9-12); (2) discussions by DFA or Dean of antitrust or competition issues associated with the Asset

---

[6] As DFA is well aware based on metrics that Plaintiff Food Lion has provided, Food Lion has extracted and is reviewing over 300,000 documents responsive to searches under DFA's first and second sets of requests for production. Over the course of their negotiation regarding those searches, DFA has at every turn required hit counts and factual justification for the elimination of <u>any term</u> from <u>any</u> string, and for any narrowing of the "w/X" limiter for <u>any</u> search. Food Lion has accommodated, and the parties reached agreement on all search strings on October 30. DFA's October 29 letter construes the Food Lion searches as "just 21 search terms," but the distinction lies in the complexity of the searches. Thus, the number of agreed-upon unique searches between the two parties is not an apples-to-apples comparison; and, in any event, the extent of DFA's involvement in and documentation of issues relevant to the parties' claims and defenses far exceeds that of Food Lion, a retail customer of fluid milk.

Sale (Request No. 3; Request No. 55, Dean Specification 7); (3) DFA or Dean's valuation(s) of the Carolinas Plaints alone or in any combination (Request No. 19; Request No. 55, Dean Specification 16); (4) Dean's filing for bankruptcy, search for alternative options or bidders, and decision to sell its assets rather than restructure or reorganize (Request No. 20; Request Nos. 51(b), (g), and (h); Request No. 55, Dean Specification 6); (5) DFA's decision to make a single, all-or-nothing bid for the Dean assets (Request No. 18); and (6) work performed by consultants to DFA or Dean in connection with these events (Request No. 12 (financial advisors, investment bankers, rating agencies); Request No. 56 (Keith Flanagan and Chris Keyes); Request No. 57-59 (Mentor Valuations Group, as to legacy Dean)).

DFA has not sought a protective order over <u>any</u> of these Requests, and in most instances agreed to engage in search term negotiations or responded by reference to an allegedly "duplicative" request for which it agreed to engage in search terms. *See* Exhibits A-G. And rightfully so, as these Requests relate directly to dozens of allegations in Plaintiffs' Complaint concerning DFA and Dean's strategic maneuvering in connection with the bankruptcy and the Asset Sale [ECF No. 1, ¶¶ 86-96, 137-39, 151, 166]; and DFA's failing firm defense, under which it must establish that Dean could not reorganize or restructure and made unsuccessful good-faith efforts to find alternative purchasers. The parties' valuation of the Carolina plants and DFA's decision to submit (and Dean's decision to accept) an all-or-nothing bid also bear on whether DFA and/or Dean viewed (or views) the relevant assets as valuable for their processing capacity, their re-sale potential, or—to keep them from the hands of competitors—their potential for closure,

consolidation, or reduction. In addition, documents and communications surrounding Dean's business failings and, ultimately, the Asset Sale, will reflect discussions of DFA's plans, analyses, market assessments, and commitments to investors or rating agencies regarding the effects of the Asset Sale versus other "rescue" strategies that DFA and/or Dean considered. DFA has served over ten requests on Plaintiffs seeking all of Plaintiffs' documents and communications concerning the same proceedings.

Search terms specifically bearing on these issues are highlighted in blue. The first batch of these terms (Lines 11-12, 14, 16, 25, 49, 61, 71, 73) asks DFA to search documents related to (1) "bankruptcy," "Chapter 11," "Dean," the code names used in connection with the Asset Sale ("Creamery," "Dove," and "Dragon"), or certain terms specific to the Relevant Area (the Carolinas Plants' names, brands ("Dairy Fresh" and "Pet") and locations, and Plaintiff MDVA terms), together with (2) ten narrow terms that relate to antitrust or competition[7]. Thus far, however, DFA has only agreed to a version of these searches that requires use of the exact words "antitrust," "competition," or "DOJ." And DFA is refusing to even search those inadequate strings against any of its five legacy Dean custodians. This will not suffice. DFA has offered no reason either to

---

[7] Plaintiffs modeled these ten terms on those that DFA and Food Lion have agreed Food Lion will search for documents responsive to DFA's corresponding requests, including:

    a. ("Southern Foods" OR milk) w/25 (bankrupt* OR "Chapter 11" OR DOJ OR "Dep* /3 Justice" OR "asset sale")

    b. milk AND (antitrust OR monopo* OR bankruptc*)

    c. milk w/25 (compet* OR "anti trust" OR anticompetitive OR "anti competitive" OR compet* OR illegal*)

- 10 -

exclude the legacy Dean custodians or to narrow the relevant searches in the manner currently proposed by DFA.

Next, Plaintiffs proposed five searches (Lines 77 and 252-253, 308-309) regarding the consultants, financial advisors, bondholders, noteholders, ad hoc committee, and rating agencies that participated in or assisted with the bankruptcy or the Asset Sale.[8] DFA has offered to search only two of its custodians for a single of these searches (Line 253), without offering any hit counts or justification as to why the other legacy DFA and legacy Dean individuals intimately involved with the Asset Sale should not be searched. The other four it has ignored entirely.

Plaintiffs also propose running searches with key bankruptcy terms (asset, bankrupt*, bid, "Chapter 11," "Project Cream" "Creamery," "Dove," "Dragon"), within close proximity of terms that bear on competition[9] (Lines 87, 89), strategic plans or analyses (Lines 218, 247), meetings referencing code names (Line 263), market assessments or projections (Line 185, 194, 275), or the DFA-Dean supply agreement (Line 305). DFA ignored most of these proposed searches, while offering a single DFA custodian and no legacy Dean custodian on Line 305.

---

[8] Exhibit P reflects deletions of three problematic terms in Line 77 that were raised in DFA's October 29 letter.

[9] Plaintiffs modeled these "competition terms" on those that DFA and Food Lion have agreed Food Lion will search for documents responsive to DFA's corresponding requests, including searches for over fifty terms specific to the Relevant Area within 25 words of "(limit* OR prevent* OR bar* OR weak* OR lessen* OR reduc* OR exclu* OR foreclos* OR rais* OR increas* OR decreas* OR strength* OR strong* OR impact* OR effect* OR constrain* OR restrain* OR close* OR closing)." Plaintiffs are searching over 58,600 documents hitting on these searches.

Finally, Plaintiffs propose the searches at Line 254-259, which require that either bankruptcy- or Relevant-Area-related terms appear within close proximity of a string aimed at uncovering discussions of DFA's or Dean's financing, restructuring, reorganization, or purchasing prospects with respect to the relevant assets. Despite twice agreeing to run searches under Request No. 20, DFA ignored five of these requests and offered a single custodian as to the sixth. Plaintiffs also proposed the searches that require the same starting terms within close proximity of either (1) a string aimed at DFA's or Dean's valuations, appraisals, stalking horse bid, and decision to submit and accept an all-or-nothing rather than a piecemeal bid (Lines 266-269)[10]; or (2) a string aimed at DFA's or Dean's discussions of winding down, reorganization, or liquidation of the subject assets (Lines 270-273). Despite being squarely called for under Request Nos. 18-22, for which DFA has agreed to negotiate search terms, six of these proposals have gone unaddressed, and DFA offers only three custodians for the remaining two.

As with all other searches subject to this motion, DFA has offered no metrics and no substantive reasons based on sampling or investigations as to why the hit counts for these highly probative searches are not justified and cannot be appropriately narrowed. Plaintiffs have been eager and willing to negotiate search terms for over two months, and cannot allow DFA to delay further on this important first category of searches.

---

[10] Line 267 was one of the nine searches for which DFA has alleged an overbreadth problem related to "bid" appearing on both sides of the string. Plaintiffs' proposal in Exhibit P eliminates "bid*" from the second half.

**B. Search terms concerning DFA and Dean's assessments of and plans for (1) the Carolinas Plants; and (2) the supply of raw or fluid milk in the Relevant Area (Exhibit P, green highlights)**

A related category is documents that concern DFA or Dean's assessments, studies, and analyses of and plans for the Carolinas plants and the supply of raw or fluid milk in the Relevant Area over the past four years. Specifically, DFA's discovery responses and objections agreed to engage in search term negotiations concerning Requests for documents concerning: (1) studies and analyses regarding the supply of raw or fluid milk in the Relevant Area (Request No. 4); (2) DFA's plans for the Carolinas plants (Request No. 22); (3) "studies, business plans, planning documents, analysis, reports, strategies, pro formas, and modeling" concerning the MilkCo, Borden, Kroger, and other processing facilities in the Relevant Area (Request No. 28); (4) forecasted orders in 2020, 2021, or 2022 by DFA customers of raw or fluid milk in the Relevant Area (Request No. 30); (5) processing capacities and percentage utilization of the Carolinas plants and other processing plants in the Relevant Area (Request No. 34); and (6) bids and proposals for the supply of raw or fluid milk in, into, or from the Relevant Area (Request No. 3). In addition, DFA's motion for a protective order was denied as to Request No. 26, seeking documents concerning "any analyses, studies, strategies, plans, assessments, or reports concerning market conditions, market participants, market shares, or competitors in the production, processing, or sale of raw milk or processed milk in, into, or from the Relevant Area." [ECF No. 66, at 4-6 (explaining that such documents are "certainly relevant").]

- 13 -

Despite agreeing in its responses and objections (Exhibit B) and again in a September 28 letter (Exhibit D) that these Requests are appropriate for search terms, DFA has ignored almost all of Plaintiffs' proposed search strings aimed at these Requests. And at the same time, DFA has propounded almost identical requests on Plaintiffs (DFA Request No. 3 to Food Lion, "All Documents and Communications relating to the former Dean plans in North or South Carolina, including . . . any of Your planning, strategy, pro formas, and modeling relating to any of these plants"; DFA Request No. 7 to Food Lion, "All Documents reflecting Your actual or contemplated business plans, commercial strategies, planning documents, and any analyses, studies, or reports relating to the procurement of Fluid Milk in, into, or from the Relevant Area"). The parties have agreed on search terms for these Requests that Food Lion has run across all of its custodians and is currently reviewing over 52,000 responsive documents (without families). For DFA to now refuse to engage in negotiations concerning corresponding searches for its own responsive documents is unacceptable.

Searches targeted at Plaintiffs' Requests concerning DFA's and Dean's strategies, plans, reports, and assessments concerning the Carolinas Plants or the Relevant Area, are highlighted in green. The first bucket concerns the specific names of the Carolinas Plants or their milk brands or city names, together with search strings aimed at competition issues and bids and requests for proposals. *See, e.g.*, Lines 12, 25, 49, 61, 71, 88, 92, 105, 113, 119, 125. DFA has not agreed to run the bids and proposals searches against any legacy Dean individuals. Line 171 is aimed at uncovering documents concerning pricing from the Carolinas Plants responsive to Request No. 31, which DFA had originally

- 14 -

included in its motion for a protective order but agreed to as revised. *See* Exhibits E, F. Lines 179, 188, 201-212, 237-245, 260, 281 and 303 seek information concerning the Carolinas Plants together with terms aimed at prospective analyses, specific aspects of those plants' operations, or the DFA-Dean supply agreement. In the few places where DFA offers select custodians for one of these searches, DFA has neither explained why the remaining custodians are not appropriate or what narrowing principles it proposes to achieve proportional results for other custodians.

Other searches were crafted with an eye toward addressing the topical Requests above. These requests include those aimed at DFA or Dean's market outlooks and forecasts for the Carolinas Plants or the Relevant Area (Lines 179-180, 182-184, 188-192), plans to sell, shut down, consolidate the Carolinas Plants (Lines 201-208), strategic assessments and plans with respect to the Carolinas Plants or the Relevant Area generally (Lines 209-212, 218, 227, 237-245, 254, 260, 274, 278, 281 and 290), plans in connection with the bankruptcy or Asset Sale (Lines 253-254, 257-259, 266, 270), and plans, assessments, or reports concerning other raw milk producers, fluid milk processors, or fluid milk customers in the Relevant Area (Lines 174-175, 219-222, 284, 286). Absent any constructive guidance as to metrics, undue burden in light of the proportion of relevant documents to non-relevant ones in light of the hit counts, or suggestions as to how these searches can be modified to address their alleged overbreadth as to specific custodians, Plaintiffs request that DFA be compelled to run against all of its custodians those searches for which DFA has not offered a good-faith solution.

## C. Search terms concerning DFA and Dean's assessments of and agreements and business dealings with each other (Exhibit P, orange highlights)

At issue in a third category of search terms are the Requests targeting the DFA-Dean relationship that is the central issue in this litigation, specifically those seeking documents concerning (1) DFA and Dean's discussions internally, with each other, or with third parties regarding each other, their promissory note, or the sale or purchase of raw or fluid milk to or from each other in the Relevant Area (Request No. 3; Request Nos. 12-16, as revised; Request No. 55, Dean Specifications 9-12, 25); (2) either's status as a market participant or its possession of market shares in the Relevant Area (Request No. 26); (3) the Carolinas Plants (Request No. 28); (4) either entity's price lists, pricing strategies, plant or processor distances, processing capacities, or quality or nature of services provided in connection with raw or fluid milk in the Relevant Area (Request No. 31-35; Request No. 55, Dean Specification 25); (5) the DFA-Dean supply agreements, DFA's actual or contemplated enforcement of or exercise of rights thereunder, and Dean's analysis of its rights and obligations thereunder (Request No. 38-39); (6) Cumberland Dairy's reduction or elimination in volume of raw milk from MDVA in favor of DFA (Request No. 40; Request No. 55, Dean Specification 24); and (7) DFA and Dean's assessments of and decisions with respect to each other during the bankruptcy proceedings (see *infra* Category A). [11] DFA has not obtained a protective order over any

---

[11] For Request Nos. 35 and 38-39, DFA's September 28 letter (Exhibit D) indicates that it is "stand[ing] on its objections and responses to this Request." As shown in Exhibit B, DFA's responses indicate its willingness to negotiate certain search terms and custodians subject to its objections to these Requests.

of these requests; and has either agreed to engage in search term negotiations, or else has lost its motion for a protective order, concerning most of them.

These categories of documents are relevant because Plaintiffs' Complaint tells the story of a decades-long relationship between DFA and Dean in which DFA has recently been able to leverage its supply arrangement with Dean to eliminate or weaken its competitors. The two struck a 2001 horizontal non-compete—a "corrupt bargain"—that also involved a $40 million promissory note under which Dean promised to purchase all its raw milk from DFA. ECF No. 1, ¶¶43-48. Subsequent conduct enabled by the note and supply agreement, including DFA's leveraging the promissory note and full-supply rights and forcing Dean to push MDVA out of its processing plants, "have materially harmed competition." *Id*. ¶¶50, 59-62. The two continued their collusion for years before and throughout the bankruptcy process, ensuring that DFA alone would come away with the majority of Dean's assets and permanently foreclosing DFA's competitors. *Id*. ¶¶86-90, 109-120. Plaintiffs are entitled to discovery to prove these allegations.

Highlighted in orange in Exhibit P are those search terms targeting to the DFA-Dean relationship. Specifically, Plaintiffs crafted separate searches for legacy custodians from each of the entities to hit upon mention of each other's names in the context of the searches crafted under Plaintiffs' pending discovery requests (legacy DFA searches at 120, 168, 177, 186, 195, 223, 231, 248, 258, 261, 268, 272, 276, 299, 306); legacy Dean searches at Lines 121, 169, 178, 187, 196, 224, 232, 249, 259, 262, 269, 273, 277, 300, 307). Plaintiffs also proposed searches expressly targeting discussions of the promissory note and exclusive or full supply arrangements (Lines 122, 170, 260-262, 303, 305-307),

- 17 -

the Carolinas Plants or bankruptcy or Asset sale code names in proximity with competition terms or bids and proposals (Lines 87-89, 92, 105, 113, 119, 125-128), and Carolinas Plants, Relevant Area, or Asset Sale terms in proximity with search strings that target price lists or pricing strategies (Line 171), market assessments or forecasting (Lines 179, 185, 188, 194), and strategic plans, assessments, and discussions with respect to each other's raw or fluid milk business (Lines 201-212, 218, 237-245, 247, 252-254, 257, 266-267, 270-271, 274-275, 278, 281, 290, 298). DFA has offered no reason why searches concerning either its business relationship with Dean or the raw or fluid milk services performed by DFA or the legacy Dean assets in the Relevant Area, upon which Plaintiffs' entire case is centered, are not appropriate or proportional to run across their custodians as requested.

**D. Search terms concerning raw milk competition with MDVA and other raw milk producers or cooperatives in the Relevant Area (Exhibit P, yellow highlights)**

DFA also has refused to run adequate searches to uncover documents responsive to Plaintiffs' numerous Requests targeting (1) DFA and Dean's discussions internally, with each other, and with third parties regarding the sale or purchase of raw or fluid milk in the Relevant Area (Request No. 3; Request Nos. 12-15, as revised; Request No. 55, Dean Specifications 9-12); (2) DFA or Dean's "analyses, studies, strategies, plans, assessments, or reports concerning market conditions, market participants, market shares, or competitors in the production, processing, or sale of raw milk or processed milk in, into, or from the Relevant Area" (Request No. 26); (3) the processing facilities in the Relevant Area for which DFA and its competitors compete for the supply of raw milk

- 18 -

(Request Nos. 28, 34); (4) DFA's or its competitors' price lists or pricing strategies in connection with raw milk (Request No. 31); (5) the impact of plant distances on competition in the Relevant Area (Request No. 33); (6) milk quality or services provided by DFA or its competitors (Request No. 35; Request No. 55, Dean Specification 23); and (7) barriers, requirements, or costs for entry into the raw or fluid milk production markets (Request No. 36).

In addition, two Requests initially served on Dean that were incorporated by the Third Requests to DFA ask for documents concerning (1) Dean's decisions to purchase or reduce purchases of raw milk MDVA (Request No. 55, Dean Specification 24); and (2) Dean communications with MDVA (*id.*). Also included in this "raw milk competitors" category are several Requests for which DFA's protective order motion was denied, which concern DFA and Dean's strategies and actions with respect to Plaintiff MDVA (Request No. 27, seeking documents concerning "MDVA, its farmer-members, or any other non-DFA producer of raw milk in the Relevant Area"), the reduction or elimination in volume or raw milk from MDVA at DFA's Cumberland Dairy plant (Request No. 40); and communications between DFA or Dean and Cobblestone Milk Cooperative or its members (Request No. 48). Magistrate Judge Webster found that these requests sought relevant information and were sufficiently tailored to avoid proportionality issues. ECF No. 66, at 7-9, 14.

DFA has not obtained a protective order over any of these Requests, and in most instances has either expressly agreed to or been ordered to search for documents responsive to them. Thus far, however, it has shown little willingness to do so.

- 19 -

Highlighted in yellow are those search terms that Plaintiffs submit bear on competition in the Relevant Area. As with the Category A, the first bucket of these are permutations of certain of DFA's 75 proposed searches under Request No. 3 that relate to the Relevant Area (Lines 2-76), for which DFA has refused without reason to add the competition terms proposed by Plaintiffs and to search these strings across legacy Dean custodians. The same holds for Line 78 (asking about Carolinas Plant terms with "power" or "share"), which DFA is not offering to run across legacy Dean custodians. Also included are those searches that use the same Relevant Area terms within close proximity of terms that bear on market power and competition described in Category A (Lines 80-118). DFA has not responded to or offered a single custodian for these searches.

Plaintiffs next propose searches targeted at uncovering documents concerning: (1) the exclusion of MDVA, which DFA is refusing to run against legacy Dean custodians (Line 123); (2) other discussions of MDVA, DFA's primary regional competitor (Lines 157, 174, 182, 191, 219, 292-294); (3) bids prices, and logistics to supply raw milk to certain Dean and non-Dean processing plants (Lines 150-152, 154-157, 161-163, 166-167, 175, 284, 295, 304), (4) discussions of other raw milk competitors (Line 184, 286, 296-297); (5) strategy discussions and market assessments and forecasts with respect to the Relevant Area (Lines 183, 189, 192, 220-221); and (6) barriers, expenses, and other difficulties of entry into the market (Lines 301-302), with DFA offering to run this final search only on two DFA and no legacy Dean custodians. Without any insight from DFA regarding the propriety or appropriate narrowing principles for these searches, Plaintiffs propose to run them in their current form.

- 20 -

### E. Documents targeting DFA and Dean's business with and discussions of Food Lion (Exhibit P, pink highlights)

The final category that warrants inclusion in DFA's searches without further delay are search strings targeting DFA or Dean's business with respect to Plaintiff Food Lion. Plaintiffs issued multiple Requests concerning processed milk customers such as Food Lion (among others, Request Nos. 30 (forecasted orders), 31 (pricing), and 53 (transportation costs)), in addition to specifically calling out Food Lion in Request No. 29 ("all documents concerning or relating to the supply of processed milk in, into, or from the Relevant Area by DFA, Dean, or a competitor, to Food Lion"), for which DFA's motion for a protective order was denied. Magistrate Judge Webster "recognize[d] the importance of [the information sought by Request No. 29] to proving rising milk prices, the alleged antitrust injury suffered by Plaintiff Food Lion." ECF No. 77, at 7-8. Where DFA has asked Food Lion to review over 300,000 documents concerning its procurement of fluid milk, it is only appropriate that DFA search its own files for documents bearing directly on the same subject.

Plaintiffs request that DFA run the searches at Lines 158-160, 164 (but only "Dunn OR Salisbury OR Elloree") and the "Food Lion" part of Lines 165, 176, 193, 222, and 285,[12] across DFA and Dean custodians who had involvement in discussions of processed milk bidding or sales to Food Lion. Notably, DFA's new proposals to address the court-ordered Request No. 29 (Lines 159-160) require that "Food Lion" appear <u>within</u>

---

[12] These searches contain an error whereby "Food Lion" is missing a space and therefore is not proposed to be included. Plaintiffs propose that the searches use ("Food Lion" or FoodLion) in their first half.

- 21 -

<u>five words</u> of "sell" or "sale," and against only one legacy DFA custodian and two legacy Dean custodians. This will not suffice to satisfy DFA's discovery obligations with respect to one of only two plaintiffs.

***

For the remainder of the searches outside these five categories, and for those that the Court determines not to order DFA to extract without further delay, Plaintiffs ask that the Court order DFA to provide metrics, substantive justification, and proposed narrowing principles within three (3) days of adjudication of this motion.

<u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs request that the Court order DFA to extract and review the five color-coded, highly probative search categories in Exhibit P across its custodians; and to provide metrics, substantive justification, and proposed narrowing principles regarding the remainder of Plaintiffs' proposed searches. Plaintiffs make this Request without prejudice to their right to move for the addition of other terms if DFA continues to resist negotiations on the remainder of their search strings, and in particular if DFA does not shortly offer terms appropriate under those Requests (Nos. 26, 27, 40, and 48) for which the Court just denied its objection to the Magistrate Judge's recommendation on their motion for a protective order [ECF No. 82].

Plaintiffs respectfully request expedited consideration of this motion when it is fully briefed, in light of its proximity to the document production deadline.

- 22 -

DATED:  November 5, 2020        Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

s/ Ryan G. Rich
A. Todd Brown, Sr., N.C. State Bar No. 13806
Ryan G. Rich, N.C. State Bar No. 37015
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: (704) 378-4700
tbrown@huntonak.com
rrich@huntonak.com

Ryan P. Phair (*admitted pro hac vice*)
John S. Martin (*admitted pro hac vice*)
Kevin Hahm (*admitted pro hac vice*)
Carter C. Simpson (*admitted pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone: (202) 955-1500
rphair@huntonak.com
martinj@huntonak.com
khahm@huntonak.com
csimpson@huntonak.com

*Attorneys for Food Lion, LLC*

**TROUTMAN PEPPER
HAMILTON SANDERS LLP**

s/ Jason D. Evans
Jason D. Evans, N.C. State Bar No. 27808
301 S. College Street, 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1502
jason.evans@troutman.com

James A. Lamberth (by special appearance)
Alan W. Bakowski (by special appearance)
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: (404) 885-3362

- 23 -

james.lamberth@troutman.com
alan.bakowski@troutman.com

*Attorneys for Maryland and Virginia Milk*
*Producers Cooperative Association, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 72.4, the undersigned certifies that the word count for the foregoing memorandum does not exceed 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

This the 5th day of November, 2020.

s/ Ryan G. Rich
Ryan G. Rich

Case 1:20-cv-00442-CCE-JLW   Document 86   Filed 11/05/20   Page 25 of 25